**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VALUE RECAPTURE PARTNERS LLC, | |
| Plaintiff, | |
| v. | Case No. 1:23-cv-16550 |
| THE BOEING COMPANY and DENNIS A. MUILENBURG, | Hon. Virginia M. Kendall |
| Defendants. | |

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

---

John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862 2000
john.hartmann@kirkland.com
brenton.rogers@kirkland.com

Kenneth Monroe
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 385-7500
kenneth.monroe@kirkland.com

*Counsel for Defendants*

Dated: August 15, 2025

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT .......................................................................... 1

BACKGROUND .......................................................................................... 3

I.      BOEING'S 737 MAX AIRCRAFT ...................................................... 3

II.     PLAINTIFF'S ALLEGATIONS ........................................................... 7

ARGUMENT ............................................................................................. 8

I.      PLAINTIFF LACKS STANDING TO ASSERT SECURITIES-FRAUD CLAIMS
        AS AN ALLEGED ASSIGNEE. ........................................................... 8

II.     PLAINTIFF'S CLAIMS ARE TIME-BARRED ..................................... 10

        A.      The five-year statute of repose bars claims based on statements made
                before December 6, 2018. ..................................................... 11

        B.      The two-year statute of limitations bars claims based on the remaining
                statements .......................................................................... 12

III.    PLAINTIFF FAILS TO STATE A CLAIM FOR SECURITIES FRAUD. ..... 14

        A.      Plaintiff does not adequately plead a material misstatement. ......... 15

        B.      Plaintiff does not plead particularized facts giving rise to a "strong
                inference" that the speakers of the challenged statements acted with
                scienter. ............................................................................ 36

        C.      The more compelling inference from Plaintiff's allegations is that
                Defendants did not act with scienter. ...................................... 43

IV.     PLAINTIFF DOES NOT ADEQUATELY PLEAD LOSS CAUSATION. ...... 45

CONCLUSION ........................................................................................ 50

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aly v. Valeant Pharm. Int'l Inc*,
 1 F.4th 168 (3d Cir. 2021) ..................................................................................................14

*American Pipe & Constr. Co. v. Utah*,
 414 U.S. 538 (1974)..................................................................................................12, 13, 14

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
 572 F.3d 440 (7th Cir. 2009) ...............................................................................................8, 9

*Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*,
 99 F.4th 928 (7th Cir. 2024) ................................................................................................11

*Asher v. Baxter Int'l, Inc.*,
 377 F.3d (7th Cir. 2004) ..................................................................................................31, 32, 35

*Aviva Life & Annuity Co. v. Davis*,
 20 F. Supp. 3d 694 (S.D. Iowa 2014) ...................................................................................9

*Aviva Life & Annuity Co. v. Davis*,
 2014 WL 12366406 ..............................................................................................................9

*Blue Chip Stamps v. Manor Drug Stores*,
 421 U.S. 723 (1975).......................................................................................................8, 9, 10

*In re: BP p.l.c. Sec. Litig.*,
 2016 WL 29300 (S.D. Tex. Jan. 4, 2016) ..........................................................................9, 10

*Cause of Action v. Chicago Transit Auth.*,
 815 F.3d 267 (7th Cir. 2016) ..............................................................................................25

*In re Ceridian Sec. Litig.*,
 542 F.3d 240 (8th Cir. 2008) ..............................................................................................43

*Chandler v. Ulta Beauty, Inc.*,
 2022 WL 952441 (N.D. Ill. Mar. 30, 2022).........................................................................42

*China Agritech v. Resh*,
 584 U.S. 732 (2018)..............................................................................................................13

*City of Monroe Employment Retirement Systems v. Bridgestone*,
 399 F.3d 651 (6th Cir. 2005) ..............................................................................................16, 17

i

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
  8 F.4th 592 (7th Cir. 2021) ...................................................................................16

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
  70 F.4th 668 (3d Cir. 2023) ...................................................................................23

*City of Westland Police and Fire Ret. Sys. v. MetLife¸*
  129 F. Supp. 3d 48 (S.D.N.Y. 2015).....................................................................36

*College Ret. Equities Fund v. The Boeing Co.*,
  2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ................................................ *passim*

*Crown, Cork & Seal Co., Inc. v. Parker*,
  462 U.S. 345 (1983)................................................................................................13

*CTS Corp. v. Waldburger*,
  573 U.S. 1 (2014)....................................................................................................11

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010) ...............................................................................34

*Denius v. Dunlap*,
  330 F.3d 919 (7th Cir. 2003) ...................................................................................5

*DiLeo v. Ernst & Young*,
  901 F.2d 624 (7th Cir. 1990) .................................................................................15

*Dobyns v. Trauter*,
  552 F. Supp. 2d 1150 (W.D. Wash. 2008).................................................................9

*Dura Pharm. v. Broudo*,
  544 U.S. 336 (2005)..........................................................................................15, 45

*ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)..............................................................................18, 19

*Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) .................................................................................19

*In re Ford Motor Co. Securities Litigation*,
  381 F.3d 563 (6th Cir. 2004) .................................................................................20

*Gillis v. QRX Pharma*,
  197 F. Supp. 3d 557 (S.D.N.Y. 2016)....................................................................20

*Glater v. Eli Lilly & Co.*,
  712 F.2d 735 (1st Cir. 1983)...................................................................................14

ii

*In re Hanford Nuclear Rsrv. Litig.*,
   534 F.3d 986 (9th Cir. 2008) ...................................................................................14

*Higginbotham v. Baxter Int'l Inc.*,
   495 F.3d 753 (7th Cir. 2007) ...................................................................................36

*Hirtenstein v. Cempra, Inc.*,
   348 F. Supp. 3d 530 (M.D.N.C. 2018) .....................................................................20

*Holwill v. AbbVie Inc.*,
   2025 WL 1908156 (N.D. Ill. July 10, 2025)............................................................48

*Howe v. Shchekin*,
   238 F. Supp. 3d 1046 (N.D. Ill. 2017) .....................................................................11

*Katyle v. Penn Nat'l Gaming, Inc.*,
   637 F.3d 462 (4th Cir. 2011) ...................................................................................46

*Kuwait Inv. Off. v. Am. Int'l Grp., Inc.*,
   128 F. Supp. 3d 792 (S.D.N.Y. 2015).......................................................................11

*Levine v. Bally Total Fitness Holding Corp.*,
   2006 WL 8460936 (N.D. Ill. Sept. 29, 2006) ..........................................................11

*In re Liberty Tax, Inc. Sec. Litig.*,
   435 F. Supp. 3d 457 (E.D.N.Y. 2020) ......................................................................50

*Logan v. Wilkins*,
   644 F.3d 577 (7th Cir. 2011) ...................................................................................10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds*, *Tellabs*, 551 U.S. 308............16, 37, 39

*McCann v. Hy-Vee, Inc.*,
   663 F.3d 926 (7th Cir. 2011) ...................................................................................11

*Merck & Co., Inc. v. Reynolds*,
   559 U.S. 633 (2010)...........................................................................................11, 12

*In re Midway Games, Inc. Sec. Litig.*,
   332 F. Supp. 2d 1152 (N.D. Ill. 2004) .....................................................................34

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
   300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret.
   Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ..............................................19

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
  575 U.S. 175 (2015)........................................................................................ *passim*

*In re Omnicom Sec. Litig.,*
  597 F.3d 501 (2d Cir. 2010)......................................................................................46

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v.*
  *Allscripts-Misys Healthcare Sols., Inc.,*
  778 F. Supp. 2d 858 (N.D. Ill. 2011) .......................................................................34

*Pugh v. Tribune Co.,*
  521 F.3d 686 (7th Cir. 2008) ...............................................................37, 41, 43, 50

*Rowe v. Maremont Corp.,*
  850 F.2d 1226 (7th Cir. 1988) .................................................................................15

*Schmude v. Sheahan,*
  312 F. Supp. 2d 1047 (N.D. Ill. 2004) .....................................................................25

*Seeks v. The Boeing Co.,*
  752 F. Supp. 3d 992 (N.D. Ill. 2024) .................................................................18, 46

*Smith v. Ayers,*
  977 F.2d 946 (5th Cir. 1992) .................................................................................8, 9

*Société Général Sec. Servs., GBMH v. Caterpillar, Inc.,*
  2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ..........................................................42

*St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.,*
  2011 WL 814932 (N.D. Ill. Feb. 28, 2011) ........................................................32, 34

*State Farm Mut. Auto. Ins. Co. v. Boellstorff,*
  540 F.3d 1223 (10th Cir. 2008) ...............................................................................14

*Tellabs v. Makor Issues & Rights,*
  551 U.S. 308 (2007)......................................................................15, 37, 38, 43

*In re The Boeing Co. Aircraft Sec. Litig.,*
  2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ................................................. *passim*

*Tricontinental Indus., Ltd. v. PwC,*
  475 F.3d 824 (7th Cir. 2007) ...................................................................................45

*TSC Indus., Inc. v. Northway, Inc.,*
  426 U.S. 438 (1976)..................................................................................................16

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
987 F.2d 429 (7th Cir. 1993) ........................................................................................5

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
2 F.4th 1199 (9th Cir. 2021) ........................................................................................15

*Wachovia Bank & Trust Co. v. Nat'l Student Mktg. Corp.*,
650 F.2d 342 (D.C. Cir. 1980) ....................................................................................14

*In re WorldCom Sec. Litig.*,
496 F.3d 245 (2d Cir. 2007)..........................................................................................14

*Wyser-Pratte Mgmt Co., Inc. v. Telxon Corp.*,
413 F.3d 553 (6th Cir. 2005) ........................................................................................13

*In re Yum! Brands Sec. Litig.*,
73 F. Supp. 3d 846 (W.D. Ky. 2014).............................................................................20

*Zucco Partners v. Digimarc Corp.*,
552 F.3d 981 (9th Cir. 2009) ........................................................................................43

**Statutes**

15 U.S.C. § 78u-4(b)(1) ...............................................................................................42

15 U.S.C. § 78u-4(b)(2)(A)......................................................................................15, 37

15 U.S.C. § 78u-5(i)(1)(B)............................................................................................31

15 U.S.C. § 78u-5(i)(1)(C)............................................................................................31

15 U.S.C. § 78u-5(c)(1)(B)...........................................................................................34

15 U.S.C. § 78u-5(c)(1)(B)(i) ..................................................................................31, 35

28 U.S.C. § 78u-5(c)(1)(A)(i) .......................................................................................31

28 U.S.C. § 1658(b) .................................................................................................1, 10

28 U.S.C. § 1658(b)(1) .................................................................................................12

28 U.S.C. § 1658(b)(2) .................................................................................................11

49 U.S.C. § 44701........................................................................................................5

Securities Act § 10(b) ......................................................................................... *passim*

Securities Act § 20(a)...................................................................................................50

61 Stat. 1180 ................................................................................................................18

**Rules**

Fed. R. Civ. P. 9(b) ..................................................................................................1, 15

Fed. R. Civ. P. 12(b)(1)............................................................................................9, 10

**Other Authorities**

49 C.F.R. § 831.13 .......................................................................................................18

**TABLE OF EXHIBITS TO DEFENDANTS' MOTION TO DISMISS**

| Exhibit Number | Exhibit Name |
|---|---|
| 1 | November 6, 2018 737 MAX Flight Crew Operations Manual Bulletin for The Boeing Company<br><br>*https://theaircurrent.com/wp-content/uploads/2018/11/boeing-737-max-service-bulletin-AOA-1920x1579.jpeg* |
| 2 | November 7, 2018 FAA Airworthiness Directive re The Boeing Company Airplanes<br><br>*https://theaircurrent.com/wp-content/uploads/2018/11/B737-MAX-AD-1107.pdf* |
| 3 | November 10, 2018 Boeing MOM re Multi-Model Stall Warning and Pitch Augmentation Operation<br><br>*https://aviation-is.better-than.tv/737%20MAX%202018%20-%20035%20-%20PK-LQP%20Final%20Report.pdf* |
| 4 | November 13, 2018 *The Seattle Times*, U.S. Pilots Flying 737 MAX Weren't Told About New Automatic Systems Change Linked to Lion Air Crash<br><br>*https://www.seattletimes.com/business/boeing-aerospace/u-s-pilots-flying-737-max-werent-told-about-new-automatic-systems-change-linked-to-lion-air-crash/* |
| 5 | November 21, 2018 Boeing Press Release re Lion Air Flight 610 Preliminary Report<br><br>*https://boeing.mediaroom.com/news-releases-statements?item=130333* |
| 6 | November 27, 2018 Boeing Press Release re Lion Air Flight JT 610 Investigation<br><br>*https://boeing.mediaroom.com/news-releases-statements?item=130336* |
| 7 | November 2018 Lion Air 310 Preliminary Accident Report<br><br>*http://jacdec.de/database/2018-10-29_PK-LQP-NTSC_Preliminary%20Report.pdf* |
| 8 | March 11, 2019 Boeing Press Release re 737 MAX Software Enhancement<br><br>*https://boeing.mediaroom.com/news-releases-statements?item=130402* |
| 9 | March 11, 2019 Continued Airworthiness Notification to the International Community (CANIC)<br><br>*https://www.faa.gov/sites/faa.gov/files/2021-* |

i

| Exhibit Number | Exhibit Name |
| --- | --- |
| | *08/Continued%20Airworthiness%20Notification%20to%20the%20International%20Community.pdf* |
| 10 | March 17, 2019 *The Seattle Times*, Flawed Analysis, Failed Oversight: How Boeing, FAA Certified the Suspect 737 MAX Flight Control System<br><br>*https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/* |
| 11 | March 31, 2019 *Reuters*, Regulators Knew Before Crashes That 737 MAX Trim Control Was Confusing In Some Conditions<br><br>*https://www.reuters.com/article/markets/corrected-insight-regulators-knew-before-crashes-that-737-max-trim-control-was-c-idUSL3N21G2D8/* |
| 12 | April 3, 2019 *The Seattle Times*, Why Boeing's Emergency Directions May Have Failed to Save 737 MAX<br><br>*https://www.seattletimes.com/business/boeing-aerospace/boeings-emergency-procedure-for-737-max-may-have-failed-on-ethiopian-flight/* |
| 13 | April 24, 2019 Boeing Q1 10-Q 2019<br><br>*https://www.sec.gov/Archives/edgar/data/12927/000001292719000030/a201903mar3110-q.htm* |
| 14 | April 29, 2019 Boeing Annual Meeting of Shareholders Transcript<br><br>*https://www.youtube.com/watch?v=zzDk4dVHo4k* |
| 15 | May 29, 2019 Boeing Investor Conference Transcript<br><br>*https://s2.q4cdn.com/661678649/files/doc_transcripts/2019/05/2019-Bernstein-Conference-Transcript.pdf* |
| 16 | June 1, 2019 *The New York Times*, Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change<br><br>*https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html* |
| 17 | June 26, 2019 Boeing Aspen Ideas Festival Transcript |

| Exhibit Number | Exhibit Name |
|---|---|
| 18 | June 26, 2019 Boeing 8-K 2019<br><br>*https://www.sec.gov/Archives/edgar/data/12927/000001292719000049/a201906jun268k.htm* |
| 19 | July 18, 2019 Boeing Press Release re Increased Costs Due to 737 MAX Grounding<br><br>*https://boeing.mediaroom.com/2019-07-18-Boeing-to-Recognize-Charge-and-Increased-Costs-in-Second-Quarter-Due-to-737-MAX-Grounding* |
| 20 | July 24, 2019 Boeing 2Q19 Earnings Call Transcript<br><br>*https://s2.q4cdn.com/661678649/files/doc_downloads/2019/07/2Q19-Earnings-Call-Transcript.pdf* |
| 21 | July 24, 2019 Boeing 2019 2Q 10-Q<br><br>*https://content.edgar-online.com/ExternalLink/EDGAR/0000012927-19-000063.html?hash=70449880153930ef11c3acc04258239f159721ae966de096a12230c4e863e412&dest=A201906JUN3010QEXHIBIT101_HTM#A201906JUN3010QEXHIBIT101_HTM* |
| 22 | September 11, 2019 Boeing Morgan Stanley Laguna Conference Transcript<br><br>*https://s2.q4cdn.com/661678649/files/doc_transcripts/2019/09/11/2019-Morgan-Stanley-Conference-Transcript.pdf* |
| 23 | November 11, 2019 Boeing Press Release re 737 MAX Progress Report<br><br>*https://boeing.mediaroom.com/news-releases-statements?item=130556* |
| 24 | December 11, 2019 *The Seattle Times*, FAA Won't Clear 737 MAX Fixes Until 2020, Agency Chief Says<br><br>*https://www.seattletimes.com/business/boeing-aerospace/boeing-737-max-certification-to-extend-into-2020-faa-chief-says/* |
| 25 | December 11, 2019 *CNBC*, FAA Chief Says Boeing 737 MAX Recertification too Stretch Into 2020<br><br>*https://www.cnbc.com/2019/12/11/faa-chief-says-boeing-737-max-recertification-to-stretch-into-2020.html* |

| Exhibit Number | Exhibit Name |
|---|---|
| 26 | December 11, 2019 *The Seattle Times*, As 737 MAX's Return Slips out to Mid February, FAA Boss Tells Boeing CEO to Back Off Predictions<br><br>*https://www.seattletimes.com/business/boeing-aerospace/faa-boss-tells-boeing-ceo-to-back-off-over-737-max-schedule/* |
| 27 | December 12, 2019 *Reuters*, Boeing Scuttles 2019 Timeline for 737 MAX Return After CEO Meets With U.S. FAA<br><br>*https://www.reuters.com/article/us-boeing-737max/boeing-scuttles-2019-timeline-for-737-max-return-after-ceo-meets-with-u-s-faa-idUSKBN1YG26J/* |
| 28 | December 22, 2019 *The Wall Street Journal*, "We've Been Humbled": Boeing's CEO Struggles to Contain 737 MAX Crisis<br><br>*https://www.wsj.com/articles/weve-been-humbled-boeings-ceo-struggles-to-contain-737-max-crisis-11577062371?gaa_at=eafs&gaa_n=ASWzDAj-CmkA1Wh5dR4D_oeFGcDJ67wvGRmNmKLMaR6QnErjqxNHuu3xyzMiLWdmmE8%3D&gaa_ts=689fcb58&gaa_sig=0IcMthKAV_oEodYk39jRscEtSiVmqxQIxZ6hrK4RhdxKgtLobWJmzJa9l02057H0jzRXPyAmEc5mJ79KG-RZMw%3D%3D* |
| 29 | June, 17, 2020 *Business Insider*, $2.5 Billion Tiger Club Valinor Management Is Closing<br><br>*https://www.businessinsider.com/25-billion-tiger-cub-valinor-management-winding-down-firm-2020-6* |
| 30 | January 7, 2021 Deferred Prosecution Agreement<br><br>*https://www.justice.gov/criminal/criminal-vns/file/1482911/dl?inline* |
| 31 | December 16, 2022 Value Recapture Partners Letter to SEC<br><br>*https://www.sec.gov/comments/3-17582/317582-20152955-320589.pdf* |

## PRELIMINARY STATEMENT

This is the latest in a string of securities-fraud actions filed following two tragic accidents involving Boeing's 737 MAX aircraft in October 2018 and March 2019. The accidents were the subject of intense media, congressional, and regulatory scrutiny; after the second accident, regulators worldwide grounded all 737 MAX airplanes. These events understandably had a significant impact on Boeing's business and stock price. Although the accidents and the prolonged grounding of the 737 MAX readily explain the decline in Boeing's stock price, Plaintiff now tries to attribute the decline to securities fraud. But the complaint comes nowhere close to pleading the essential elements—that Defendants made material misstatements with an intent to deceive investors and that those statements caused investment losses—under the heightened pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). The complaint's flaws are glaring, and each is an independent basis for dismissal.

Before even getting to the required elements, Plaintiff's claims fail as a threshold matter. Plaintiff lacks standing because it has never purchased or sold any Boeing stock and thus has not been injured by Defendants. Plaintiff's attempt to sue as the purported assignee of unrelated parties' securities-fraud claims is invalid. Plaintiff's claims are also time-barred. Securities-fraud claims are subject to a two-year statute of limitations and a five-year statute of repose. 28 U.S.C. § 1658(b). The repose period runs from the date of each alleged misstatement, and the limitations period runs from discovery of facts constituting the alleged violation. Because Plaintiff waited until December 6, 2023, to file this lawsuit, the statute of repose bars any claim based on an alleged misstatement made before December 6, 2018, *i.e.*, all the statements made in the immediate aftermath of the first accident. Plaintiff's claims based on the remaining statements are untimely under the two-year statute of limitations and cannot be saved by equitable tolling.

Even if the Court reaches the merits, Plaintiff's securities-fraud claims fail for at least three

reasons. *First*, Plaintiff fails to allege an actionable false or misleading statement. Many of the alleged misstatements—for example, that the 737 MAX is "safe" and that safety is a "core value" at Boeing—are the kinds of highly generalized statements that courts consistently hold are not material as a matter of law and thus cannot support a securities-fraud claim. Others are statements of opinion, which are actionable as fraud only if the speaker did not actually hold the stated opinion—something Plaintiff does not allege. Still others are not actionable because Plaintiff mischaracterizes what the speaker actually said, frequently disregarding other allegations that demonstrate that the statements were neither false nor misleading.

*Second*, the complaint fails to allege that Defendants acted with scienter—*i.e*., an intent to deceive investors. The Seventh Circuit has repeatedly held that a plaintiff cannot base a securities-fraud claim on the collective knowledge of every company employee. Rather, a plaintiff must plead with particularity that the individual who made, prepared, or approved the alleged misstatement acted with the requisite mental state. Here, Plaintiff relies on allegations about what "Boeing" supposedly knew—which often relate to technical engineering judgments made at an operational level during the 737 MAX's development—without alleging what the senior Boeing executives responsible for the challenged statements knew. Plaintiff thus fails to plead particularized facts supporting the required "strong inference" that those executives acted with scienter. At minimum, any inference of scienter is less compelling than the opposing, commonsense inference that the individuals responsible for the challenged statements believed that the 737 MAX was safe, that pilots had the information and training necessary to operate the aircraft safely, and that, after the 737 MAX was grounded, their estimates of when the aircraft might return to service were reliable based on the information available to them at the time.

*Third*, Plaintiff fails to plead loss causation—*i.e*., that the disclosure of the "truth"

2

correcting the alleged misstatements *caused* an investment loss by eliminating the "inflation" in Boeing's stock price supposedly created by the statements. Plaintiff contends that information about the 737 MAX that was publicly disclosed on four days in 2019 "corrected" the prior misstatements and caused Boeing's stock price to fall. But Plaintiff makes no attempt to explain *how* the disclosed information even related to—much less corrected—the alleged misstatements. And in each case, there is an obvious alternative explanation for the decline in the stock price.

Accordingly, the Court should dismiss the complaint for lack of standing, as untimely, and for failure to state an actionable claim for securities fraud.

## BACKGROUND

### I.      Boeing's 737 MAX Aircraft

In August 2011, Boeing announced the launch of the 737 MAX program. Am. Compl. ¶ 66, ECF No. 28. Boeing spent almost six years developing, testing, and certifying the 737 MAX. *Id.* ¶¶ 66, 135. The 737 MAX featured larger, more efficient engines than previous generations of Boeing's 737 aircraft. *Id.* ¶ 79. Early tests showed that the 737 MAX's new engines and their position on the wings created a tendency for the aircraft's nose to pitch up during certain flight maneuvers involving a high angle of attack (the angle of the plane's nose relative to oncoming air) and high speeds, conditions not expected to occur in commercial air travel. *Id.* ¶¶ 80–82. To address this tendency, Boeing added a control law to the aircraft's flight software that would automatically adjust the nose down in those circumstances. *Id.* ¶ 84. During initial flight testing in 2016, pilots noticed that the plane "wasn't handling well when nearing stalls at low speeds." *Id.* ¶ 119. As a result, Boeing modified the control law to adjust the plane's nose down when it encountered high angles of attack at low speeds in addition to high speeds. *Id.* This control law is called the "Maneuvering Characteristics Augmentation System," or "MCAS" for short.

Before the 737 MAX could be certified for commercial service, two different groups at the

3

FAA were required to make "two distinct determinations" about the aircraft: one group determined whether the aircraft met federal airworthiness standards, and another group determined the minimum level of pilot training required to fly the aircraft. *Id.* ¶¶ 69–70. There is no dispute that Boeing disclosed the modification of MCAS to the FAA group responsible for certifying the 737 MAX as airworthy. Ex. 30 at ¶ 25; *see also* Am. Compl. ¶¶ 69–70.

On October 29, 2018, a Lion Air flight crashed shortly after takeoff. *Id.* ¶ 143. During flight, MCAS activated after receiving inaccurate information from one of the aircraft's angle-of-attack sensors, which incorrectly indicated the nose was too high. *Id.* Soon after the accident, Boeing convened an internal Safety Review Board of technical experts to begin considering what factors might have contributed to the accident and assessing fleet-wide risks. *Id.* ¶¶ 149–50. One possibility was inappropriate crew response to erroneous MCAS activation caused by a failure of an angle-of-attack sensor. *Id.* ¶ 149. The flight data recorder, which investigators provided to Boeing the week after the accident, supported this hypothesis. *Id.* It also indicated that the aircraft's angle-of-attack sensor had malfunctioned on the flight immediately before the accident flight, but the pilots on the earlier flight had successfully controlled the plane notwithstanding erroneous MCAS activation. Ex. 7 at 22. The Safety Review Board concluded that Boeing should issue a bulletin to remind flight crews how to "properly respond" to the conditions encountered during the Lion Air flight. Am. Compl. ¶ 152.

On November 6, 2018, Boeing issued a bulletin explaining that the Indonesian authority investigating the accident "indicated that Lion Air flight 610 experienced erroneous input from one" of its angle-of-attack sensors. *Id.* ¶¶ 152, 163. The bulletin described the flight conditions that could result, including "[r]epetitive cycles of uncommanded nose down stabilizer," and warned crews that it "is possible for the stabilizer to reach the nose down limit" if they did not

4

respond. *Id.* ¶ 164; *see* Ex. 1.[1] The bulletin reminded pilots to follow the procedure in the 737 MAX's Flight Crew Operations Manual for responding to uncommanded stabilizer movements, the "Runaway Stabilizer Non-Normal Checklist," which pilots were already required as part of their training to commit to memory. *Id.* The bulletin directed pilots to use that checklist, emphasizing that moving the stabilizer trim cutout switches to the cutout (off) position would "deactivat[e]" the "stabilizer trim system." *Id.* Boeing concluded that issuing that reminder to flight crews mitigated any risk, and that pilots could continue to fly the 737 MAX safely while Boing further investigated the accident and updated MCAS's design. Am. Compl. ¶ 176.

The next day, the FAA issued an Emergency Airworthiness Directive requiring domestic airlines to incorporate the guidance in Boeing's bulletin into the 737 MAX flight manual. *Id.* ¶ 159; *see also* Ex. 2 at 1.[2] Like Boeing's bulletin, the FAA's directive advised that, "if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer." *Id.* Having reached the same conclusion as Boeing's Safety Review Board that reminding pilots of the proper existing procedures to handle that situation would mitigate the risk, the FAA allowed the 737 MAX to remain in service. Like Boeing, the FAA directed pilots to use the runaway stabilizer procedure from the existing flight manual to address the condition, highlighting that the pilots should move the stabilizer trim cutout switches to the cutout position. *See id.* at 5.

---

[1] The Court may consider in full the bulletin and other documents expressly referenced in the complaint under the incorporation-by-reference doctrine. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993) ("Documents that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim.").

[2] The FAA issued the directive under statutory rulemaking authority. Ex. 2 at 2 (citing 49 U.S.C. § 44701). The Court should take judicial notice of it and other official documents cited here. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (courts shall take notice of information published by federal agencies).

On November 10, 2018, Boeing sent a message to all 737 MAX operators explaining that a "pitch augmentation system function called 'Maneuvering Characteristics Augmentation System' (MCAS) is implemented on the 737-8, -9 (MAX) to enhance pitch characteristics with flaps UP and at elevated angles of attack." Ex. 3 at 290. Three days later, on November 13, the *Seattle Times* published an article similarly highlighting "a key change to an automatic system that's been linked to the fatal crash of a Lion Air jet last month"—*i.e.*, MCAS. Ex. 4 at 2. The article reported that MCAS "automatically pushes the nose of the aircraft down when" the angle-of-attack sensor "indicates that the nose is pitched up and putting the plane in danger of a stall." *Id.* at 2. The same day this article was published, Boeing's then-CEO, Defendant Dennis Muilenburg, explained during a television interview that "there are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions." Am. Compl. ¶ 171. Plaintiff itself acknowledges that by at least November 13, 2018, Boeing had publicly "disclosed" that the pitch trim augmentation system "was MCAS." *Id.* ¶ 168.

On March 10, 2019, an Ethiopian Airlines flight crashed. *Id.* ¶ 211. As with the Lion Air accident, MCAS activated during flight based on erroneous data from an angle-of-attack sensor and forced the aircraft's nose down. *Id.* The next day, Boeing announced that over the past several months, it had been in the process of developing a software update to MCAS. *Id.* ¶ 217. On March 13, the FAA and regulators worldwide grounded the 737 MAX fleet. *Id.* ¶ 220.

Periodically between June and November 2019, Boeing and Muilenburg gave estimates of when the Company believed the grounding order might be lifted and the 737 MAX could return to service, consistently making clear that the FAA ultimately would decide when to recertify the aircraft. *Id.* ¶¶ 240, 245–52, 265. The earliest estimate was Muilenburg's comment in June that

6

Boeing was "looking at" a potential return to service at the "end of summer" 2019. *Id.* ¶ 240. As the recertification process proceeded, however, Boeing continually revised its estimate out further in time to reflect the evolving information available, first to early fourth quarter 2019 and then to the end of 2019. *Id.* ¶¶ 245, 265. Throughout this period, Boeing repeatedly cautioned that the timetable for the aircraft's return to service was uncertain and contingent on the FAA's approval. *See* Ex. 13 at 30, 50; Ex. 21 at 15, 53. The FAA ultimately recertified the 737 MAX on November 18, 2020.

## II.      Plaintiff's Allegations

Plaintiff Value Recapture Partners LLC never purchased or sold a single share of Boeing stock. Rather, two investment funds—Valinor Capital Partners, L.P., and Valinor Capital Partners Offshore Master Fund, L.P., both managed by Valinor Management L.P.—that are not parties to this action purchased the relevant shares of Boeing stock. Am. Compl. ¶¶ 35–40. According to the complaint, these investment funds bought Boeing stock in 13 separate transactions between June 2019 and March 2020. *Id.* ¶ 40; *see also* Am. Compl. Exs. A, B. On July 21, 2020—more than three years before the filing of this action—the funds allegedly assigned any claims arising out of those purchases to Value Recapture Partners. Am. Compl. ¶¶ 34-35. Valinor Management, and apparently the Valinor funds, is now defunct. Consistent with its business model, Value Recapture Partners now seeks to capitalize on the purportedly assigned claims.

The complaint alleges that Boeing and Muilenburg made 28 fraudulent public statements regarding the 737 MAX in violation of Section 10(b) of the Securities Exchange Act of 1934 between November 7, 2018, and November 11, 2019. *Id.* ¶ 392. They fall into four categories:[3]

---

[3]    A chart listing all the alleged misstatements challenged in the complaint and the category into which each falls is attached as Appendix A.

- Safety: Statements in November 2018 and in 2019 after the second accident that the 737 MAX is "safe" and that safety is a "core value" at Boeing;

- Existing Procedures: Statements in November 2018 and in 2019 that pilots could respond to erroneous MCAS activations by following specific "existing procedures";

- MCAS Design and Certification: Statements in 2019 concerning MCAS's design and the FAA's certification of the 737 MAX as airworthy; and

- Return-to-Service: Estimates in 2019 concerning the 737 MAX's return to service.

These same statements are at issue in a putative class action, *In re the Boeing Company Aircraft Securities Litigation*, No. 1:19-cv-2394 (*"Seeks"*), and another individual action, *College Retirement Equities Fund v. The Boeing Company*, No. 1:22-cv-3845, both of which are pending in this District.

## ARGUMENT

**I.    Plaintiff Lacks Standing to Assert Securities-Fraud Claims as an Alleged Assignee.**

Plaintiff lacks standing to bring this action. "Standing is an essential component of Article III's case-or-controversy requirement." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). "As a jurisdictional requirement, the plaintiff bears the burden of establishing standing." *Id.* at 443–45. In *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 731 (1975), the Supreme Court held that standing to bring a securities-fraud claim is limited to purchasers and sellers of the stock. Plaintiff here never purchased or sold a single share of Boeing stock.

Instead, Plaintiff suggests it has standing to sue as the assignee of claims from two investment funds that did buy Boeing stock. Am. Compl. ¶¶ 33–40. But federal courts have held that securities-fraud claims are not freely assignable. In *Smith v. Ayers*, 977 F.2d 946 (5th Cir. 1992), the Fifth Circuit explained that the Supreme Court in *Blue Chip* "intended to tightly restrict the availability of Rule 10b-5 actions." *Id*. at 949–50. Given the unique factors present in such cases, that tight restriction is appropriate because allowing non-purchasers to sue risks "vexatious"

8

litigation and "strike suits" and infecting cases with "the evidentiary problems inherent in allowing a non-purchaser or non-seller to bring a Rule 10b-5 action." *Id.* at 950. Applying those principles, the Fifth Circuit held that an assignment of claims did not give a non-purchaser standing to sue under Section 10(b). *Id.* at 951. Other courts have agreed and dismissed securities-fraud claims by purported assignees for lack of standing. *See, e.g.*, *id.*; *Dobyns v. Trauter*, 552 F. Supp. 2d 1150, 1157 (W.D. Wash. 2008); *Aviva Life & Annuity Co. v. Davis*, 2014 WL 12366406, at *12–13 (S.D. Iowa July 29, 2014 (holding assignment invalid and noting that "express assignments are incredibly rare and have only ever been recognized in two cases"); *see also In re: BP p.l.c. Sec. Litig.*, 2016 WL 29300, at *9 (S.D. Tex. Jan. 4, 2016) ("The Court therefore holds the Assignments inoperable for purposes of this litigation, and dismisses the Assignee Plaintiffs' Complaints for lack of standing.").

Granting Plaintiff standing to pursue purportedly assigned claims would be especially problematic here. Plaintiff apparently exists only for the purpose of buying litigation claims from unaffiliated entities that are winding down. In this case, Plaintiff was purportedly assigned claims by unrelated and dissolving investment funds the year after the events at issue in the complaint.[4] This fact pattern raises serious concerns over creating a litigation market spawned by remote claims-monetization entities asserting zombie claims belonging to defunct funds to extract settlements. *See Smith*, 977 F.2d at 950 ("As assignee, [plaintiff] falls squarely within the type of remote purchasers whose 10b-5 claims are discouraged by *Blue Chip Stamps* and later decisions relying thereon."); *Aviva Life & Annuity Co. v. Davis*, 20 F. Supp. 3d 694, 702 (S.D. Iowa 2014)

---

[4]   *See* Am. Compl. ¶¶ 33–35; Ex. 31 (Value Recapture Partners explaining to SEC that it "is in the business of purchasing recovery rights … when a pooled investment vehicle is in the process of winding down"). And that is apparently what happened here. *See* Am. Compl. ¶¶ 33, 360–61; Ex. 29 (June 2020 article noting wind-down of Valinor Management and its funds). Courts evaluating standing under Rule 12(b)(1) may consider material beyond the complaint. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443–45 (7th Cir. 2009).

("[T]he Supreme Court seeks to ensure a 'purchaser or seller' of the securities who experienced the alleged securities violation is the party bringing suit, as the more distant a plaintiff is from the alleged violation, the more likely it is that the *Blue Chip* concerns are realized.").

There is also a real risk of prejudice to Defendants' ability to mount a defense in this case. Unless Plaintiff is required to produce all relevant documents and witnesses from the (apparently defunct) assignors, Defendants will be forced "to serve subpoenas to request documents from the Purchasers, which is a far more burdensome process than serving discovery requests on a party. Additionally, Defendants would be unable to serve requests for admission or interrogatories on the Purchasers," or to their procure trial testimony. *See BP*, 2016 WL 29300, at *6 n.44. And, where "the assignee-plaintiffs are litigation vehicles with no material assets … , this could be problematic if the Court tries to impose sanctions on the Assignee Plaintiffs." *Id.* at *8.

For these reasons, the purported assignment of claims to Plaintiff is invalid, and the complaint should be dismissed for lack of standing under Rule 12(b)(1).

## II.    Plaintiff's Claims Are Time-Barred.

Even if Plaintiff had standing to bring the claims in the complaint, it brought them too late. The complaint's allegations "reveal that relief is barred by the applicable statute of limitations" and statute of repose. *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011). Claims alleging securities fraud in violation of the Exchange Act "may be brought not later than the earlier of … (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C. § 1658(b). Plaintiff filed this lawsuit on December 6, 2023. Compl., ECF No. 1. Thus, any claim based on alleged misstatements made before December 6, 2018, is barred by the five-year statute of repose, and because Plaintiff's assignors discovered the "facts constituting the violation" no later than December 16, 2019—under Plaintiff's theory, the entirety of Defendants' alleged fraud had been revealed by that date—Plaintiff's claims based on the

10

remaining alleged misstatements are barred the two-year statute of limitations.

### A. The five-year statute of repose bars claims based on statements made before December 6, 2018.

Securities-fraud claims are subject to a five-year statute of repose.  28 U.S.C. § 1658(b)(2).  Because Plaintiff filed its complaint on December 6, 2023, any claim based on Defendants' statements before December 6, 2018, is time-barred.  That includes all of Defendants' statements made in November 2018 following the first accident.

Seventh Circuit precedent makes clear that Section 1658(b)(2) is "a statute of repose rather than as a statute of limitations."  *McCann v. Hy-Vee, Inc.*, 663 F.3d 926, 932 (7th Cir. 2011).  Unlike statutes of limitation, statutes of repose are not subject to judicial extension or equitable tolling.  *CTS Corp. v. Waldburger*, 573 U.S. 1, 9 (2014).  Section 1658(b)(2) thus erects an "unqualified bar … giving defendants total repose after five years."  *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 650 (2010).  The statute-of-repose period for a Section 10(b) claim begins to run from the date of the alleged misstatement.  *McCann*, 663 F.3d at 932; *see also Appvion, Inc. Ret. Sav. & Emp. Stock Ownership Plan v. Buth*, 99 F.4th 928, 950 (7th Cir. 2024) (holding that because "securities-fraud claims are subject to a five-year statute of repose," claims can "reach only conduct occurring on or after" five years before filing).  Where multiple misstatements are alleged, the repose period runs from the date of *each* alleged misstatement.  *See Howe v. Shchekin*, 238 F. Supp. 3d 1046, 1050–51 (N.D. Ill. 2017); *Levine v. Bally Total Fitness Holding Corp.*, 2006 WL 8460936, at *8 (N.D. Ill. Sept. 29, 2006); *see also Kuwait Inv. Off. v. Am. Int'l Grp., Inc.*, 128 F. Supp. 3d 792, 807–08 (S.D.N.Y. 2015).

Given the filing date of the original complaint, Plaintiff's claims are barred to the extent they are based on alleged misstatements made before December 6, 2018.  As reflected in Appendix A, twelve of the 28 statements challenged in the complaint were made in

November 2018 and are thus time-barred, including statements that the MAX is "safe" and safety is a "core value," Am. Compl. ¶¶ 301–02, 305, 307–08; that "existing procedures" can counteract an erroneous application of MCAS, *id.* ¶¶ 298, 301–03, 305–06; and that Boeing was "deeply saddened" and working to determine what went wrong, *id.* ¶ 300. The Court should dismiss Plaintiff's claims based on these statements as untimely under the statute of repose.

### B. The two-year statute of limitations bars claims based on the remaining statements.

Section 1658(b)(1)'s two-year statute of limitations bars Plaintiff's claims based on the remaining statements. That time limit begins to run "once the plaintiff did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Merck*, 559 U.S. at 653 (quoting 28 U.S.C. § 1658(b)(1)). Plaintiff's own allegations make clear that a reasonably diligent plaintiff would have discovered the facts constituting the alleged violation as early as July 24, 2019, and no later than December 16, 2019—the date of the last alleged corrective disclosure. Plaintiff's theory of loss causation is that the "truth" about the alleged fraud was revealed by four public disclosures made between those dates. *See* Am. Compl. ¶¶ 375–89. The complaint nevertheless was not filed until *four years* later—on December 6, 2023. Furthermore, there is no need to guess when the assignor funds (and Plaintiff) learned of their claims here—the funds allegedly assigned their claims related to transactions in Boeing securities to Plaintiff on July 21, 2020, more than *three years* before the filing of this action. By any measure, Plaintiff filed far too late under the two-year statute of limitations.

Plaintiff assumes it is entitled to tolling of the limitations period due to "the filing of the class action complaints against Defendants," *id.* ¶ 402, but the Seventh Circuit has never held that equitable tolling applies in these circumstances, and there is no reason that it should. The only arguable basis for tolling is *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974), where the

12

Supreme Court held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class *who would have been parties had the suit been permitted to continue* as a class action." *Id.* at 554; *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350 (1983). In that case, tolling was "necessary to insure effectuation of [Rule 23's] purposes of litigative efficiency and economy"—otherwise, putative class members "would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Am. Pipe*, 414 U.S. at 553, 555. This logic makes clear that *American Pipe* tolling applies by its own terms only to "putative class members who wish to sue individually *after a class-certification denial*." *China Agritech v. Resh*, 584 U.S. 732, 739–40 (2018) (citing *Am. Pipe*, 414 U.S. at 552, *Crown*, 462 U.S. at 349, 352) (emphasis added).

Plaintiff is no such party. By filing its own lawsuit before a motion to certify the class was even pending in the related class action, Plaintiff established its intent to saddle Defendants with costly and redundant litigation *regardless* of whether a class is certified in the putative class action. The Seventh Circuit has never held that *American Pipe* tolling extends to parties that, like Plaintiff, preemptively opt *out* of a pending class action before class certification is decided. And there is no reason to believe that it should, for such a holding would undermine the very interests of "efficiency and economy" on which *American Pipe* rests. *Am. Pipe* 414 U.S. at 555. Far from reducing pointless "protective motions," giving plaintiffs that prefer to go it alone the benefit of *American Pipe* tolling would merely extend—potentially for years—the statutory two-year limitations period for them to act. Such a rule can only increase redundant litigation; it would do nothing to reduce it. The only rule consistent with the express purposes of *American Pipe* tolling is that no such tolling applies to opt-out plaintiffs that sue before class certification is denied. "The reasoning supporting this approach is both sound and persuasive." *Wyser-Pratte Mgmt Co., Inc.*

13

*v. Telxon Corp.*, 413 F.3d 553, 569 (6th Cir. 2005) (collecting cases limiting *American Pipe* tolling in these circumstances); *accord Glater v. Eli Lilly & Co.*, 712 F.2d 735, 739 (1st Cir. 1983); *Wachovia Bank & Trust Co. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 346 n.7 (D.C. Cir. 1980).

While some other circuits disagree, their analyses gloss over the question of *why* a plaintiff that voluntarily forgoes class membership before class certification is decided should get the benefit of *American Pipe* tolling. *See Aly v. Valeant Pharm. Int'l Inc*, 1 F.4th 168 (3d Cir. 2021); *In re Hanford Nuclear Rsrv. Litig.*, 534 F.3d 986 (9th Cir. 2008); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223 (10th Cir. 2008); *In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007). None of these courts explain why plaintiffs that file an individual claim after the limitations period but before a ruling on class certification should be rescued from their own lack of diligence.

That is particularly true here. Plaintiff was assigned the claims it seeks to assert on July 21, 2020, for no other purpose than to commence litigation. Am. Compl. ¶ 34. Yet Plaintiff inexplicably waited over three years to file its complaint, allowing the statute of limitations to expire. There is no equity in saving Plaintiff from its own inexcusable delay. Indeed, it is hard to imagine a less compelling case for equitable tolling. Because the two-year statute of limitations bars Plaintiff's claims based on the statements in 2019 after the second accident, the Court should dismiss the complaint in its entirety.

## III.    Plaintiff Fails to State a Claim for Securities Fraud.

Although the Court need not reach the merits of the time-barred claims that Plaintiff lacks standing to bring as an assignee, the complaint nevertheless fails to state a claim for securities fraud. To state a Section 10(b) claim, Plaintiff must allege: (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, (4) reliance,[5] (5) economic loss,

---

[5]    Plaintiff alleges it is entitled to a presumption of reliance under *Affiliated Ute*. Am. Compl. ¶¶ 370, 374. That

14

and (6) loss causation. *Dura Pharm. v. Broudo*, 544 U.S. 336, 341-342 (2005). Rule 9(b) and the PSLRA heighten the pleading standards for Section 10(b) claims. *Tellabs v. Makor Issues & Rights*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). Rule 9(b) requires a plaintiff to plead "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). And the PSLRA requires a plaintiff to identify the alleged misstatements, plead with particularity why each was misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

Plaintiff's claims fail for three reasons, each of which is an independent basis for dismissing the complaint. First, Plaintiff does not plead that Defendants made actionable misstatements. Second, Plaintiff does not plead with particularity facts creating a strong inference that any purported misstatement was made with an intent to deceive investors. Third, Plaintiff does not plead that any losses were caused by the correction of an alleged misstatement.

> **A.** **Plaintiff does not adequately plead a material misstatement.**
>
> **1.** **Plaintiff does not adequately allege that Defendants' statements about safety were material or false or misleading.**

The largest category of alleged misstatements consists of statements in November 2018[6] and in 2019 after the second accident about the safety of the 737 MAX. These statements either affirm Boeing's belief that the 737 MAX is "safe" or highlight that safety is a "core value" or "priority" at Boeing. For example, Dennis Muilenburg said on November 13, 2018, that "the 737

---

"presumption is limited to cases that primarily allege omissions and present plaintiffs with the difficult task of proving a speculative negative." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2 F.4th 1199, 1204 (9th Cir. 2021). Because this case is based primarily on alleged affirmative misstatements, the presumption does not apply. *See Rowe v. Maremont Corp.*, 850 F.2d 1226, 1244 n.4 (7th Cir. 1988).

[6] These November 2018 statements are barred by the statute of repose. *See supra* Section II.A.

MAX is safe and safety is a core value for us at Boeing." Am. Compl. ¶ 301. Two weeks later, Boeing issued a press release that similarly stated that "[s]afety is a core value for everyone at Boeing" and that "the 737 MAX is as safe as any airplane that has ever flown the skies." *Id.* ¶ 307. And after the Ethiopian Airlines accident, Boeing again stated that "[s]afety is a core value for everyone at Boeing and the safety of our airplanes … is always our top priority" and that the "737 MAX is a safe airplane." *Id.* ¶ 310. These statements are not actionable for three reasons.

*First*, they are immaterial as a matter of law. A statement is "material" only if a reasonable investor would view it "as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The "crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*"), *rev'd on other grounds*, *Tellabs*, 551 U.S. 308. Applying this standard, courts have held that a reasonable investor would not view vague, generalized, or nonquantifiable statements of corporate optimism or values as important in making investment decisions. As Judge Easterbrook put it, statements that "do not make any concrete assertion" and instead "express[] only vague optimism" are not material. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021).

The Sixth Circuit's decision in *City of Monroe Employment Retirement Systems v. Bridgestone*, 399 F.3d 651 (6th Cir. 2005), is instructive. That case involved Bridgestone's public statements about a particular line of tires after a series of fatal accidents. In the wake of the accidents, Bridgestone said that it had "no reason to believe that there is anything wrong with [the tires]," that it had "full confidence" in the tires, and that "rigorous testing under diverse conditions at our proving grounds around the world helps ensure reliable quality." *City of Monroe*, 399 F.3d

16

at 670–71. Bridgestone later recalled the tires, and investors sued for securities fraud. *Id.* at 671. The Sixth Circuit held that Bridgestone's statements were not actionable because they were "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.* at 671.

The safety statements that Plaintiff challenges here are not actionable for the same reason. Like the statements in *City of Monroe*, the statements that the 737 MAX is "safe" and that safety is a "core value" at Boeing were not pegged to any objectively verifiable data or "anything measurable." *Id.* at 671. They instead are the kind of "rosy affirmation heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, [and] so lacking in specificity, … that no reasonable investor could find them important to the total mix of information available." *Id.* at 669 (citation omitted).

Indeed, other courts in this District have already held that the very same safety statements Plaintiff challenges here are immaterial as a matter of law. *See College Ret. Equities Fund v. The Boeing Co.*, 2023 WL 6065260, \*7, \*15 (N.D. Ill. Sept. 18, 2023); *In re The Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at \*9, \*19 (N.D. Ill. Aug. 23, 2022) ("*Seeks I*"). As Judge Tharp stated, "Muilenburg's statements about Boeing's 'core values' and similar affirmations of safety are just th[e] kind rosy affirmation that reasonable investors know are meaningless to the total mix of information." *Seeks I*, 2022 WL 3595058, at \*19. Judge Shah agreed that "only unreasonable investors would find Muilenburg and Boeing's simple affirmations of safety and general references to Boeing's core values meaningful to the total mix of information." *College Ret. Equities Fund*, 2023 WL 6065260, at \*7. That principle applies with even greater force to the statements made after the second accident, "when the total mix of information available to investors had grown to include two crashes and the indefinite grounding of the 737 MAX."

17

*Seeks I*, 2022 WL 3595058, at *19; *see College Ret. Equities Fund*, 2023 WL 6065260, at *15.[7]

Plaintiff's allegation that investors were generally concerned about the subject of aircraft safety does not render the statements themselves material. The question is not whether the subject of safety generally is important to Boeing and its stockholders (it undoubtedly is), but rather whether the specific challenged statements were material. By their very nature, the safety statements are too vague and general for reasonable investors to have relied on them to make investment decisions. No matter whether investors considered the subject of aircraft safety to be important, the statements themselves remain the "kind of loosely optimistic statements that are unimportant to the total mix of information for investors." *Id*. at *7.

At bottom, Plaintiff conflates the general importance of safety with the materiality of the particular statements that it challenges. Even when a statement's subject matter is important in the abstract, the statement is still immaterial as a matter of law if it is couched in vague and highly general terms. The Second Circuit made this point in *ECA, Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009). In that case, shareholders sued JPMorgan for fraud based on statements touting its reputation for integrity, including that it "set the standard for integrity" and had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process." *Id.* 205–06 (cleaned up). The shareholders argued that JPMorgan's statements were material because the "significance of a

---

[7] Although the *Seeks* court (after the case was reassigned) later declined to dismiss several statements affirming that the 737 MAX is "safe," its reasoning rests on the idea that investors might have understood these statements to be weighing in on what *caused* the accident. *Seeks v. The Boeing Co.*, 752 F. Supp. 3d 992, 1017 (N.D. Ill. 2024) ("*Seeks II*"). Respectfully, that reasoning is flawed; neither the language of the statements themselves nor the context in which they were made supports a causal inference. Quite the contrary. Reasonable investors would know that Boeing could not discuss the specifics of the accidents under Annex 13 of convention to which the United States is a signatory and federal regulations. Convention on Int'l Civ. Aviation, Dec. 7, 1944, 61 Stat. 1180; Annex 13 § 5.12; 49 C.F.R. § 831.13, .22. Both Boeing and Muilenburg consistently reminded the public that the investigation was ongoing and that they could not discuss the specifics. *E.g.*, Am. Compl. ¶ 306.

bank's reputation is undeniable." *Id.* at 206. The court rejected this argument, holding that the statements were "too general to cause a reasonable investor to rely upon them" and explaining that "[w]hile a bank's reputation is undeniably important, that does not render a particular statement by a bank regarding its integrity per se material." *Id.*; *see also Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018).

So too here: Even though the statements concerned safety—a subject no one would deny is important for an aircraft manufacturer—they are immaterial because they were too vague and general and too untethered to anything measurable for any reasonable investor to rely on them when making an investment decision.

Nor can Plaintiff salvage its claims by pointing to one analyst's reference to "Boeing's commitment to airline safety" or another's assurance that "we would never doubt the company's commitment to safety." Am. Compl. ¶¶ 174, 183. Plaintiff does not allege that either of these analysts commented specifically on any of the challenged safety statements, as opposed to relying on available facts and data about Boeing. Indeed, Plaintiffs cannot point to a single analyst that referenced any of the safety statements at issue in this lawsuit. And even if an analyst did reference one of those statements, "the fact of recapitulation by analysts did not make these statements actionable": a "report that merely recaps corporate puffery does not convert that puffery into a material misstatement." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

*Second*, the safety statements are best understood as opinions, and Plaintiff fails to plead facts showing that Defendants' opinions about safety are actionable as fraud. Opinions can form the basis of a securities-fraud claim only if a plaintiff pleads with particularity that the speaker did

19

not actually believe the professed opinion or the opinion did not "fairly alig[n]" with information in the speaker's possession at the time. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 188–89 (2015). If the plaintiff attempts to plead the latter, the complaint "must identify particular (and material) facts going to the basis for the [speaker's] opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. This "is no small task." *Id.*

Courts consistently treat product-safety statements like those challenged here as nonactionable opinions—even when the products are involved in accidents or recalled. For instance, in *In re Ford Motor Co. Securities Litigation*, 381 F.3d 563 (6th Cir. 2004), investors alleged that Ford misrepresented the safety of the Ford Explorer after a series of accidents by stating that the "Ford Explorer is an extremely safe and thoroughly engineered vehicle." *Id.* at 571. Despite a later recall, the Sixth Circuit rejected the plaintiffs' securities-fraud claim based on that statement because it was an opinion and the plaintiffs offered "no basis" to conclude the defendants "did not believe the opinions expressed." *Id.*[8]

The safety statements challenged here are likewise opinions, and Plaintiff does not plead with particularity the narrow circumstances in which opinions could be actionable as fraud under *Omnicare*. Plaintiff does not allege that Muilenburg or anyone else who prepared or approved the statements did not in fact hold the expressed opinions. Nor does Plaintiff allege that the stated opinions about safety did not fairly align with the information in those individuals' possession at

---

[8]  *See also Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 556–58 (M.D.N.C. 2018) (statement touting "safety" of pharmaceutical was nonactionable opinion despite objective testing "because reasonable persons may disagree over how to analyze data and interpret results" (cleaned up)); *Gillis v. QRX Pharma*, 197 F. Supp. 3d 557, 597 (S.D.N.Y. 2016) (statement that data "showed a respiratory safety advantage" compared to other treatments was nonactionable opinion); *In re Yum! Brands Sec. Litig.*, 73 F. Supp. 3d 846, 862–64 (W.D. Ky. 2014) (statements that "restaurants … must adhere to strict food quality and safety standards," that company acts "to ensure food safety," and that suspected unsafe product is withdrawn "until safety can be assured" are nonactionable opinions).

20

the time of the statements.  Indeed, Plaintiff does not allege "particular (and material) facts going to the basis" for the opinions at all.  *Omnicare*, 575 U.S. at 194.

*Third,* the safety statements are not actionable because they are not false or misleading. Plaintiff argues that they were false and misleading because of alleged deficiencies in MCAS's design, development, and certification.  Am. Compl. ¶¶ 304, 309.  But vague affirmations that the 737 MAX is "safe" and safety is a "core" Boeing "value" cannot plausibly be understood as specific representations about MCAS's design, development, and certification.  Nor does Boeing's Safety Review Board determination that repeated unintended MCAS activations posed an "airplane safety issue," *id*. ¶ 312, contradict the challenged safety statements.  To the contrary, the statements reflected Defendants'—and the FAA's—judgment that the 737 MAX remained safe overall *notwithstanding* the possibility of repeated unintended MCAS activations, as reflected in Boeing's bulletin and the FAA's airworthiness directive reminding pilots of the existing procedures for addressing the resulting flight conditions.

For example, Muilenburg followed his November 13, 2018, statement that "the 737 MAX is safe" by acknowledging that "there were some indications of an inaccurate angle of attack signal that was being sent to the [Lion Air] airplane and of course our airplane has the ability to handle that with procedures in place and we've already issued a couple of bulletins to our operations and pilots around the world that point them back to existing flight procedures to handle that kind of condition." *Id*. ¶ 170.  Boeing's November 27 press release similarly acknowledged that the Lion Air flight experienced "automatic nose down trim" and called out the "runaway stabilizer non-normal check list" as the "appropriate procedure to address unintended horizontal stabilizer movement, regardless of source."  Ex. 6.  Given these disclosures, no reasonable investor could have understood Defendants' highly generalized safety statements as representing that MCAS

could not erroneously activate as it had on the Lion Air flight or that MCAS could not be improved. Plaintiff thus fails to plead facts showing that the safety statements were false or misleading.

### 2. Plaintiff does not adequately allege that Defendants' statements about existing procedures were false or misleading.

Plaintiff challenges several statements related to Boeing's guidance to flight crews on how they should respond if they encountered the flight conditions experienced on the Lion Air flight. Plaintiff fails to plead facts sufficient to show these statements were false or misleading.

On November 6, 2018, Boeing issued its bulletin directing flight crews to execute the "Runaway Stabilizer Non-Normal Checklist" in the event of uncommanded nose down stabilizer trim—*i.e.*, the condition experienced on the Lion Air flight due to the failure of the angle-of-attack sensor. Am. Comp. ¶ 164; *see also supra* at 4. Plaintiff challenges as fraudulent Defendants' later reference to this guidance in external communications. For example, Boeing announced on November 7, 2018, that it had issued a bulletin "directing operators to existing flight crew procedures to address circumstances where there is erroneous input from an [angle-of-attack] sensor." Am. Compl. ¶ 163. Muilenburg also said in an interview on November 13 that there were "existing … procedures to handle" the conditions encountered on the Lion Air flight, *id.* ¶ 170, and that those procedures are "part of the training manual," *id.* ¶ 172. A Boeing press release on November 21 likewise noted that Boeing had "provided two updates for our operators around the world that re-emphasize existing procedures." *Id.* ¶ 184.[9] And Boeing issued a press release on March 11, 2019, after the Ethiopian Airlines accident, stating that the 737 MAX's flight manual "already outlines an existing procedure to safely handle the unlikely event of erroneous

---

[9] The statute of repose bars claims based on the 2018 statements relating to existing procedures. *See supra* Section II.A.

data coming from an angle of attack" sensor. *Id.* ¶ 217.

Plaintiff does not allege any facts undermining the accuracy of these statements. The challenged statements say nothing more than that pilots could use the existing runaway stabilizer procedure to address erroneous MCAS activations.[10] That is true. In fact, the pilots on the Lion Air flight immediately before the accident experienced the same conditions, followed the same existing procedure that the challenged statements referenced, and were able to fly the airplane safely to its intended destination. Ex. 7 at 22.

Rather than dispute the accuracy of the challenged statements, Plaintiff argues that the runaway stabilizer procedure was "insufficient to address MCAS" because pilots might not promptly execute it. Am. Compl. ¶ 299. Plaintiff alleges, for example, that "pilots would be unable to counteract *repeated* MCAS activation using existing flight procedures." *Id.* But none of the "existing procedures" statements can be understood to deny that possibility—in fact, both Boeing's bulletin and the FAA's airworthiness directive recognized that repeated MCAS activations without proper pilot response could cause the pilots to lose control of the aircraft. As Plaintiff acknowledges, Boeing's bulletin was intended to remind "flight crews of how to properly respond to the errors that could cause erroneous MCAS activation." *Id.* ¶ 152.

To the extent these statements can be read to express any view on the *sufficiency* of existing procedures, they are nonactionable statements of opinion. The question whether existing procedures were sufficient to counteract an erroneous MCAS activation is a judgment based on a combination of technical and human factors. *See City of Warren Police & Fire Ret. Sys. v.*

---

[10] Some challenged statements say even less. For example, Boeing's November 21 press release says only that Boeing "provided two updates for our operators around the world that re-emphasize existing procedures for these situations." Ex. 5. This statement is factually accurate because Boeing *had* released two such updates.

*Prudential Fin., Inc.*, 70 F.4th 668, 683–84 (3d Cir. 2023) (holding that insurance company's statement regarding "adequacy of its reserves" was an opinion because it was judgment "based on variety of complex assumptions and considerations"). Once again, Plaintiff does not plead with particularity the narrow circumstances in which opinions can be actionable as fraud under *Omnicare*. Plaintiff does not allege that Muilenburg or anyone else at Boeing who prepared or approved the existing procedures statements did not in fact believe that those procedures were sufficient. Nor does Plaintiff allege that the belief that existing procedures were sufficient did not fairly align with the information possessed by those individuals at the time of the statements. To the contrary, after the Lion Air accident, both the FAA and Boeing's technical experts agreed that the runaway stabilizer procedure provided the proper response to an erroneous MCAS activation and that the plane could remain in operation. *See* Am. Compl. ¶¶ 150, 152, 159, 176. Plaintiff's allegations thus fail to satisfy the *Omnicare* standard.

### 3. Plaintiff does not adequately allege that Defendants' statements about the 737 MAX design and certification were false or misleading.

Plaintiff fails to plead facts establishing that the statements regarding the design and certification of the 737 MAX were false or misleading.

March 11, 2019: The day after the second accident, a press release included the statement that "MCAS does not control the airplane in normal flight; it improves the behavior of the airplane in a non-normal part of the operating envelope." Am. Compl. ¶ 310. According to Plaintiff, it was "misleading for Defendants to state that MCAS does not control the airplane during normal flight when, in fact, it could operate during nearly the entire speed range for the 737 MAX." *Id.* ¶ 312. But the market could not have understood Boeing's statement after the second accident to deny that MCAS could activate erroneously during normal commercial flight—that much was

24

already widely known.[11]  By March 2019, the market understood that MCAS could *erroneously* activate during normal flight if the aircraft's angle-of-attack sensor failed, as it had in the Lion Air accident, and falsely signaled to MCAS that the aircraft was operating *outside* normal flight conditions—*i.e.*, in a "non-normal part of the operating envelope."  The March 11, 2019, press release containing the challenged statement acknowledged that possibility, explaining that MCAS "was implemented on the 737 MAX to improve aircraft handling characteristics and decrease pitch-up tendency at elevated angles of attack" while noting that MCAS also could activate in the "event of erroneous data coming from an angle of attack" sensor.  *Id.* ¶ 217.  Boeing's bulletin and the FAA's airworthiness directive from November 2018 likewise recognized this possibility. *Supra* at 4-5.  And numerous news articles published after the Lion Air accident reported that MCAS could activate during normal commercial flight as a result of faulty angle-of-attack data. *See, e.g.*, Ex. 4 at 2.[12]

March 22, 2019: On March 21, 2019, *The New York Times* reported that the Lion Air and Ethiopian Airlines aircraft lacked two flight deck display indicators that provide data about the plane's angle of attack.  Am. Compl. ¶ 227.  *The New York Times* inaccurately described the indicators as "safety" features and reported that Boeing "charged extra" for them.  *Id.* ¶ 227.  Boeing issued a response the next day stating that:

---

[11]  Plaintiff pleads no facts showing that the statement "MCAS does not control the airplane in normal flight" was *material* to investors.  The same press release announced that Boeing was "developing a flight control software enhancement for the 737 MAX" that would alter MCAS's design.  Am. Compl. ¶ 217; *see also* Ex. 8.  The same day, the FAA issued a notice detailing planned MCAS design changes and updates to pilot training requirements, which it anticipated "mandating … no later than April 2019."  Ex. 9 at 1.  Given the market's understanding that Boeing was overhauling the flight control software, no reasonable investor would have considered the information about MCAS's operational scope important in making an investment decision.

[12]  The Court can take judicial notice of public documents on this motion to dismiss not for their truth, but for the fact that the information in them was public.  *See Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016) (judicial notice of matters of public record); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) ("it is routine for courts to take judicial notice of both newspaper articles and court records").

> All Boeing airplanes are certified and delivered to the highest levels of safety consistent with industry standards. Airplanes are delivered with a baseline configuration, which includes a standard set of flight deck displays and alerts, crew procedures and training materials that meet industry safety norms…. Customers may choose additional options, such as alerts and indications, to customize their airplanes to support their individual operations or requirements….

*Id.* ¶ 229. Plaintiff argues that this statement was misleading because it "tout[ed] the certification of the 737 MAX" when, in 2016, one of its technical pilots had withheld information about MCAS's operational authority from the FAA group responsible for determining the required level of pilot training. *Id* ¶ 314.

Plaintiff conflates two separate processes at the FAA—certifying the aircraft as airworthy under federal airworthiness standards and determining the minimum level of pilot training to fly the aircraft. The general assertion that "[a]ll Boeing airplanes are certified … to the highest levels of safety consistent with industry standards" cannot plausibly be understood to make any specific representation about the circumstances surrounding the FAA's determination of the appropriate level of pilot *training* for the 737 MAX, especially given that the statement was a direct response to *The New York Times*' mistaken suggestion that the safety of the aircraft Boeing manufactures depended on the particular options operators selected.

April 24, 2019: During Boeing's first-quarter earnings call—after the FAA had grounded the 737 MAX—an analyst asked Muilenburg "how did this slip through the engineering organization?" Am. Compl. ¶ 236. Muilenburg (correctly) understood the question to be about MCAS's design from an engineering perspective, and he responded:

> [T]here is no technical slip or gap here, right? Again, as I mentioned, we know that both accidents were a series of events, and that is very common to all accidents that we've seen in history. And what we know is that in this case, there was erroneous angle of attack information that came into the airplane from multiple causes. We know [that at] some point during the flight, that activated the MCAS control laws, and we know that ultimately there were actions or actions not taken that contributed to the final outcome….

26

> I can tell you with confidence that we understand our airplane. We understand how the design was accomplished, how the certification was accomplished and remain fully confident in the product that we put in the field. But we also know there are areas where we can improve, and that is the source of the software update. But there was no surprise or gap or unknown here or something that somehow slipped through a certification process. Quite the opposite. We know exactly how the airplane was designed. We know exactly how it was certified. We have taken the time to understand that. That has led to the software update that we've been implementing and testing….

*Id.* Plaintiff asserts that it was misleading for Muilenburg "to state that nothing out of the ordinary happened in connection with the certification of the 737 MAX when, in fact, [Boeing] had defrauded the FAA into certifying the 737 MAX based on incorrect information." *Id.* ¶ 316.

Again, Plaintiff conflates two separate processes at the FAA. As Plaintiff recognizes, Muilenburg was not discussing the FAA's evaluation of pilot-training requirements for the 737 MAX. The exchange makes clear that both the analyst's question and Muilenberg's response related to MCAS's design from an engineering perspective and the FAA's certification of that design as airworthy. The analyst's question was about how the issues with MCAS "slip[ped] through the *engineering* organization." *Id.* ¶ 315 (emphasis added). And in answering that question, Muilenburg twice referred to the MCAS update—an *engineering* redesign of MCAS's software logic—and clearly discussed "how the airplane was designed." *Id.* Plaintiff does not allege a "slip" or "gap" in the certification of MCAS's design as airworthy.

As a result, Boeing's later entry into a Deferred Prosecution Agreement ("DPA") with the Department of Justice in January 2021 related to the failure of two technical pilots to disclose certain information about MCAS to the FAA Aircraft Evaluation Group ("AEG") responsible for determining the required level of pilot training has no bearing on whether Muilenburg's statement was misleading. *See id.* ¶ 279; *see also* Ex. 30. The DPA makes clear that this misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management." Ex. 30 ¶ 4(a), (h). Critically, the DPA also confirms that

27

"others in the Company disclosed MCAS's expanded operational scope to different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." Ex. 30 ¶ 4(a), (h).

In sum, Boeing engineers identified the risks associated with repeated MCAS activations and concluded that pilots would recognize and correct the resulting runaway stabilizer. The issue thus did not "slip through the engineering organization"; it was the subject of a considered process. While Plaintiff may disagree with the engineers' analysis, the fact that Boeing made a judgment on the issue confirms that there was no technical "slip" or "gap." Further, whether there was a "slip" or "gap" in the design and certification of the 737 MAX is a matter of opinion, and Plaintiff does not plead facts sufficient to satisfy *Omnicare*, *i.e.*, that Muilenburg did not believe his statement or that his belief did not fairly align with the information in his possession at the time.

April 29, 2019: Responding to a reporter's suggestion that the "design of MCAS was deeply flawed" and a request to "admit that the design was flawed," Muilenburg responded:

> We've designed the MAX to have the flying qualities that were desired in the hands of the pilots. The MCAS system is part of that design effort. We have gone back and confirmed again as we do the safety analysis, the engineering analysis, that we've followed exactly the steps in our design and certification processes that consistently produce safe airplanes. Now, in this case again, as in most accidents, there are a chain of events that occur. It's not correct to attribute that to any single item. We know there's some improvements that we can make to MCAS, and we will make those improvements.

Ex. 14 at 8; *see also* Am. Compl. ¶ 237. Plaintiff says this statement was misleading for the same reason as the April 24 statement—because in 2016 two pilots misled the AEG about MCAS's operational scope. *Id*. ¶ 318. Again, Plaintiff confuses two separate processes at the FAA.[13]

---

[13] Plaintiff incorrectly alleges that, during this same exchange, Muilenburg also said "[i]t was designed per our standards" and "[i]t was certified per our standards." Am. Compl. ¶ 237. In response to a different question, Muilenburg did state that "[w]e've also gone back and taken a look at the design of the MCAS system itself, the original design. We've confirmed that it was designed per our standards, certified per our standards, and we're confident in that process." Ex. 14 at 2-3. To the extent the complaint can be read to challenge this statement, it

As with the April 24 statement, Muilenburg made clear that he was addressing MCAS's design from an *engineering* perspective and the certification of that design as airworthy under federal regulations, not the FAA's determination about the required level of pilot training. The question from the reporter asked whether "the final design of MCAS was deeply flawed." Ex. 14. at 8. And in a portion of the response Plaintiff obscures with ellipses, Muilenburg explained that Boeing had confirmed that it followed the steps in its design and certification processes as part of the Company's "safety analysis, the engineering analysis" after the accidents. *Id.* In other words, when Muilenburg said that Boeing "followed exactly the steps in our design and certification processes," he was referring to the design and certification of MCAS from an *engineering and safety* perspective. This statement could not have created a misleading impression about the FAA's separate evaluation of the *pilot training* requirements for the 737 MAX.

> May 29, 2019: A month later at an investor conference, Muilenburg stated:
>
> I think the question there on the relationship with the FAA has centered on the delegated authority approval and how that process works. And I will tell you that I have a great deal of confidence in that process and how it works. It's a high integrity process and I think it's proven. It's demonstrated results. It's a way for the FAA to exercise its independent role, its regulatory role as it should, but also tap into the deep technical expertise in our company.

Ex. 15 at 6; *see also* Am. Compl. ¶ 238. Plaintiff claims it was misleading for Muilenburg "to state that he had confidence in the certification process and that it was 'proven' and of 'high integrity' when Defendants had defrauded the FAA into certifying the 737 MAX based on incorrect information." *Id.* ¶ 320. But Plaintiff again conflates two distinct issues.

To start, Muilenburg was not addressing the "certification process," but rather the "delegated authority approval" program (known as the Organization Designation Authorization,

---

is not actionable for the same reasons discussed above.

29

or ODA) under which the FAA can delegate certain tasks associated with certification and compliance to Boeing. *Id.* ¶¶ 51, 223, 359; *see Seeks I*, 2022 WL 3595058, at *19. Plaintiff does not plead any facts showing that the ODA process was not "proven" and of "high integrity." Moreover, although media outlets had questioned the authority delegated to Boeing to review *MCAS's design*, Am. Compl. ¶ 223, Plaintiff nowhere suggests that this delegated authority played any part whatsoever in the FAA's *pilot training* determination. Plaintiff thus cannot rely on allegations related to the FAA's pilot-training determination to plead that Muilenburg's statement about the ODA process was misleading.

In addition, whether the ODA process is "proven" and "high integrity" is a matter of opinion. Muilenburg's statement uses classic opinion language—he says "*I think* it's proven" and that he has "a great deal of confidence" in the process. *Id.* ¶ 238 (emphasis added). Plaintiff nowhere alleges facts suggesting Muilenburg did not hold that opinion or that his opinion did not fairly align with the information in his possession at the time, as required by *Omnicare*.

### 4. Plaintiff does not adequately allege that Defendants' statements about the 737 MAX's expected return to service were false or misleading.

Plaintiff claims that Defendants' projections about when the 737 MAX might return to service after it was grounded were false or misleading. The first such estimate was provided on June 26, 2019, when Muilenburg said he was "still looking at" the end of summer 2019 for a return to service. *Id.* ¶ 321. The following month, Muilenburg updated that estimate, stating that Boeing's "current best estimate" was a "return to service early in the fourth quarter" of 2019, *id.* ¶ 326, but also cautioned that Boeing was "assessing" the estimate on a daily basis and that it was "dependent on the FAA and other regulators for achieving that timeline," Ex. 20 at 25. Other statements reiterated the estimate of a potential return to service early in the fourth quarter. *See* Am. Compl. ¶¶ 323, 326, 328–29. On November 11, 2019, a press release stated that "Boeing

30

continues to target FAA certification of the MAX flight control software updates during this quarter" and that "it is possible that the resumption of MAX deliveries to airline customers could begin in December." *Id.* ¶ 331. These estimates of when the 737 MAX might return to service are not actionable for two separate reasons: they are forward-looking statements protected by the PSLRA's statutory safe harbor, and they are nonactionable statements of opinion under *Omnicare*.

> **a.** **Boeing's return-to-service projections are forward-looking statements that fall within the PSLRA's safe harbor.**

The PSLRA creates a statutory safe harbor for "forward-looking statements" such as statements "of the plans and objectives of management for future operations" and statements "of future economic performance." 15 U.S.C. § 78u-5(i)(1)(B), (C). Both courts in the other securities actions involving Boeing held that the same return-to-service estimates are forward-looking statements under the PSLRA. *See College Ret. Equities Fund*, 2023 WL 6065260, at *20; *Seeks I*, 2022 WL 3595058, at *24. The PSLRA's safe harbor provides that a defendant "shall not be liable with respect to any forward-looking statement" if either (1) the statement is identified as a forward-looking statement and is accompanied by meaningful cautionary language, *id.* § 78u-5(c)(1)(A)(i), or (2) "the plaintiff fails to prove" that the person who made or approved the statement had "actual knowledge … that the statement was false or misleading," *id.* § 78u-5(c)(1)(B)(i). The return-to-service statements are independently protected by both prongs of this statutory safe harbor.

The first prong applies because these forward-looking statements were accompanied by meaningful cautionary language. To be meaningful, cautionary language need only "point to the principal contingencies that could cause actual results to depart from the projection," *i.e.*, "the major risks [the defendant] objectively faced when it made its forecasts." *Asher v. Baxter Int'l, Inc.*, 377 F.3d at, 734 (7th Cir. 2004). The cautionary language accompanying Boeing's return-to-service projections squarely addressed the very risk Plaintiff says ultimately caused the

31

projections to be wrong: that regulators would not recertify the 737 MAX as quickly as Boeing was forecasting. *See St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *10 (N.D. Ill. Feb. 28, 2011).

Every one of the challenged statements warned investors that the actual return-to-service date could differ from Boeing's projections because the FAA and other regulators controlled the timing of recertification.[14] Boeing's other public statements further explained why the actual return-to-service date could differ from its estimates.[15] For instance, Boeing's first quarter 10-Q, filed on April 24, 2019, cautioned that the actual return to service of the 737 MAX could vary from Boeing's estimates based on the conditions the FAA and other aviation regulators set for certifying the updates to the plane. Ex. 13 at 30; *see id.* at 50 (recognizing possibility of "delays in one or more jurisdictions to achieve required authorizations to return to service"). After the FAA identified additional items Boeing needed to address in the planned software update, Boeing promptly disclosed this information in a Form 8-K, warning investors that it "will not offer the 737 MAX for certification by the FAA until we have satisfied all requirements for certification of the MAX and its safe return to service." Ex. 18 at 2. In its second quarter 10-Q filed a month later, Boeing warned that the "FAA and other civil aviation authorities will determine the timing and conditions of the 737 MAX's return to service" and noted that the return-to-service estimates

---

[14] Ex. 17 at 6 ("We're now in the process of a certification with the FAA and regulators around the world"); Ex. 19 at 1 ("Boeing continues to work with civil aviation authorities to ensure the 737 MAX's safe return to service, and these authorities will determine the timing of return to service"); Ex. 20 at 4("as we have consistently emphasized, it is the FAA and other global aviation regulators that will determine when the 737 MAX returns to service"); Ex. 22 at 2 ("the principal schedule risk on [return to service] continues to be a regulator alignment around the world and regulator approvals" and noting that "[u]ltimately return-to-service timing will be determined by the regulator"); Ex. 23 at 1 ("the FAA and other regulatory authorities will determine the timing of certification and return to commercial service").

[15] Boeing's estimates were made in the wake of these cautionary statements and must be treated as subject to them. *See, e.g.*, *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 732 (7th Cir. 2004); *St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, *9–*10 (N.D. Ill. Feb. 28, 2011).

were "highly uncertain." Ex. 21 at 15, 53. Numerous disclosures reiterated this warning.[16]

The market appreciated the import of these warnings. During Muilenburg's June 26, 2019, interview, for instance, the moderator commented: "So it sounds like you don't really know the bottom of the pool. … When are they going to fly, when or do we get done? … [I]t sounds like you don't really know." Ex. 17 at 9. Muilenburg responded: "Yeah, we're working our way through all of that. … The exact timeline, the financial boundaries of this, you know, the, these are things that over time we'll, we'll figure out." *Id.*

In the putative class action, the court agreed that the return-to-service statements were forward-looking and accompanied by cautionary language. *Seeks I*, 2022 WL 3595058, at *24–25. That court nevertheless concluded that certain statements fell outside the PSLRA's safe harbor because of a conversation in early June 2019 between Muilenburg and then-acting FAA Administrator Elwell. According to the complaint here, Elwell asked Muilenburg to "slow down … talk of progress" on return to service. Am. Compl. ¶ 239. The *Seeks* court held that this suggestion meant the risk that regulators would disrupt the return-to-service timeline had manifested, rendering the cautionary language not meaningful. Respectfully, the court erred.

First, the PSLRA's text and structure make clear that a speaker's knowledge is irrelevant under the first prong of the safe harbor. By its terms, this prong examines only the meaningfulness of the statement's cautionary language, not the speaker's mental state or purported knowledge. The other prong—joined to this subsection of the statute by an "or"—precludes liability for forward-looking statements where "the plaintiff fails to prove" that the individual who made or

---

[16] *See* Ex. 19 at 1 ("civil aviation authorities … will determine the timing of return to service"); Ex. 22 at 2 ("the principal schedule risk on [return to service] continues to be a regulator alignment around the world and regulator approvals" and "[u]ltimately return-to-service timing will be determined by the regulator").

33

approved the statement had "actual knowledge" it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B). Because the PSLRA uses the disjunctive "or" between these provisions, it creates two *independent* safe harbors. It is therefore erroneous to evaluate the meaningfulness of the cautionary language accompanying the return-to-service estimates by considering what Muilenburg supposedly knew at the time of his statements.[17]

In *St. Lucie*, this Court rejected the notion that the speaker's state of mind should be considered when evaluating a forward-looking statement's cautionary language. In that case, Motorola argued that the PSLRA's safe harbor protected its executive's forward-looking earnings projections because the statements were accompanied by meaningful cautionary language. 2011 WL 814932, at *8. Plaintiffs responded that the cautionary language was not meaningful because the executive was aware that the warned-of risks had "already come to pass."[18] The Court rejected that argument, explaining that if "a forward-looking statement is accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is 'irrelevant, and the statement is not actionable regardless of [a] plaintiff's showing of scienter.'" *Id.* at *9 (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112–13 (9th Cir. 2010)). Other courts in this District have likewise rejected the argument that the meaningfulness of a statement's cautionary language depends on the speaker's state of mind. *See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 876 (N.D. Ill. 2011); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1168 (N.D. Ill. 2004).

Any contrary ruling would read the first prong of the PSLRA safe harbor out of existence.

---

[17] Plaintiff alleges that Elwell's June 2019 comment was made in a "secret" meeting with Muilenburg and "[u]nbeknownst to investors" until later that year. *See* Am. Compl. ¶ 239; *see* Ex. 28. Elwell's comment is thus potentially relevant only to what was known by Muilenburg, not by investors.

[18] Mem. in Opp'n to Defs.' Mot. to Dismiss at 21, *St. Lucie*, No. 1:10-cv-427 (N.D. Ill. Feb. 28, 2011), ECF No. 66.

As Judge Easterbrook explained:

> A safe harbor matters only when the firm's disclosures (including the accompanying cautionary statements) are false or misleadingly incomplete; yet whenever that condition is satisfied, one can complain that the cautionary statement must have been inadequate. The safe harbor loses its function. Yet it would be unsound to read the statute so that the safe harbor never works; then one might as well treat [the safe harbor] as defunct.

*Asher*, 377 F.3d at 729.

Second, even if the speaker's state of mind were relevant to whether cautionary language is meaningful, the *Seeks* court failed to account for the mismatch between Elwell's alleged comment and Defendants' particular return-to-service estimates. Even read favorably to Plaintiff, Elwell's alleged statement cannot be read to mean that Boeing should stop making return-to-service estimates altogether, regardless of their substance and even if they included express reminders that the FAA ultimately controlled the process. Neither Muilenburg's estimate that Boeing was still "looking at" a return to service at the end of summer—three months later—nor any of his later estimates were inconsistent with a request to slow down "talk of progress."

The return-to-service projections are also independently protected by the second prong of the PLSRA's safe harbor because Plaintiff pleads no facts showing that Muilenburg, or anyone else who prepared or approved the estimates, had "actual knowledge" the estimates were inaccurate. 15 U.S.C. § 78u-5(c)(1)(B)(i). Plaintiff does not allege that Muilenburg knew in June 2019 that Boeing was not "looking at" the end of the summer as the "timeframe" for the 737 MAX's return to service, or that he knew in September 2019 that Boeing was not "targeting" early fourth quarter for return to service, or that he knew in November 2019 that it was not "possible that the resumption of MAX deliveries to airline customers could begin in December" 2019. Am. Compl. ¶¶ 321, 328, 331.

Elwell's alleged request in early June 2019 that Boeing downplay talk of progress does not

35

establish that Muilenburg had "actual knowledge" that his end of summer 2019 estimate was inaccurate. And Plaintiff has no theory at all for why Elwell's suggestion supposedly shows that Muilenburg had "actual knowledge" that the *revised* return-to-service estimates in July and September 2019 were false. The November 2019 estimate—nearly five months after Elwell's alleged request and after Boeing had *twice* revised its return-to-service estimates—is even further removed. Because none of these return-to-service estimates is contradicted by Elwell's alleged suggestion, they are protected by the second prong of the PSLRA's safe harbor.

### b. Boeing's return-to-service projections are nonactionable statements of opinion.

Boeing's return-to-service projections are also not actionable as fraud because they are statements of opinion, and Plaintiff's allegations do not plead facts that satisfy the *Omnicare* standard for pleading fraud based on opinions. *See City of Westland Police and Fire Ret. Sys. v. MetLife¸* 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015) ("While … estimates involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief."). As explained above, Plaintiff does not plead that Muilenburg or anyone responsible for the estimates did not believe they were attainable at the time. Nor does Plaintiff plead facts showing that the estimates did not fairly align with what the speakers knew at the time of the statements. This is an independent basis to dismiss all claims based on Defendants' return-to-service estimates.

### B. Plaintiff does not plead particularized facts giving rise to a "strong inference" that the speakers of the challenged statements acted with scienter.

The complaint should also be dismissed because Plaintiff fails to plead scienter with the requisite particularity. Scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). To plead scienter, a plaintiff must "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with

36

the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A) (emphases added). To be strong, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. The plaintiff must satisfy this pleading burden with respect to each defendant and each alleged misstatement. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008). The complaint here falls well short of the mark.

### 1. Plaintiff does not plead facts giving rise to a strong inference that the speakers knew their statements were false.

Plaintiff's allegations fail at the first step: They do not give rise to a strong inference that Muilenburg or anyone else who prepared or approved the statements knew that the statements were false. Most of Plaintiff's scienter allegations are not tied to any individual and therefore fail on their face. Throughout the complaint, Plaintiff instead alleges that "Defendants" knew things, grouping Boeing and Muilenburg together without distinction. *E.g.*, Am. Compl. ¶¶ 335–42, 349–50, 354–58. But allegations of what a corporation "knew" are insufficient to plead scienter because "[i]ntent to deceive is not a corporate attribute." *Tellabs I*, 513 F.3d at 707. "To establish corporate liability for a violation of Rule 10b-5 requires look[ing] to the state of mind of the individual corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)." *Id.* (quotation marks omitted). Plaintiff does not allege with particularity facts supporting a strong inference that Muilenburg or anyone else who prepared or approved any alleged misstatement acted with intent to deceive. As a result, they simply do not plead scienter.

In an attempt to plead scienter for the "safety" and "existing procedures" statements, Plaintiff alleges that Muilenburg and others were updated on the Safety Review Board's investigation. Am. Compl. ¶¶ 341–46. But these allegations defeat—rather than support—any inference of intent to deceive. Boeing convened a Safety Review Board immediately after the

37

Lion Air accident to begin considering what factors might have contributed to it. *Id.* ¶¶ 149–50. One possibility identified early on was inappropriate crew response to erroneous MCAS activation. *Id.* ¶ 149. The flight data recorder supported this hypothesis. *Id.* The Safety Review Board thus concluded that Boeing should issue a bulletin reminding flight crews of how to "properly respond" to the conditions encountered on the Lion Air flight. *Id.* ¶ 152. The FAA later issued an emergency airworthiness directive endorsing the guidance in Boeing's bulletin. *Id.* ¶¶ 158–59.

The challenged statements regarding the safety of the 737 MAX and the adequacy of existing procedures were consistent with the conclusions of both the Safety Review Board and the FAA. Plaintiff alleges no basis for Muilenburg or anyone else involved in the statements to second-guess what Boeing's technical experts and the FAA had concluded—that existing procedures provided the proper response to an erroneous MCAS activation and, after reminding pilots of those procedures, the 737 MAX remained safe to fly. Plaintiff's allegations thus negate any possible inference of scienter—or, at the very least, render it not "as compelling as [the] opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. As the court concluded in another Boeing case, "[t]he much more plausible inference is that, like Boeing's safety engineers and the FAA, Muilenburg believed the airplane remained safe to fly." *College Retirement Equities Fund*, 2023 WL 6065260, at *9; *see also Seeks I*, 2022 WL 3595058, at *10 ("At worst, the Safety Board's conclusions … support an inference of negligence on Muilenburg's part").

Plaintiff next alleges that a Boeing engineer named Thomas Dodt told Boeing Vice President of Engineering, John Hamilton, that "MCAS could not be controlled after repeated activations and that Boeing had never even tested the hazards associated with repeated MCAS activation." Am. Compl. ¶ 345. Setting aside that Plaintiff mischaracterizes what Dodt actually said, neither of these purported statements would have given Boeing's technical experts—much

less Muilenburg—reason to believe that the airplane was unsafe to fly or that pilots could not counter an erroneous MCAS activation using the runaway stabilizer procedure. To the contrary, the Safety Review Board was well aware that, *without a proper pilot response*, repeated MCAS activations could result in a mis-trim condition that would make it difficult to control the aircraft. The November 6 bulletin advised flight crews that the stabilizer could "reach the nose down limit" if pilots did not execute the runaway stabilizer procedure. Ex. 1 at 1. The FAA's airworthiness directive likewise noted this risk and instructed pilots to follow the same procedures highlighted in Boeing's bulletin. Am. Compl. ¶ 159; *see also* Ex. 2 at 1. In short, both the Safety Review Board and the FAA concluded that—notwithstanding whatever Dodt might have told Hamilton— existing procedures were sufficient to respond to erroneous MCAS activation and the 737 MAX remained safe to fly. The fact that the Safety Review Board and the FAA were aware of these facts refutes any possible inference that Muilenburg acted with scienter when he spoke.

In any event, Plaintiff does not even allege that Hamilton reported Dodt's message to Muilenburg. Plaintiff at most alleges that Hamilton would generally update Muilenburg on the Safety Review Board's conclusions and the internal investigation's findings. Am. Comp. ¶¶ 151, 155. These general allegations about updates are not a basis to attribute *Hamilton*'s alleged knowledge to Muilenburg—precisely the type of group pleading the PSLRA's particularity requirement forbids. *See Tellabs I*, 513 F.3d at 710.

Plaintiff next attempts to plead scienter by alleging that in January 2019—*after* most of the alleged misstatements concerning the safety of the MAX and the existing procedures available to pilots—Muilenburg learned about a 2016 instant message exchange involving a Boeing technical pilot, Mark Forkner, regarding what he believed was an MCAS malfunction in flight simulator testing. Am. Compl. ¶¶ 129, 207, 336. Although Plaintiff suggests that Muilenburg's awareness

39

of these messages supports an inference of scienter, the complaint never identifies which statements would be implicated, and the suggested inference is implausible.

To start, Plaintiff alleges only that Muilenburg was informed *about* the Forkner messages, not that he actually examined them, and Plaintiff does not specify what Muilenburg was told about the messages. *Id.* ¶ 207. The messages described Forkner's experience in a *simulator*, and nothing in the messages indicates that Forkner expressed concerns about the safety of the airplane itself. *Id.* ¶ 129. Plaintiff also does not explain what Forkner's comment meant, what caused the 2016 simulator issue, what actions Boeing took in response, or why Muilenburg should have viewed the messages as casting doubt on the 737 MAX's safety or certification when the message involved a simulator, especially when Muilenburg learned of it *after* the FAA's intensive regulatory engagement following the Lion Air accident.

Moreover, Forkner's interactions with the FAA did *not* relate to the design of the airplane or the FAA's certification of that design as airworthy. Rather, Forkner's "[t]eam was *separate and distinct* from" the "group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards," and "others in the Company *disclosed* MCAS's expanded operational scope to" the FAA group responsible for certifying airworthiness. Ex. 30 at ¶¶ 4h, 11 (emphasis added). Against this backdrop, Plaintiff's allegations regarding the Forkner messages cannot support any inference, much less a "compelling" inference, that Muilenburg knew his statements about the 737 MAX's design, safety, and certification were false or misleading.

With respect to the return-to-service statements, Plaintiff alleges that then-acting FAA Administrator Elwell's alleged request to Muilenburg in early June 2019 to "slow down … talk of progress" on return to service should have alerted him that Boeing's later return-to-service

projections over the next five months were too optimistic. Am. Compl. ¶ 350. These allegations cannot support a strong inference of scienter because Plaintiff fails to point to anything that Elwell (or anyone else) allegedly said that contradicted Boeing's return-to-service estimates at the time those estimates were made between June and November 2019. *See supra* at 6-7. The notion that Boeing was lying to the public during that five-month period while its regulator stood by silently, refusing to correct those estimated dates, strains credulity.

Plaintiff's final scienter theory is based on the allegation that an employee at one of Boeing's production facilities, Edward Pierson, raised concerns about production quality to the head of Boeing's 737 MAX program in the summer of 2018 and sent a letter raising similar issues to Muilenburg in December 2018, two months after the Lion Air accident. Am. Compl. ¶¶ 138, 205. These allegations do not support any inference of scienter for at least two reasons. First, Plaintiff does not allege that Pierson's concerns about *production issues* had anything to do with the supposed *design flaws* related to MCAS that are the focus of the complaint. Nor does Plaintiff suggest that any alleged misstatements touched on those production issues. Second, the letter Pierson allegedly sent Muilenburg does not support scienter because knowledge of *accusations* does not constitute knowledge of *misconduct*. *Pugh*, 521 F.3d at 695 (holding that allegation that lawsuits filed against defendants made them aware of fraud "completely misses the boat" because litigation confers knowledge only "of accusations of fraud, not fraud itself"). Plaintiff does not allege what, if anything, Muilenburg learned about the accuracy of any of Pierson's accusations, or how any such knowledge could support scienter for statements entirely unrelated to production.

### 2. Plaintiff's circumstantial allegations do not support a strong inference of scienter.

Attempting to make up for the complaint's threadbare allegations of actual knowledge, Plaintiff attempts to craft a circumstantial case for inferring scienter. But these circumstantial

41

allegations come no closer to pleading the required "strong inference" of scienter.

Plaintiff first alleges that the 737 MAX was an "integral part" of Boeing's business, highlighting that the 737 MAX accounts for an outsized portion of the Company's annual revenue. Am. Compl. ¶ 353. This is known as a "core operations" theory of scienter. But courts routinely reject this theory as a basis for pleading scienter. *See Société Général Sec. Servs., GBMH v. Caterpillar, Inc.*, 2018 WL 4616356, at *8 (N.D. Ill. Sept. 26, 2018); *Chandler v. Ulta Beauty, Inc.*, 2022 WL 952441, at *25 (N.D. Ill. Mar. 30, 2022). And for good reason: The core operations theory is antithetical to the PSLRA's requirement that the facts supporting the scienter inference be "state[d] with particularity." 15 U.S.C. § 78u-4(b)(1). If it were enough for a plaintiff to plead that a corporate executive made a false or misleading statement about something "important" to the company, that would eliminate the particularity requirement altogether.

More fundamentally, just because executives generally stay abreast of their company's key operations does not mean they know every fact about them. Especially in a case like this involving a company that makes many highly complex products consisting of thousands of different parts and systems, spanning a spectrum of specialized fields, there is no basis to infer that Boeing's CEO was familiar with every detail of a particular aircraft's software design or certification, and Plaintiff does not allege facts establishing Muilenburg's exposure to that information. Courts in the other securities actions involving Boeing rejected this theory of scienter. *College Ret. Equities Fund*, 2023 WL 6065260, at *10; *Seeks I*, 2022 WL 3595058, at *11. This Court should do the same.

Plaintiff's next circumstantial allegation is that Boeing employees were "concerned about emphasizing MCAS to the FAA" during the 737 MAX's development because it could have resulted in a higher level of pilot training, which "would have been prohibitively expensive and time-consuming for airlines, and, by extension, Boeing." Am. Comp. ¶ 337. This allegation

42

cannot support any inference of scienter with respect to any of the alleged misstatements because none of them concern the level of required pilot training.

Finally, Plaintiff speculates that Muilenburg's resignation in December 2019 is evidence of scienter. *Id.* ¶ 351. But nothing about his departure, nine months after the second accident, supports an inference of scienter. The more natural inference is straightforward: Two planes had tragically crashed and the 737 MAX fleet had been grounded for nine months, with dire financial consequences for Boeing, all of which, not surprisingly, led to the CEO's departure. Plaintiff alleges no facts suggesting that Muilenburg resigned because anyone had engaged in fraud. *See Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (finding no inference of scienter where complaint merely alleged CFO's resignation was in close proximity to alleged fraud); *In re Ceridian Sec. Litig.*, 542 F.3d 240, 249 (8th Cir. 2008) (similar).

Because the complaint is devoid of particularized factual allegations giving rise to an inference that Muilenburg or anyone else who prepared or approved the statements acted with intent to deceive in uttering any alleged misstatement, Plaintiff fails to satisfy the first part of the scienter analysis, and the complaint should be dismissed.

### C. The more compelling inference from Plaintiff's allegations is that Defendants did not act with scienter.

Turning to the next part of the analysis, Plaintiff fails entirely to establish that the inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 309. In applying this part of the test, the Court "must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Pugh*, 521 F.3d at 693.

Here, the opposing inference of nonfraudulent intent is far more compelling than the inference of intent to deceive. As Plaintiff acknowledges, "in the hours following" the first

43

accident, Boeing convened experts in an effort to understand what factors may have contributed to the accident and identified a possible scenario involving MCAS activation. Am. Compl. ¶ 149. Boeing officials also met with the FAA to explain the details of MCAS. *Id.* ¶ 158. Within a week, Boeing issued a bulletin to operators, reinforcing the relevant flight procedure to follow should pilots encounter the conditions experienced on the Lion Air flight. *Id.* ¶¶ 163–64. The next day, the FAA issued an emergency airworthiness directive that gave pilots the same guidance. *Id.* ¶ 159. And in the following weeks and months, Boeing engaged in extensive additional dialogue with the FAA and other regulatory authorities in an effort to understand the causes of the accidents and evaluate possible additional safety measures. *See, e.g.*, Ex. 4 at 3. These allegations show that Boeing moved swiftly after the accidents to understand potential causes and to share information with pilots, all in close coordination with regulatory authorities.

Plaintiff's competing inference—that Boeing's most senior executives knew the plane was unsafe, knew the design and certification process was flawed, knew pilots could not counteract an erroneous MCAS activation using existing procedures, and knew that the 737 MAX would not return to service on their estimated timetable, and then lied about all of those issues—is wholly implausible by comparison. In fact, Plaintiff's proffered inference makes little sense. For example, if Muilenburg and others knew existing procedures would not work, then why would Boeing voluntarily issue a bulletin advising pilots to follow those procedures? What gain could Boeing possibly hope to achieve from giving flight crews ineffective instructions? And why would the FAA give the same guidance to pilots? Plaintiff's allegations cannot answer these questions.

The far more compelling inference is that Muilenburg and others at Boeing (1) believed the Company had manufactured a safe aircraft; (2) believed the design and certification process was robust; (3) believed that pilots had the information and training to safely address an erroneous

44

MCAS activation using existing procedures, particularly after Boeing issued the bulletin to operators and the FAA endorsed it; and (4) after the grounding, believed that Boeing was making progress toward the aircraft's return to service and expected to complete the process on the disclosed timetables. The Court should accordingly dismiss the complaint.

## IV. Plaintiff Does Not Adequately Plead Loss Causation.

The complaint should also be dismissed because Plaintiff does not adequately plead loss causation for any alleged misstatement. To plead loss causation, a plaintiff must allege a causal nexus between the alleged misrepresentations and the losses the plaintiff seeks to recover. *Dura Pharm.*, 544 U.S. at 341. The plaintiff thus must allege facts showing "that it was the very facts about which the defendant lied which caused its injuries," rather than ordinary market forces or business reversals. *Tricontinental Indus., Ltd. v. PwC*, 475 F.3d 824, 842 (7th Cir. 2007). A plaintiff can plead loss causation by alleging facts showing that when the truth regarding an alleged misstatement emerged—referred to as a "corrective disclosure"—the value of the company's stock declined as a result. *Dura Pharm.*, 544 U.S. at 346–47. Here, Plaintiff alleges four purported "corrective disclosures." But Plaintiff does not—and cannot—establish a connection between the stock-price declines on those dates and the *correction* of any alleged misstatement.

July 24, 2019: Plaintiff alleges Boeing's stock price declined when "Muilenburg hinted at the possibility that production for the 737 MAX could be halted altogether" if the grounding of the MAX continued. Am. Comp. ¶ 378. Plaintiff asserts that this disclosure revealed that "[t]he 737 MAX was fundamentally unsafe and could not be fixed by way of a quick and easy change to MCAS." *Id.* ¶ 379. This leap in logic is unsupported. Plaintiff nowhere explains how a statement that "hinted at the possibility" of a production halt—which on its face said nothing about the safety of the 737 MAX or MCAS—revealed the falsity of any of Defendants' prior statements, none of which concerned whether Boeing would continue producing the 737 MAX during its grounding.

45

Beyond this disconnect, the possibility of a production halt was not news as of July 24, 2019. Boeing had previously delivered the same warning to investors in its first quarter 10-Q, filed on April 24, 2019, disclosing that delays in returning the 737 MAX to service "could result in additional disruption to the 737 production system, including further reductions in the production rate *and/or a temporary cease of production*." Ex. 13 at 50 (emphasis added). An alleged disclosure that contains no new information is not a *corrective* disclosure that can support a plausible inference of loss causation. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011) ("Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time"); *see also In re Omnicom Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010) (similar). And, tellingly, neither court in the other securities actions involving Boeing concluded that the alleged disclosure on July 24, 2019, supported loss causation for any of the statements challenged here. *See Seeks II*, 752 F. Supp. 3d at 1021–24, 1026–27; *College Ret. Equities Fund*, 2023 WL 6065260, at *24; *Seeks I*, 2022 WL 3595058, at *29.

October 18, 2019: On October 18, 2019, *The New York Times* published an article containing the 2016 instant messages sent by former Boeing technical pilot Mark Forkner in which he described his experience with MCAS in a flight simulator and his communications with the FAA group responsible for approving pilot training. Am. Compl. ¶¶ 129–30, 382. Forkner's messages included highly inflammatory language about his dealings with the FAA, including the statement that he "basically lied to the regulators (unknowingly)." *Id*. ¶ 129. As such, the publication of these messages reflected concerning conduct by Forkner and another Boeing employee, and their disclosure in *The New York Times* was embarrassing to Boeing and damaging to its business. This headline news also came at a time when Boeing was already under intense media and regulatory scrutiny and days before its then-CEO, Dennis Muilenburg, was set to testify

46

before Congress. *See id.* ¶ 259. Not surprisingly, Boeing's stock price dropped after *The New York Times* published Forkner's messages. As troubling as they were, however, the messages corrected no prior misstatements. Indeed, publication of the messages would have negatively affected Boeing's business going forward and its stock price would have declined even if Defendants had made none of the challenged statements.

Moreover, the Forkner messages did not reveal any new information about the 737 MAX's design and certification. Defendants' statements addressed the 737 MAX's design from an *engineering* perspective and its certification as airworthy under federal regulations. *Supra* at 26-27. Forkner was not an engineer, and he did not work on certifying the 737 MAX as a safe aircraft. *See id.* ¶¶ 69–70, 118. Instead, Forkner's messages related to his communications with the FAA group responsible for evaluating the pilot-training requirements for the 737 MAX. Another group at the FAA was responsible for certifying the 737 MAX's design as airworthy, and Boeing fully disclosed the expanded operation of MCAS to the FAA "personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." Ex. 30 at ¶ 4h.

Similarly, the messages did not reveal any new information about the safety of the 737 MAX. By the time the messages were published by *The New York Times*, the market well understood that MCAS was a common factor in Lion Air and Ethiopian Airlines accidents, and the 737 MAX had been grounded worldwide for seven months. *See* Am. Compl. ¶¶ 220, 232. Numerous articles had also examined MCAS's design and development in great detail, highlighting the very features Plaintiff says made the aircraft unsafe. *E.g.*, Exs. 10, 16. And, as Plaintiff acknowledges, Boeing had already announced that it was working on a software redesign for MCAS. Am. Compl. ¶ 217; Ex. 8 at 1 (Mar. 11, 2019 software announcement). In short, Forkner's messages were "not breaking news" insofar as they addressed MCAS, and "[t]he extent

47

of public awareness is fatal to the plaintiffs' loss causation theory." *See Holwill v. AbbVie Inc.*, 2025 WL 1908156, at \*21 (N.D. Ill. July 10, 2025). "It stands to reason, then, that the mere publication of the [Forkner messages] altered share prices for reasons unrelated to any correction of a defendant's prior misstatement." *See id.*

The messages also did not reveal any new information about existing procedures. The messages say nothing at all about the runaway stabilizer procedure or whether pilots could use it to counteract an erroneous MCAS activation. There also was considerable public discussion about the perceived shortcomings of those procedures in the weeks and months after the Ethiopian Airlines accident—well before the Forkner messages became public in October 2019. *E.g.* Exs. 12, 11. Again, given all the facts in the public record, the Forkner messages disclosed no new information that "corrected" the statements about the sufficiency of existing procedures.

Finally, the Forkner messages did not correct Defendants' estimates of when the 737 MAX might return to service. Although the complaint quotes analyst reports suggesting that the publication of the messages might adversely affect Boeing's relationship with the FAA and thus delay the 737 MAX's return to service, Am. Compl. ¶¶ 385–87, that does not mean that the messages "corrected" Defendants' prior return-to-service estimates—*i.e.*, show that those estimates were false when made. Analysts instead speculated that publication of the messages could potentially delay the 737 MAX's return to service going forward by negatively affecting Boeing's relationship with the FAA after October 2019.

October 20, 2019: Plaintiff next cites a *Wall Street Journal* article published on October 20, 2019, addressing a three-year-old Boeing survey showing that some workers "felt 'potential undue pressure' from managers regarding safety-related approvals by federal regulators across an array of commercial planes." *Id.* ¶ 383. But Plaintiff fails to identify any corrective information in this

48

article relevant to the alleged misstatements. The results of a general survey of employees "across an array of commercial airplanes" cannot plausibly be understood to say anything specific about the 737 MAX program, let alone MCAS or the 737 MAX's pilot manuals.

December 16, 2019: On December 16, 2019, Boeing announced that it was temporarily suspending production of the 737 MAX. *Id.* ¶ 388. Again, this development negatively affected Boeing's business going forward and caused Boeing's stock price to decline—something that would have happened even if none of the challenged statements had been made. Although Plaintiff does not identify which statements this disclosure supposedly corrected, the production-halt announcement could plausibly relate only to the return-to-service estimates. But the December 16 announcement revealed no new corrective information about the 737 MAX's return to service.

All but one of the challenged statements predicted that the 737 MAX would return to service "early in the fourth quarter" of 2019 or earlier. *Id.* ¶¶ 321, 323, 325–26, 328–29. Each of these statements was "corrected" by the passage of time before December 16. By that date, the market already understood that return to service would not occur by the "end of summer," "in the September timeframe," or "early in the fourth quarter" of 2019.

That leaves only the November 11, 2019, statement that "it is possible that the resumption of MAX deliveries to airline customers could begin in December." *Id*. ¶ 331. Plaintiff's own allegations establish, however, that this statement also was corrected before December 16. Plaintiff acknowledges that on December 12, four days earlier, the market learned that the 737 MAX "would not be returned to service until 2020." *Id.* ¶ 269. Plaintiff quotes a December 12 *Reuters* article that reported the 737 MAX would not return to service on the predicted timeline. *Id.* ¶ 268; *see* Ex. 27. Numerous outlets released similar reports, such as *The Seattle Times* report on December 11 that the timeline had slipped to mid-February 2020. Ex. 26; *see* Exs. 25, 24.

Plaintiff's pleadings thus leave no doubt that the December 16 production-halt announcement was not a corrective disclosure for the challenged return-to-service statements. By December 12 at the latest, the market understood that the 737 MAX was not going to return to service in 2019. As a result, the December 16 announcement provided no new information to the market about the 737 MAX's expected return-to-service timing and was not a corrective disclosure as a matter of law. *See In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 472 (E.D.N.Y. 2020) ("Plaintiffs cannot rely on events that happened after Hewitt's misconduct was revealed to the market … to establish loss causation").[19]

## CONCLUSION

For the foregoing reasons, the Court should dismiss this action with prejudice.[20]

---

[19] Plaintiff alleges that its assignors purchased Boeing stock on several dates in early 2020. *See* Am. Compl. Exs. A, B. Plaintiff does not plead loss causation for any alleged losses related to these transactions because the transactions occurred *after* the last alleged corrective disclosure. Plaintiff's theory is that the alleged misstatements were all "corrected" by December 16, 2019. Am. Compl. ¶¶ 375–89. The "correction" of the alleged misstatements would sever any causal link between those statements and losses incurred with transactions after that date.

[20] Because Plaintiff fails to allege a primary violation of Section 10(b), it also fails to state a Section 20(a) claim against Muilenburg. *See Pugh*, 521 F.3d at 693.

Dated: August 15, 2025

Respectfully submitted,

*/s/ John F. Hartmann*
John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
Telephone: (312) 862-2000
john.hartmann@kirkland.com
brenton.rogers@kirkland.com

Kenneth Monroe
KIRKLAND & ELLIS LLP
200 Clarendon Street
Boston, MA 02116
Telephone: (617) 385-7500
kenneth.monroe@kirkland.com

*Counsel for Defendants*

51

52

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2025, a true and correct copy of the foregoing document was served on all counsel of record via the Court's CM/ECF system.

/s/ John F. Hartmann
John F. Hartmann, P.C.