**fUNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| VALUE RECAPTURE PARTNERS LLC, <br><br> Plaintiff, <br><br> v. <br><br> THE BOEING COMPANY and DENNIS A. MUILENBURG, <br><br> Defendants. | Case No. 1:23-cv-16550 <br><br> Hon. Virginia M. Kendall |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED COMPLAINT**

John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
Jules H. Cantor
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862 2000
john.hartmann@kirkland.com
brenton.rogers@kirkland.com
jules.cantor@kirkland.com

*Counsel for Defendants*

Dated: May 5, 2026

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ...................................................................................................... 1

BACKGROUND .............................................................................................................................. 3

I. PROCEDURAL HISTORY............................................................................................... 3

    A. The Court's Prior Dismissal Order ........................................................................ 3

    B. VRP's New Allegations Regarding the Purported Assignment ........................... 5

II. FACTUAL BACKGROUND............................................................................................. 6

III. VRP'S SECURITIES-FRAUD CLAIMS AS AN ALLEGED ASSIGNEE.................... 10

ARGUMENT.................................................................................................................................. 10

I. VRP STILL LACKS STANDING TO ASSERT SECURITIES-FRAUD CLAIMS
    AS AN ALLEGED ASSIGNEE. .................................................................................... 10

II. VRP'S ASSIGNED CLAIMS ARE TIME-BARRED. ................................................... 14

III. THE SAC FAILS TO STATE A CLAIM FOR SECURITIES FRAUD. ........................ 18

    A. The SAC does not adequately plead a material misstatement. ........................... 19

        1. The SAC does not adequately allege that the safety statements were
            material or false or misleading................................................................. 19

        2. The SAC does not adequately allege that the existing procedures
            statements were false or misleading. ....................................................... 24

        3. The SAC does not adequately allege that the statements about the
            737 MAX design and certification were false or misleading. ................. 26

        4. The SAC does not adequately allege that the statements about the
            737 MAX's expected return to service were false or misleading............ 32

    B. The SAC does not adequately plead scienter.................................................... 38

        1. The SAC does not plead facts giving rise to a strong inference that
            the speakers knew their statements were false......................................... 38

        2. The SAC's circumstantial allegations of scienter are insufficient............ 42

        3. The more compelling inference from the SAC's allegations is that
            Defendants did not act with scienter.......................................................... 44

    C. The SAC does not adequately plead loss causation........................................... 45

CONCLUSION............................................................................................................................... 50

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aly v. Valeant Pharm. Int'l Inc*,
1 F.4th 168 (3d Cir. 2021) ...................................................................................17

*American Pipe & Constr. Co. v. Utah*,
414 U.S. 538 (1974)...................................................................................2, 15, 16, 17

*Apex Digital, Inc. v. Sears, Roebuck & Co.*,
572 F.3d 440 (7th Cir. 2009) ...............................................................................10

*Asher v. Baxter Int'l, Inc.*,
377 F.3d 727 (7th Cir. 2004) ...................................................................33, 34, 36

*Aviva Life & Annuity Co. v. Davis*,
20 F. Supp. 3d 694 (S.D. Iowa 2014) ...................................................................11

*In re Bally Total Fitness Sec. Litig.*,
2006 WL 3714708 (N.D. Ill. July 12, 2006).........................................................43

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975)................................................................................... *passim*

*In re Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ................................................. *passim*

*In re Boeing Co. Aircraft Sec. Litig.*,
2026 WL 734721 (N.D. Ill. Mar. 16, 2026)....................................................16, 50

*In re BP p.l.c. Sec. Litig.*,
2016 WL 29300 (S.D. Tex. Jan. 4, 2016)..........................................11, 12, 13, 14

*In re Brand Name Prescription Drugs Antitrust Litig.*,
1998 WL 474146 (N.D. Ill. Aug. 6, 1998) ............................................................18

*CalPERS v. ANZ Sec., Inc.*,
582 U.S. 497 (2017).............................................................................................17

*Calvello v. Elec. Data Sys.*,
2004 WL 941809 (W.D.N.Y. Apr. 15, 2004).........................................................17

*Cause of Action v. Chicago Transit Auth.*,
815 F.3d 267 (7th Cir. 2016) ...............................................................................27

*In re Ceridian Corp. Sec. Litig.*,
542 F.3d 240 (8th Cir. 2008) ...............................................................................44

*China Agritech v. Resh*,
584 U.S. 732 (2018)..............................................................................................16

*City of Monroe Emp. Ret. Sys. v. Bridgestone*,
399 F.3d 651 (6th Cir. 2005) ..........................................................................19, 20

*City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*,
8 F.4th 592 (7th Cir. 2021) ..................................................................................19

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*,
70 F.4th 668 (3d Cir. 2023) .................................................................................25

*City of Westland Police and Fire Ret. Sys. v. MetLife Inc.*,
129 F. Supp. 3d 48 (S.D.N.Y. 2015).....................................................................37

*Coll. Ret. Equities Fund v. Boeing Co.*,
2023 WL 6065260 (N.D. Ill. Sept. 18, 2023) ...................................................... *passim*

*Coll. Ret. Equities Fund v. Boeing Co.*,
2026 WL 891657 (N.D. Ill. Mar. 31, 2026)..............................................20, 21, 47

*Crown, Cork & Seal Co., Inc. v. Parker*,
462 U.S. 345 (1983).................................................................................15, 16, 17

*In re Cutera Sec. Litig.*,
610 F.3d 1103 (9th Cir. 2010) ..............................................................................36

*Denius v. Dunlap*,
330 F.3d 919 (7th Cir. 2003) ..................................................................................8

*DiLeo v. Ernst & Young*,
901 F.2d 624 (7th Cir. 1990) ................................................................................18

*Dobyns v. Trauter*,
552 F. Supp. 2d 1150 (W.D. Wash. 2008)..............................................................11

*Dura Pharm. v. Broudo*,
544 U.S. 336 (2005).........................................................................................18, 46

*ECA v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)..............................................................................21, 22

*Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*,
905 F.3d 892 (5th Cir. 2018) ................................................................................22

*In re Ford Motor Co. Sec. Litig.*,
 381 F.3d 563 (6th Cir. 2004) ...................................................................................23

*Fry v. UAL Corp.*,
 84 F.3d 936 (7th Cir. 1996) ......................................................................................4

*Gavin v. AT & T Corp.*,
 2004 WL 2260632 (N.D. Ill. Sept. 30, 2004) ........................................................12

*Gillis v. QRX Pharma*,
 197 F. Supp. 3d 557 (S.D.N.Y. 2016)......................................................................23

*Glater v. Eli Lilly & Co.*,
 712 F.2d 735 (1st Cir. 1983)....................................................................................17

*In re Hanford Nuclear Rsrv. Litig.*,
 534 F.3d 986 (9th Cir. 2008) ...................................................................................17

*Herron v. Gold Standard Baking, Inc.*,
 2021 WL 1340804 (N.D. Ill. Apr. 9, 2021) .......................................................17, 18

*Higginbotham v. Baxter Int'l Inc.*,
 495 F.3d 753 (7th Cir. 2007) ...................................................................................38

*Hirtenstein v. Cempra, Inc.*,
 348 F. Supp. 3d 530 (M.D.N.C. 2018) .....................................................................23

*Holwill v. AbbVie Inc.*,
 2025 WL 1908156 (N.D. Ill. July 10, 2025)............................................................48

*Katyle v. Penn Nat'l Gaming, Inc.*,
 637 F.3d 462 (4th Cir. 2011) ...................................................................................47

*Makor Issues & Rts., Ltd. v. Tellabs, Inc.*,
 437 F.3d 588 (7th Cir. 2006), *rev'd on other grounds*, *Tellabs II*, 551 U.S. 308 ....................19

*Makor Issues & Rts., Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) .......................................................................38, 39, 40

*Merck & Co. v. Reynolds*,
 559 U.S. 633 (2010).................................................................................................15

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*,
 547 U.S. 71 (2006)....................................................................................................4

*In re Midway Games, Inc. Sec. Litig.*,
 332 F. Supp. 2d 1152 (N.D. Ill. 2004) .....................................................................36

iii

*In re Neurotrope, Inc. Sec. Litig.*,
    315 F. Supp. 3d 721 (S.D.N.Y. 2018)................................................................43

*Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*,
    300 F. Supp. 3d 551 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret.*
    *Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019) ........................................22

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)................................................................... *passim*

*In re Omnicom Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)...............................................................47

*Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v.*
    *Allscripts-Misys Healthcare Sols., Inc.*,
    778 F. Supp. 2d 858 (N.D. Ill. 2011) ...................................................36

*Pugh v. Tribune Co.*,
    521 F.3d 686 (7th Cir. 2008) .......................................................38, 42, 44, 50

*Schmude v. Sheahan*,
    312 F. Supp. 2d 1047 (N.D. Ill. 2004) ..................................................27

*Seeks v. The Boeing Co.*,
    752 F. Supp. 3d 992 (N.D. Ill. 2024) .......................................21, 35, 36, 47

*Smith v. Ayres*,
    977 F.2d 946 (5th Cir. 1992) ......................................................... *passim*

*Société Générale Sec. Servs., GBMH v. Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ........................................43

*St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*,
    2011 WL 814932 (N.D. Ill. Feb. 28, 2011) .........................................33, 34, 35, 36

*State Farm Mut. Auto. Ins. Co. v. Boellstorff*,
    540 F.3d 1223 (10th Cir. 2008) ........................................................17

*Tellabs v. Makor Issues & Rights*,
    551 U.S. 308 (2007)..............................................................18, 38, 39, 44

*Tricontinental Indus., Ltd. v. PwC LLP*,
    475 F.3d 824 (7th Cir. 2007) ...........................................................46

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)...................................................................19

iv

*Venture Assocs. Corp. v. Zenith Data Sys. Corp.*,
    987 F.2d 429 (7th Cir. 1993) ...................................................................................................7

*Wachovia Bank & Tr. Co. v. Nat'l Student Mktg. Corp.*,
    650 F.2d 342 (D.C. Cir. 1980) ...............................................................................................17

*In re WorldCom Sec. Litig.*,
    496 F.3d 245 (2d Cir. 2007).....................................................................................................17

*Wyser-Pratte Mgmt Co. v. Telxon Corp.*,
    413 F.3d 553 (6th Cir. 2005) ...................................................................................................17

*In re Yum! Brands Sec. Litig.*,
    73 F. Supp. 3d 846 (W.D. Ky. 2014) .....................................................................................23

*Zucco Partners v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ...................................................................................................44

**Statutes**

15 U.S.C. § 78u-4(b)(1) ..................................................................................................................43

15 U.S.C. § 78u-4(b)(2)(A)......................................................................................................18, 38

15 U.S.C. § 78u-5(i)(1)(B), (C) .....................................................................................................32

15 U.S.C. § 78u-5(c)(1)(A)(i) .........................................................................................................33

15 U.S.C. § 78u-5(c)(1)(B) .............................................................................................................35

15 U.S.C. § 78u-5(c)(1)(B)(i) ...................................................................................................33, 37

28 U.S.C. § 1658(b) ........................................................................................................................14

28 U.S.C. § 1658(b)(1) ....................................................................................................................15

49 U.S.C. § 44701............................................................................................................................8

Securities Exchange Act of 1934 Section 10(b) ..................................................................3, 10, 50

Securities Exchange Act of 1934 Section 20(a) ..................................................................3, 10, 50

**Rules**

Fed. R. Civ. P. 9(b) ........................................................................................................................18

Securities Exchange Act Rule 10b-5 ..................................................................................... *passim*

Fed. R. Civ. P. 12(b)(1) .................................................................................................14

Fed. R. Civ. P. 23 ..........................................................................................................15

**TABLE OF EXHIBITS TO DEFENDANTS' MOTION TO DISMISS**

| Exhibit Number | Exhibit Name |
|---|---|
| 1 | November 6, 2018 737 MAX Flight Crew Operations Manual Bulletin for The Boeing Company<br><br>*https://theaircurrent.com/wp-content/uploads/2018/11/boeing-737-max-service-bulletin-AOA-1920x1579.jpeg* |
| 2 | November 7, 2018 FAA Airworthiness Directive re The Boeing Company Airplanes<br><br>*https://theaircurrent.com/wp-content/uploads/2018/11/B737-MAX-AD-1107.pdf* |
| 3 | November 10, 2018 Boeing MOM re Multi-Model Stall Warning and Pitch Augmentation Operation<br><br>*https://www.aaiu.ie/sites/default/files/FRA/2018%20-%20035%20-%20PK-LQP%20Final%20Report.pdf* |
| 4 | November 13, 2018 *The Seattle Times*, U.S. Pilots Flying 737 MAX Weren't Told About New Automatic Systems Change Linked to Lion Air Crash<br><br>*https://www.seattletimes.com/business/boeing-aerospace/u-s-pilots-flying-737-max-werent-told-about-new-automatic-systems-change-linked-to-lion-air-crash/* |
| 5 | November 2018 Lion Air 610 Preliminary Accident Report<br><br>*https://web.archive.org/web/20191017072333/http://knkt.dephub.go.id/knkt/ntsc_aviation/baru/pre/2018/2018%20-%20035%20-%20PK-LQP%20Preliminary%20Report.pdf* |
| 6 | March 11, 2019 Boeing Press Release re 737 MAX Software Enhancement<br><br>*https://boeing.mediaroom.com/news-releases-statements?item=130402* |
| 7 | March 11, 2019 Continued Airworthiness Notification to the International Community (CANIC)<br><br>*https://www.faa.gov/sites/faa.gov/files/2021-08/Continued%20Airworthiness%20Notification%20to%20the%20International%20Community.pdf* |

i

| Exhibit Number | Exhibit Name |
|---|---|
| 8 | March 17, 2019 *The Seattle Times*, Flawed Analysis, Failed Oversight: How Boeing, FAA Certified the Suspect 737 MAX Flight Control System<br><br>*https://www.seattletimes.com/business/boeing-aerospace/failed-certification-faa-missed-safety-issues-in-the-737-max-system-implicated-in-the-lion-air-crash/* |
| 9 | March 31, 2019 *Reuters*, Regulators Knew Before Crashes That 737 MAX Trim Control Was Confusing In Some Conditions<br><br>*https://www.reuters.com/article/markets/corrected-insight-regulators-knew-before-crashes-that-737-max-trim-control-was-c-idUSL3N21G2D8/* |
| 10 | April 3, 2019 *The Seattle Times*, Why Boeing's Emergency Directions May Have Failed to Save 737 MAX<br><br>*https://www.seattletimes.com/business/boeing-aerospace/boeings-emergency-procedure-for-737-max-may-have-failed-on-ethiopian-flight/* |
| 11 | April 24, 2019 Boeing Q1 10-Q 2019<br><br>*https://www.sec.gov/Archives/edgar/data/12927/000001292719000030/a201903mar3110-q.htm* |
| 12 | April 29, 2019 Boeing Annual Meeting of Shareholders Transcript<br><br>*https://www.youtube.com/watch?v=zzDk4dVHo4k* |
| 13 | May 29, 2019 Boeing Investor Conference Transcript<br><br>*https://s2.q4cdn.com/661678649/files/doc_transcripts/2019/05/2019-Bernstein-Conference-Transcript.pdf* |
| 14 | June 1, 2019 *The New York Times*, Boeing Built Deadly Assumptions Into 737 Max, Blind to a Late Design Change<br><br>*https://www.nytimes.com/2019/06/01/business/boeing-737-max-crash.html* |
| 15 | June 26, 2019 Boeing Aspen Ideas Festival Transcript |
| 16 | June 26, 2019 Boeing 8-K 2019<br><br>*https://www.sec.gov/Archives/edgar/data/12927/000001292719000049/a201906jun268k.htm* |

| Exhibit Number | Exhibit Name |
|---|---|
| 17 | July 18, 2019 Boeing Press Release re Increased Costs Due to 737 MAX Grounding<br><br>*https://boeing.mediaroom.com/2019-07-18-Boeing-to-Recognize-Charge-and-Increased-Costs-in-Second-Quarter-Due-to-737-MAX-Grounding* |
| 18 | July 24, 2019 Boeing 2Q19 Earnings Call Transcript<br><br>*https://s2.q4cdn.com/661678649/files/doc_downloads/2019/07/2Q19-Earnings-Call-Transcript.pdf* |
| 19 | July 24, 2019 Boeing 2019 2Q 10-Q<br><br>*https://content.edgar-online.com/ExternalLink/EDGAR/0000012927-19-000063.html?hash=70449880153930ef11c3acc04258239f159721ae966de096a122 30c4e863e412&dest=A201906JUN3010QEXHIBIT101_HTM#A201906JUN3010 QEXHIBIT101_HTM* |
| 20 | September 11, 2019 Boeing Morgan Stanley Laguna Conference Transcript<br><br>*https://s2.q4cdn.com/661678649/files/doc_transcripts/2019/09/11/2019-Morgan-Stanley-Conference-Transcript.pdf* |
| 21 | November 11, 2019 Boeing Press Release re 737 MAX Progress Report<br><br>*https://boeing.mediaroom.com/news-releases-statements?item=130556* |
| 22 | December 11, 2019 *The Seattle Times*, FAA Won't Clear 737 MAX Fixes Until 2020, Agency Chief Says<br><br>*https://www.seattletimes.com/business/boeing-aerospace/boeing-737-max-certification-to-extend-into-2020-faa-chief-says/* |
| 23 | December 11, 2019 *CNBC*, FAA Chief Says Boeing 737 MAX Recertification to Stretch Into 2020<br><br>*https://www.cnbc.com/2019/12/11/faa-chief-says-boeing-737-max-recertification-to-stretch-into-2020.html* |
| 24 | December 12, 2019 *The Seattle Times*, As 737 MAX's Return Slips out to Mid February, FAA Boss Tells Boeing CEO to Back Off Predictions<br><br>*https://www.seattletimes.com/business/boeing-aerospace/faa-boss-tells-boeing-ceo-to-back-off-over-737-max-schedule/* |

| Exhibit Number | Exhibit Name |
|---|---|
| 25 | December 12, 2019 *Reuters*, Boeing Scuttles 2019 Timeline for 737 MAX Return After CEO Meets With U.S. FAA<br><br>*https://www.reuters.com/article/us-boeing-737max/boeing-scuttles-2019-timeline-for-737-max-return-after-ceo-meets-with-u-s-faa-idUSKBN1YG26J/* |
| 26 | December 22, 2019 *The Wall Street Journal*, "We've Been Humbled": Boeing's CEO Struggles to Contain 737 MAX Crisis<br><br>*https://www.wsj.com/articles/weve-been-humbled-boeings-ceo-struggles-to-contain-737-max-crisis-11577062371?gaa_at=eafs&gaa_n=ASWzDAj-CmkA1Wh5dR4D_oeFGcDJ67wvGRmNmKLMaR6QnErjqxNHuu3xyzMiLWdmmE8%3D&gaa_ts=689fcb58&gaa_sig=0IcMthKAV_oEodYk39jRscEtSiVmqxQIxZ6hrK4RhdxKgtLobWJmzJa9l02057H0jzRXPyAmEc5mJ79KG-RZMw%3D%3D* |
| 27 | January 7, 2021 Deferred Prosecution Agreement<br><br>*https://www.justice.gov/criminal/criminal-vns/file/1482911/dl?inline* |
| 28 | February 17, 2026 Valinor Capital Partners, L.P. 13F-NT<br><br>*https://www.sec.gov/Archives/edgar/data/1401387/000117266126001104/xslForm13F_X02/primary_doc.xml* |
| 29 | February 17, 2026 Valinor Capital Partners Offshore Master Fund, L.P. 13F-NT<br><br>*https://www.sec.gov/Archives/edgar/data/1452938/000117266126001105/xslForm13F_X02/primary_doc.xml* |
| 30 | Mem. in Opp'n to Defs.' Mot. to Dismiss, *St. Lucie*, No. 1:10-cv-427 (N.D. Ill. Feb. 28, 2011), ECF No. 66 |
| 31 | March 27, 2026 Valinor Management, L.P. Form ADV<br><br>*Retrievable at https://adviserinfo.sec.gov/firm/summary/157246 (last visited May 2, 2026)* |

## PRELIMINARY STATEMENT

This is the third attempt by Plaintiff Value Recapture Partners LLC ("VRP") to sue Boeing and its former Chief Executive Officer for securities fraud, despite never having purchased or sold a single share of Boeing stock. In this third try, VRP seeks once again to prosecute this case as the purported assignee of claims from unrelated third-party investment funds. But this Court has already held that VRP lacks standing under the longstanding rule that only purchasers or sellers of securities can bring securities-fraud claims. None of the cosmetic changes in the Second Amended Complaint ("SAC") alters this analysis, and none can overcome the Court's well-reasoned ruling.

The basic facts relevant to standing have not changed at all between the first and second amended complaints: on July 21, 2020, two investment funds, Valinor Capital Partners, L.P. and Valinor Capital Partners Offshore Master Fund, L.P. (together, the "Funds"), managed and advised by Valinor Management LP ("Valinor"), purportedly assigned their securities-fraud claims to VRP, an unrelated entity. In its order dismissing the prior complaint, the Court correctly held that these alleged facts fail to confer standing on VRP to sue under the Supreme Court's seminal decision in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975), the Fifth Circuit's opinion in *Smith v. Ayres*, 977 F.2d 946 (5th Cir. 1992), and many district court rulings.

The SAC's new allegations merely restate and elaborate on arguments VRP previously made—unsuccessfully—in opposing Defendants' first motion to dismiss. VRP insists that these new allegations establish that "[t]he assignment … had a legitimate business purpose for both [VRP] and the Valinor Parties,"[1] and that Valinor will "aid[] and support[]" VRP's pursuit of the securities-fraud claims. SAC ¶ 321. But this Court has already considered these contentions and held that they do not establish standing. ECF No. 57 ("MTD Order") at 10–11. Moreover, VRP's

---

[1]    VRP defines "Valinor Parties" to mean both the Funds and Valinor. SAC, ECF No. 58, at 1.

new claim that the assignment was necessary because the Funds were winding up, SAC ¶¶ 304–316, is contradicted both by judicially noticeable documents reflecting that the Funds continue to exist today and by VRP's new allegations that the Funds are party to a cooperation agreement with VRP and remain entitled to 17.5% of any recovery in this litigation, *id*. ¶¶ 317–320.

On top of the lack of standing, VRP's claims remain time-barred. Securities-fraud claims are subject to a two-year statute of limitations. Although the facts purportedly exposing Defendants' alleged fraud existed no later than December 16, 2019, VRP waited nearly four years, until December 6, 2023, to file this lawsuit. VRP's claims are therefore untimely, and they cannot be saved by *American Pipe* tolling, which does not apply in these circumstances.

Even if the Court were to reach the merits of VRP's securities-fraud claims, those claims would fail for at least three reasons. *First*, the SAC still fails to allege an actionable false or misleading statement. Several of the alleged misstatements are highly generalized and immaterial as a matter of law. Others are inactionable statements of opinion or statements that the SAC's other allegations demonstrate were neither false nor misleading.

*Second*, the SAC still fails to allege that Defendants acted with scienter. To plead scienter, VRP must allege with particularity that the individual who made, prepared, or approved the purported misstatement acted with the requisite mental state, but it relies instead on allegations about what "Boeing" supposedly knew—often related to technical engineering judgments made at an operational level during the 737 MAX's development—without alleging what the senior executives actually responsible for the challenged statements knew. The SAC thus fails to plead particularized facts supporting the required "strong inference" that those executives acted with scienter. At minimum, any inference of scienter is less compelling than the opposing inference that the individuals responsible for the challenged statements believed in their veracity when made.

2

*Third*, the SAC still fails to plead loss causation—*i.e.*, that the decline in Boeing's stock price was attributable to fraud. VRP alleges corrective disclosures on four dates in 2019 but does not explain *how* the information disclosed on those dates related to—much less corrected—the alleged misstatements. On each date, there is an obvious alternative explanation for the decline.

**BACKGROUND**

## I. Procedural History

### A. The Court's Prior Dismissal Order

VRP filed this lawsuit on December 6, 2023, asserting claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 thereunder. ECF No. 1. VRP filed an Amended Complaint on December 13, 2024. ECF No. 28. On February 17, 2026, the Court granted Defendants' motion to dismiss the Amended Complaint. Relying on *Blue Chip* and *Smith*, among other authorities, the Court held that VRP, "as the purported assignee of unrelated parties' securities-fraud claims," lacks standing because VRP "has never purchased or sold any Boeing stock." MTD Order at 7, 12. The Court rejected VRP's attempt to limit *Blue Chip* to its specific facts, *id*. at 7, and instead "embrace[d] the reasoning of *Smith*" by holding that VRP's claims are "squarely foreclosed by the policy considerations laid out in *Blue Chip*," *id*. at 8–9. The Court acknowledged that *Smith* "reserved the question of whether some Rule 10b-5 claims may be expressly assigned." *Id*. at 8 (quoting *Smith*, 977 F.2d at 950–51). "Upon review," however, the Court found "that if that reserved possibility exists, it is not present in these facts." *Id*. at 9.

The Court first addressed VRP's contention that the objective of the assignment was "not a 'sham' purpose, as in *Smith*." *Id*. The Court observed that although "there is nothing problematic … as a general matter" about the fact that VRP's "explicit business is purchasing recovery rights from pooled investment vehicles," *id*. (quotation omitted), "litigation under Rule 10b-5 presents a danger of vexatiousness different in degree and in kind from that which accompanies litigation in

3

general," *id*. at 9–10 (quoting *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 80 (2006)). "Valinor, now defunct, expressly purported to assign its claims to [VRP] to generate federal standing in this action," just as in *Smith*. *Id*. at 10 (quotation and alteration omitted). Thus, while the assignment here "comes across as less obviously tactical than the *Smith* assignment," the Court held that "it nonetheless compels a similar result." *Id*.

The Court next addressed the "evidentiary problems" created by the purported assignment. *Id*. at 11 (citing *Blue Chip*, 421 U.S. at 741–43). The Court acknowledged VRP's contention "that Valinor is contractually obligated" to facilitate VRP's participation in discovery. *Id*. But the Court explained that "the Supreme Court explicitly considered and rejected that type of discovery process." *Id*. (citing *Blue Chip*, 421 U.S. at 745–46). Quoting *Blue Chip*, the Court stressed the "virtue" in limiting standing to pursue Rule 10b-5 claims to "the class of plaintiffs … who have at least dealt in the security to which the … representation[] or omission relates," which ensures that discovery is based in "objectively demonstrable fact[s]." *Id*.

Finally, the Court analyzed *Fry v. UAL Corp.*, 84 F.3d 936 (7th Cir. 1996), where Judge Posner held that option traders have standing to sue under Rule 10b-5. MTD Order at 11. The Court distinguished *Fry*, finding that its reasoning, which "broadly rested on the significant exposure to loss that short sellers possess," did not apply. *Id*. at 12. To the contrary, the Court found that VRP's "business model allows it to 'await developments on the sidelines without risk,' the deterrence of which was a motivator in the *Blue Chip* Court's reasoning." *Id*. (quoting *Blue Chip*, 421 U.S. at 747).

Ultimately, the Court held "that the guiding principles laid out in *Blue Chip*, the Fifth Circuit's reasoning in *Smith* and adopted by another judge in this district in *Soderberg*, as well as the cabined exceptions to that rule expressed by district courts[,] … govern the result in this case."

4

*Id*. at 12. Accordingly, the Court dismissed the Amended Complaint with leave to replead. *Id*.

### B. VRP's New Allegations Regarding the Purported Assignment

VRP filed its SAC on March 6, 2026. VRP still does not allege that it ever purchased or sold Boeing stock. ECF Nos. 28, 58. Rather, it alleges that the non-party Funds, both managed and advised by Valinor, purchased Boeing stock from June 28, 2019, to March 3, 2020. SAC ¶¶ 41–48 & Exs. A, B. VRP further alleges that the Funds and Valinor "irrevocably assigned … their federal securities-fraud claims against Boeing and its executives" to VRP on July 21, 2020, "in exchange for good and valuable consideration and the Valinor Parties' agreement to cooperate in the prosecution of such claims." SAC ¶¶ 30, 313.

The SAC expounds upon the circumstances of the purported assignment without changing the key facts. First, VRP alleges that Valinor "owed fiduciary duties" to the Funds' limited partners "to maximize the value of [the Funds'] assets, including contingent litigation assets." *Id.* ¶ 29. VRP also alleges that its business is "purchas[ing] 'recovery rights from pooled investment vehicles,'" particularly those in the process of liquidating, and that the purported assignment "immediately return[ed] value to shareholders" and allowed the Funds to undergo an "orderly and prompt wind down and liquidat[ion]." *Id.* ¶ 37; *see id.* ¶¶ 28–30, 304–316.

Second, VRP alleges that a "Litigation Cooperation Agreement" requires Valinor and the Funds to assist VRP in prosecuting this case, including in discovery. *Id.* ¶¶ 317–320. VRP alleges that Valinor "continues to possess all information, documents, communications, and other items that are potentially relevant." *Id.* ¶ 318. And VRP alleges that "the Valinor Parties are … incentivized to cooperate" with VRP because "pursuant to a Side Agreement Regarding Cooperation Claims, dated September 30, 2020, the Valinor Parties are entitled to 'receive

5

seventeen and one-half percent' of any recovery" by VRP. *Id.* ¶ 320.[2]

These new allegations, according to VRP, establish that "[t]he assignment … had a legitimate business purpose for both Plaintiff and the Valinor Parties." *Id.* ¶ 321.

## II.    Factual Background

In August 2011, Boeing announced the launch of the 737 MAX program. SAC ¶ 72. Boeing then spent almost six years developing, testing, and certifying the aircraft. *Id.* ¶¶ 72, 141. The 737 MAX featured larger, more efficient engines than previous generations of Boeing's 737 aircraft. *Id.* ¶ 85. Early tests showed that these new engines and their position on the wings created a tendency for the aircraft's nose to pitch up during certain flight maneuvers involving a high angle of attack (the angle of the plane's nose relative to oncoming air) and high speeds—conditions not expected to occur in commercial air travel. *Id.* ¶¶ 86–88. To address this tendency, Boeing added a control law to the aircraft's flight software that would automatically adjust the nose down in those circumstances. *Id.* ¶ 90. During initial flight testing in 2016, pilots noticed that the plane "was not handling well when nearing stalls at low speeds." *Id.* ¶ 125. As a result, Boeing modified the control law to adjust the plane's nose down when it encountered high angles of attack at lower speeds in addition to high speeds. *Id.* This control law is called the "Maneuvering Characteristics Augmentation System," or "MCAS" for short.

Before the 737 MAX could be certified for commercial service, two different groups at the FAA were required to make "two distinct determinations" about the aircraft: one group determined whether the aircraft met federal airworthiness standards, and another group determined the minimum level of pilot training required to fly the aircraft. *Id.* ¶¶ 75–76. There is no dispute that

---

[2]    VRP does not attach the Notice of Assignment, the Litigation Cooperation Agreement, or the Side Agreement Regarding Cooperation Claims to the SAC.

6

Boeing disclosed the modification of MCAS to the FAA group responsible for certifying the 737 MAX as airworthy. Ex. 27, Statement of Facts ¶ 25; *see also* SAC ¶¶ 75–76.

On October 29, 2018, a Lion Air flight crashed shortly after takeoff. SAC ¶ 149. During flight, MCAS activated after receiving inaccurate information from one of the aircraft's angle-of-attack sensors, which incorrectly indicated the nose was too high. *Id.* Soon after the accident, Boeing convened an internal Safety Review Board of technical experts to begin considering what factors might have contributed to the accident and assessing fleet-wide risks. *Id.* ¶¶ 155–156. One possibility was inappropriate crew response to erroneous MCAS activation caused by a failure of an angle-of-attack sensor. *Id.* ¶ 155. The flight data recorder, which investigators provided to Boeing the week after the accident, supported this hypothesis. *Id.* It also indicated that the aircraft's angle-of-attack sensor had malfunctioned on the flight immediately before the accident flight, causing MCAS to activate erroneously, but that the pilots on the earlier flight had successfully controlled the plane by following appropriate procedures. Ex. 5 at 22. The Safety Review Board concluded that Boeing should issue a bulletin to remind flight crews how to "properly respond" to the conditions encountered during the Lion Air flight. SAC ¶ 158.

On November 6, 2018, Boeing issued a bulletin explaining that the Indonesian authority investigating the accident "indicated that Lion Air flight 610 experienced erroneous input from one" of its angle-of-attack sensors. *Id.* ¶¶ 158, 169. The bulletin described the flight conditions that could result, including "[r]epetitive cycles of uncommanded nose down stabilizer," and warned crews that it "is possible for the stabilizer to reach the nose down limit" if they did not respond. *Id.* ¶ 170; *see* Ex. 1.[3] The bulletin reminded pilots to follow the procedure in the 737

---

[3] The Court may consider in full the bulletin and other documents expressly referenced in the SAC under the incorporation-by-reference doctrine. *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993).

MAX's Flight Crew Operations Manual for responding to uncommanded stabilizer movements, the "Runaway Stabilizer Non-Normal Checklist," which pilots were already required as part of their training to commit to memory. *Id.* The bulletin directed pilots to use that checklist, emphasizing that moving the stabilizer trim cutout switches to the cutout (off) position would "deactivat[e]" the "stabilizer trim system." *Id.* Boeing concluded that issuing this reminder to flight crews mitigated any risk and that pilots could continue to fly the 737 MAX safely while Boeing further investigated the accident and updated MCAS's design. SAC ¶ 182.

The next day, the FAA issued an Emergency Airworthiness Directive requiring domestic airlines to incorporate the guidance in Boeing's bulletin into the 737 MAX flight manual. *Id.* ¶ 165; *see also* Ex. 2 at 1.[4] Like Boeing's bulletin, the FAA's directive advised that, "if an erroneously high single angle of attack (AOA) sensor input is received by the flight control system, there is a potential for repeated nose-down trim commands of the horizontal stabilizer." Ex. 2 at 1. Like Boeing, the FAA directed pilots to use the runaway stabilizer procedure from the existing flight manual to address the condition, highlighting that the pilots should move the stabilizer trim cutout switches to the cutout position. *See id.* at 4. Having reached the same conclusion as Boeing's Safety Review Board—that reminding pilots of the proper existing procedures to handle that situation would mitigate the risk—the FAA allowed the 737 MAX to remain in service.

On November 10, 2018, Boeing sent a message to all 737 MAX operators explaining that a "pitch augmentation system function called 'Maneuvering Characteristics Augmentation System' (MCAS) is implemented on the 737-8, -9 (MAX) to enhance pitch characteristics with flaps UP and at elevated angles of attack." Ex. 3 at 290. Three days later, on November 13, 2018,

---

[4] The FAA issued the directive under statutory rulemaking authority. Ex. 2 at 2 (citing 49 U.S.C. § 44701). The Court should take judicial notice of it and other official documents cited here. *See Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir. 2003) (courts shall take notice of information published by federal agencies).

the *Seattle Times* published an article similarly highlighting "a key change to an automatic system that's been linked to the fatal crash of a Lion Air jet last month"—*i.e.*, MCAS. Ex. 4 at 2. The article reported that MCAS "automatically pushes the nose of the aircraft down when" the angle-of-attack sensor "indicates that the nose is pitched up and putting the plane in danger of a stall." *Id.* Also on November 13, Boeing's then-CEO, Defendant Dennis Muilenburg, explained during a television interview that "[t]here are new systems on the airplane that are designed to take advantage of the capabilities of the airplane and provide control capability in high angle of attack conditions." SAC ¶ 177. VRP itself acknowledges that, by at least November 13, 2018, Boeing had publicly "disclosed" that the pitch trim augmentation system "was MCAS." *Id*. ¶ 174.

On March 10, 2019, an Ethiopian Airlines flight crashed. *Id.* ¶¶ 217–218. As with the Lion Air accident, MCAS activated during flight based on erroneous data from an angle-of-attack sensor and forced the aircraft's nose down. *Id.* The next day, Boeing announced that over the past several months, it had been in the process of developing a software update to MCAS. *Id.* ¶ 223. On March 13, 2019, the FAA and regulators worldwide grounded the 737 MAX fleet. *Id.* ¶ 226.

Periodically between June and November 2019, Boeing and Muilenburg gave estimates of when the Company believed the grounding order might be lifted and the 737 MAX could return to service, consistently making clear that the FAA ultimately would decide when to recertify the aircraft. *Id.* ¶¶ 246, 251–257, 271. The first estimate was Muilenburg's comment in June that Boeing was "looking at" a potential return to service at the "end of summer" 2019. *Id.* ¶ 246. As the recertification process continued, however, Boeing revised its estimate out further in time to reflect evolving information, first to early fourth quarter 2019 and then to the end of 2019. *Id.* ¶¶ 251, 271. Throughout this period, Boeing repeatedly cautioned that the timetable for the aircraft's return to service was uncertain and contingent on the FAA's approval. *See* Ex. 11 at 30,

9

50; Ex. 19 at 15, 53.  The FAA ultimately recertified the 737 MAX on November 18, 2020.

### III.  VRP's Securities-Fraud Claims as an Alleged Assignee

The SAC alleges that Boeing and Muilenburg made 16 fraudulent public statements regarding the 737 MAX in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 between March 11, 2019, and November 11, 2019.  SAC ¶¶ 405, 417.  The challenged statements fall into four categories:[5]

- Safety: Statements that the 737 MAX is "safe" and that safety is a "core value" at Boeing;

- Existing Procedures: Statements that pilots could respond to erroneous MCAS activations by following specific "existing procedures";

- MCAS Design and Certification: Statements concerning MCAS's design and the FAA's certification of the 737 MAX as airworthy; and

- Return to Service: Estimates concerning the 737 MAX's expected return to service.

These same statements are at issue in a class action, *In re the Boeing Company Aircraft Securities Litigation*, No. 1:19-cv-2394 ("*Seeks*"), and another individual action, *College Retirement Equities Fund v. The Boeing Company*, No. 1:22-cv-3845, both pending in this District.

### ARGUMENT

### I.  VRP Still Lacks Standing to Assert Securities-Fraud Claims as an Alleged Assignee.

VRP lacks standing to bring this action.  "Standing is an essential component of Article III's case-or-controversy requirement," which "plaintiff bears the burden of establishing." *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009).  In *Blue Chip*, the Supreme Court held that standing to bring a securities-fraud claim is limited to purchasers and sellers of securities.  421 U.S. at 731.  VRP never purchased or sold a single share of Boeing stock.

---

[5]  A chart listing all the alleged misstatements challenged in the complaint and the category into which each falls is attached as Appendix A.

VRP suggests it nevertheless has standing to sue as the assignee of two investment funds that did buy Boeing stock. SAC ¶ 38. But numerous courts, including the Fifth Circuit in *Smith* and this Court in its prior decision, have applied *Blue Chip*, which was "intended to tightly restrict the availability of Rule 10b-5 actions," to dismiss Rule 10b-5 claims brought by purported assignees for lack of standing. *See Smith*, 977 F.2d at 950 ("As assignee, [plaintiff] falls squarely within the type of remote purchasers whose 10b-5 actions are discouraged by *Blue Chip Stamps* and later decisions relying thereon."). Allowing assignees to sue risks "vexatious" litigation and "strike suits" and raises the same "evidentiary problems inherent in allowing a non-purchaser or non-seller to bring a Rule 10b-5 action" that *Blue Chip* addressed. *Id*. at 950–51. Thus, the "non-assignability of Rule 10b-5 claims" is "the generally accepted rule." *Id.* at 949; *see also, e.g.*, *In re BP p.l.c. Sec. Litig.*, 2016 WL 29300, at *9 (S.D. Tex. Jan. 4, 2016); *Aviva Life & Annuity Co. v. Davis*, 20 F. Supp. 3d 694, 702 (S.D. Iowa 2014) (emphasizing "the extremely rare nature of allowable express assignments after *Blue Chip*"); *Dobyns v. Trauter*, 552 F. Supp. 2d 1150, 1156–57 (W.D. Wash. 2008).

Conferring standing on VRP would be especially problematic here. VRP's business model is to buy litigation claims from unaffiliated entities that are winding down. SAC ¶ 37. Here, unrelated investment funds in the process of winding down purportedly assigned claims to VRP long after the alleged fraud. *Id*. ¶¶ 313, 402. This fact pattern raises serious concerns over creating a market for buying and selling securities-fraud claims as speculative investments. *See Smith*, 977 F.2d at 949–50 (dismissing for lack of standing after recognizing argument that allowing "assignment to create standing would presage the development of a futures market in Rule 10b-5 claims"); *Aviva Life*, 20 F. Supp. at 702 ("[T]he more distant a plaintiff is from the alleged … violation, the more likely it is that the *Blue Chip* concerns are realized." (citation omitted)).

11

VRP's new allegations about the supposed reason for the assignment do not change the analysis. According to VRP, the purpose of the purported assignment was to "immediately monetiz[e] the value of a contingent litigation asset" and facilitate the "swift and orderly liquidation of the Assignors' assets" in connection with the "wind up" of the Funds, which allegedly "legally dissolved shortly after the assignment was effectuated." SAC ¶¶ 306, 312, 316. But that assertion is at odds with VRP's allegations, discussed below, that the "Valinor Parties"— defined as both Valinor *and* the Funds—are parties to a litigation cooperation agreement and retain a financial stake in the outcome of this litigation. They are also contradicted by the Valinor Parties' recent SEC filings, including the Funds' Quarterly Reports on Form 13-F dated February 17, 2026, and Valinor's March 27, 2026 Form ADV, showing the Funds still have gross asset values totaling more than $40 million. Exs. 28, 29, 31 at 10, 15.[6] These filings indicate that the Funds have not been "legally dissolved" but rather continue to exist today as legal entities with substantial assets.

Moreover, the Court has already considered VRP's contention that the assignment was not a "sham" and acknowledged that "there is 'nothing problematic'" about the assignment "as a *general* matter." MTD Order at 9 (emphasis added). The Court nonetheless held that because "[t]he issue is specific to 10b-5 standing," and the "express[]" purpose of the assignment was to "'generat[e] federal standing' in this action," VRP's claims are "squarely foreclosed by the policy considerations laid out in *Blue Chip*." *Id.* at 8–10 (citing *Smith*, 977 F.2d at 948).

As the *BP* court noted, the fact that the purchaser of the security is not a party to the litigation also "raise[s] several problematic procedural issues" that "have a prejudicial effect both on Defendants' ability to litigate the case and the Court's ability to adjudicate it." *BP*, 2016 WL

---

[6] The Court may take judicial notice of these SEC filings in connection with Defendants' motion to dismiss. *Gavin v. AT & T Corp.*, 2004 WL 2260632, at *1 (N.D. Ill. Sept. 30, 2004).

29300, at *5. For instance, Defendants must "serve subpoenas to request discovery" from the purportedly defunct Funds and their manager, "which is a far more burdensome process than serving discovery requests on a party." *Id.* at *6 n.44. "Additionally, Defendants would be unable to serve requests for admission or interrogatories on the Purchasers [the Funds]" or Valinor or to compel the trial testimony of individuals who reside more than 100 miles from the courthouse. *Id.* Finally, the fact that VRP is apparently a "litigation vehicle[] with no material assets … could be problematic if the Court tries to impose sanctions on" VRP for noncompliance in discovery. *Id.* at *8.

VRP's new allegations regarding a "Litigation Cooperation Agreement" do not assuage these concerns. SAC ¶ 317. According to VRP, the Funds and Valinor "are contractually obligated to fully cooperate in the prosecution of the assigned claims, including by providing all discovery necessary under the Federal Rules of Civil Procedure." *Id*. VRP alleges that this purported agreement requires the Funds and Valinor to "provid[e] written discovery," "mak[e] relevant corporate officers available," "execute documents necessary for the prosecution of the [c]laims," and "mak[e] deponents available … for purposes of prosecuting the [c]laims." *Id.* ¶ 318. But the Court has already determined that an alleged contractual obligation to provide discovery creates the type of "third-party discovery" process that "the Supreme Court explicitly considered and rejected" in *Blue Chip*. MTD Order at 11.

VRP asserts that such a cooperation agreement is "common in the asset management industry" and that, "regardless of whether the [Funds] assigned their securities claims or sued in their own capacities, Valinor would be the main source of information for this action." SAC ¶ 319. But Defendants are aware of no case in which a court has found that a similar cooperation agreement between an assignee and the investment manager of an assignor overcomes "the

13

evidentiary problems inherent in allowing a non-purchaser or non-seller to bring a Rule 10b-5 action." MTD Order at 11 (citing *Blue Chip*, 421 U.S. at 741–43). If anything, this convoluted arrangement, predicated on contractual agreements among parties unrelated to VRP, including purportedly defunct assignors, only heightens the risk of such evidentiary problems.

Lastly, VRP's new allegation that the Funds and Valinor are entitled to "receive seventeen and one-half percent" of any recovery in this case only further undermines VRP's purported justification for the assignment. SAC ¶ 320. Rather than "immediately monetizing the value of a contingent litigation asset," *id*. ¶ 312, the Funds apparently were content to maintain a contingent interest in this litigation, so long as they did not have to litigate it themselves. The purported assignment thus was apparently made "for the sake of expediency, not out of necessity." *BP*, 2016 WL 29300, at *7. This arrangement also apparently grants a financial interest in the outcome of the case to Valinor—a separate legal entity that never owned the underlying claims, either as assignor or assignee. This convoluted division of financial interests and responsibility for prosecuting this case among the assignor Funds, the assignee Plaintiff, and a third-party investment manager divorces the risks and rewards of pursuing these claims from the risks and rewards of the underlying investment in Boeing securities. *See* MTD Order at 12 (noting that "relative risks and roles in the market sit outside the parameters of the express assignment" in this case).

In sum, this case raises all the same concerns addressed in *Blue Chip*, *Smith*, and their progeny regarding prosecution of Rule 10b-5 claims by non-purchasers. VRP therefore lacks standing, and the SAC should be dismissed in its entirety under Rule 12(b)(1).

## II.  VRP's Assigned Claims Are Time-Barred.

Even if VRP had standing to bring these assigned claims, it brought them too late. Claims under the Exchange Act "may be brought not later than the earlier of … (1) 2 years after the discovery of the facts constituting the violation; or (2) 5 years after such violation." 28 U.S.C.

14

§ 1658(b). VRP filed this lawsuit on December 6, 2023. ECF No. 1. To avoid the five-year statute of repose, VRP removed all claims from the SAC based on alleged misstatements made before December 6, 2018. But VRP's claims are still barred by the two-year statute of limitations because the "facts constituting the violation" were apparent by December 16, 2019, at the very latest—when under VRP's own theory, the full extent of Defendants' alleged fraud had been revealed.

Section 1658(b)(1)'s two-year limitations period began to run once VRP "did discover or a reasonably diligent plaintiff would have 'discover[ed] the facts constituting the violation'—whichever comes first." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010) (quoting 28 U.S.C. § 1658(b)(1)). VRP's theory of loss causation is that Defendants' alleged fraud was revealed by four public disclosures made between July 24, 2019, and December 16, 2019. *See* SAC ¶¶ 388–402. VRP's allegations thus make clear that a reasonably diligent plaintiff would have discovered all the facts constituting the alleged violation no later than December 16, 2019. Yet, VRP did not file this lawsuit until *four years* later—on December 6, 2023. What is more, the Funds allegedly assigned their claims to VRP on July 21, 2020, more than *three years* before VRP filed this action. By any measure, VRP filed this lawsuit far too late.

Faced with these facts, VRP contends that the limitations period was tolled due to "the filing of the class action complaints against Defendants." *Id.* ¶ 415. That contention does not withstand scrutiny. The only arguable basis for tolling is *American Pipe & Construction Co. v. Utah*, which held that "the commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class *who would have been parties had the suit been permitted to continue as a class action*." 414 U.S. 538, 554 (1974) (emphasis added); *see also Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 350 (1983). In that case, tolling was "necessary to insure effectuation of [Rule 23's] purposes of litigative efficiency and economy"

15

because putative class members otherwise "would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable." *Am. Pipe*, 414 U.S. at 553, 556. This logic makes clear that *American Pipe* tolling applies by its own terms only to "putative class members who wish to sue individually *after a class-certification denial*." *China Agritech v. Resh*, 584 U.S. 732, 739–40 (2018) (citing *Am. Pipe*, 414 U.S. at 552; *Crown*, 462 U.S. at 349, 352) (emphasis added).

But VRP was never a putative class member and never could have been because the class is defined to include only purchasers of Boeing securities. *In re Boeing Co. Aircraft Sec. Litig.*, 2026 WL 734721, at *24 (N.D. Ill. Mar. 16, 2026). Although the Funds might have been putative class members, they have now made clear that they never intended to "await, as passive class members, the outcome of the Class Action." SAC ¶ 310–312. Instead, the Funds purported to assign their claims to VRP, which then chose to file its own lawsuit before a motion to certify the class was even pending in the related class action, establishing its intent to saddle Defendants with costly and redundant litigation *regardless* of whether a class was ever certified.

The Seventh Circuit has never held that *American Pipe* tolling extends to parties that preemptively abandon a pending class action *before* class certification is decided, and such a holding would undermine the very interests of "efficiency and economy" on which *American Pipe* tolling rests. *Am. Pipe* 414 U.S. at 556. Far from reducing pointless "protective motions," giving plaintiffs determined to go it alone the benefit of *American Pipe* tolling would merely extend—potentially for years—the statutory two-year limitations period for them to act. Such a rule would encourage and increase redundant litigation; it would do nothing to reduce it. As a result, the only rule consistent with the express purposes of *American Pipe* tolling is that such tolling does not apply to opt-out plaintiffs that sue before class certification is decided.

16

Although the Seventh Circuit has not yet decided this issue, three appellate courts have held that tolling would be inappropriate in these circumstances. *See Wyser-Pratte Mgmt Co. v. Telxon Corp.*, 413 F.3d 553, 569 (6th Cir. 2005) (collecting cases limiting *American Pipe* tolling in these circumstances and holding that "the reasoning supporting this approach is both sound and persuasive"); *accord Glater v. Eli Lilly & Co.*, 712 F.2d 735, 739 (1st Cir. 1983); *Wachovia Bank & Trust Co. v. Nat'l Student Mktg. Corp.*, 650 F.2d 342, 346 n.7 (D.C. Cir. 1980). Likewise, "most" courts in this District have reached the same result. *See Herron v. Gold Standard Baking, Inc.*, 2021 WL 1340804, at *3 (N.D. Ill. Apr. 9, 2021) (collecting cases from this District); *see also*, *e.g.*, *Calvello v. Elec. Data Sys.*, 2004 WL 941809, at *4–5 (W.D.N.Y. Apr. 15, 2004) (collecting cases across circuits).

Although some other circuits have disagreed, their analyses gloss over the question of *why* a plaintiff that voluntarily forgoes class membership before class certification is decided should get the benefit of *American Pipe* tolling. *See Aly v. Valeant Pharm. Int'l Inc*, 1 F.4th 168 (3d Cir. 2021); *In re Hanford Nuclear Reservation Litig.*, 534 F.3d 986 (9th Cir. 2008); *State Farm Mut. Auto. Ins. Co. v. Boellstorff*, 540 F.3d 1223 (10th Cir. 2008); *In re WorldCom Sec. Litig.*, 496 F.3d 245 (2d Cir. 2007). *American Pipe* reasoned that absent class members could not be faulted for a lack of diligence when they filed their own claims promptly after class certification was denied in the potential class action upon which they were relying, and that their reliance on the pendency of the class action was an extraordinary circumstance that prevented them from bringing otherwise timely actions. *Am. Pipe*, 414 U.S. at 553–54; *Crown, Cork*, 462 U.S. at 352–53; *CalPERS v. ANZ Sec., Inc.*, 582 U.S. 497, 514–15 (2017). Neither rationale applies here.

VRP was not diligent in waiting to file its claims until more than four years after the supposed fraud was revealed and three years after the alleged assignment, and VRP identifies no

17

"extraordinary circumstances" justifying its delay.

After the statute of limitations had expired, VRP "made a conscious decision … to pursue [its] claims on an entirely separate, though essentially parallel, track from that of the [c]lass case." *In re Brand Name Prescription Drugs Antitrust Litig.*, 1998 WL 474146, at *8 (N.D. Ill. Aug. 6, 1998). Under the circumstances here, "it would be inequitable to now allow [VRP] to reap the benefits of a doctrine which is designed for a group—the [c]lass and its putative members—which [it] disavowed" before class certification was decided. *Id*. Following "most" courts in this District, this Court should "refuse[] to extend tolling" to this untimely action asserting assigned claims. *Herron*, 2021 WL 1340804, at *3.

## III. The SAC Fails to State a Claim for Securities Fraud.

Although the Court need not reach the merits of these time-barred claims that VRP lacks standing to assert, the SAC nevertheless fails to state a claim for securities fraud. To state such a claim, VRP must allege: (1) a material misrepresentation, (2) in connection with the purchase or sale of a security, (3) scienter, (4) reliance, (5) economic loss, and (6) loss causation. *Dura Pharm. v. Broudo*, 544 U.S. 336, 341–42 (2005). Rule 9(b) and the PSLRA impose a heightened pleading standard for Section 10(b) claims. *Tellabs v. Makor Issues & Rts.*, 551 U.S. 308, 313 (2007) ("*Tellabs II*"). Rule 9(b) requires a plaintiff to plead "the who, what, when, where, and how" of the alleged fraud. *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990). And the PSLRA requires a plaintiff to identify the alleged misstatements, plead with particularity why each was misleading, and "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A).

VRP's assigned claims fail for three reasons, each of which is an independent basis for dismissing the SAC. First, the SAC does not plead that Defendants made actionable misstatements. Second, it does not plead with particularity facts creating a strong inference that

18

any purported misstatement was made with an intent to deceive investors. Third, the SAC does not plead that any losses were caused by the correction of an alleged misstatement.

### A. The SAC does not adequately plead a material misstatement.

#### 1. The SAC does not adequately allege that the safety statements were material or false or misleading.

The first category of alleged misstatements consists of statements in 2019 about the safety of the 737 MAX. These statements either affirm Boeing's belief that the 737 MAX is "safe" or highlight that safety is a "core value" or "priority" at Boeing. For example, after the Ethiopian Airlines accident, Boeing issued a statement that "[s]afety is a core value for everyone at Boeing and the safety of our airplanes … is always our top priority" and that the "737 MAX is a safe airplane." SAC ¶ 322. This and similar alleged misstatements are not actionable for three reasons.

*First*, the safety statements are immaterial as a matter of law. A statement is "material" only if a reasonable investor would view it "as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). The "crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Makor Issues & Rts., Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 596 (7th Cir. 2006) ("*Tellabs I*"), *rev'd on other grounds*, *Tellabs II*, 551 U.S. 308. Applying this standard, courts have held that a reasonable investor would not view vague, generalized, or nonquantifiable statements of corporate optimism or values as important in making investment decisions. As Judge Easterbrook put it, statements that "d[o] not make any concrete assertion" and instead "express[] only vague optimism" are not material. *City of Taylor Police & Fire Ret. Sys. v. Zebra Techs. Corp.*, 8 F.4th 592, 595 (7th Cir. 2021).

The Sixth Circuit's decision in *City of Monroe Employment Retirement Systems v. Bridgestone*, 399 F.3d 651 (6th Cir. 2005), is instructive. That case involved Bridgestone's public

19

statements about a particular line of tires after a series of fatal accidents. In the wake of the accidents, Bridgestone said that it had "no reason to believe there is anything wrong with [the tires]," that it had "full confidence" in the tires, and that "rigorous testing under diverse conditions at our proving grounds around the world helps ensure reliable quality." *City of Monroe*, 399 F.3d at 670–71. Bridgestone later recalled the tires, and investors sued for securities fraud. The Sixth Circuit held that Bridgestone's statements were not actionable because they were "too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *Id.* at 671.

The safety statements that VRP challenges here are not actionable for the same reason. Like the statements in *City of Monroe*, the statements that the 737 MAX is "safe" and that safety is a "core value" at Boeing were not pegged to any objectively verifiable data or "anything measurable." *Id*. They instead are the kind of "rosy affirmation heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, [and] so lacking in specificity, … that no reasonable investor could find them important to the total mix of information available." *Id.* at 669 (citation omitted).

Indeed, other courts in this District have already held that the very same safety statements VRP challenges here are immaterial as a matter of law. *See Coll. Ret. Equities Fund v. Boeing Co.,* 2026 WL 891657, at *6 (N.D. Ill. Mar. 31, 2026) ("*Coll. Ret. II*"); *Coll. Ret. Equities Fund v. Boeing Co.*, 2023 WL 6065260, *7, *15 (N.D. Ill. Sept. 18, 2023) ("*Coll. Ret. I*"); *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *9, *19 (N.D. Ill. Aug. 23, 2022) ("*Seeks I*"). As Judge Tharp held in *Seeks I,* "Muilenburg's statements about Boeing's 'core values' and similar affirmations of safety are just th[e] kind of rosy affirmation that reasonable investors know are meaningless to the total mix of information." 2022 WL 3595058, at *19. Judge Shah agreed that

20

"only unreasonable investors would find Muilenburg and Boeing's simple affirmations of safety and general references to Boeing's core values meaningful to the total mix of information." *Coll. Ret. I*, 2023 WL 6065260, at *7. That principle applies with particular force to the safety statements made after the second accident, "when the total mix of information available to investors had grown to include two crashes and the indefinite grounding of the 737 MAX." *Id.* at *15; *see Seeks I*, 2022 WL 3595058, at *19.[7]

The SAC's allegation that investors were generally concerned about the subject of aircraft safety does not render the statements themselves material. The question is not whether the subject of safety generally is important to Boeing and its stockholders (it undoubtedly is), but rather whether the specific challenged statements were material. *See ECA* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

Even when a statement's subject matter is important in the abstract, the statement is still immaterial as a matter of law if it is couched in vague and highly general terms. For instance, in *JP Morgan*, stockholders challenged statements touting JPMorgan's reputation for integrity, including that it "set the standard for integrity" and had "risk management processes [that] are highly disciplined and designed to preserve the integrity of the risk management process." 553 F.3d at 205–06 (cleaned up). The plaintiffs argued that these statements were material because the "significance of a bank's reputation is undeniable." *Id.* at 206. The Second Circuit disagreed, holding that the statements were "too general to cause a reasonable investor to rely upon them" and explaining that "[w]hile a bank's reputation is undeniably important, that does not render a

---

[7] The *Seeks* court (after the case was reassigned) later declined to dismiss several statements after the second accident affirming that the 737 MAX was "a safe airplane" on the basis that they may have been material to investors, "particularly given that the statements came after a second crash." *Seeks v. The Boeing Co.*, 752 F. Supp. 3d 992, 1024 (N.D. Ill. 2024) ("*Seeks II*"). Respectfully, for the reasons stated in *Seeks I*, 2022 WL 3595058, at *19, *Coll. Ret. I*, 2023 WL 6065260, at *15, and *Coll. Ret. II*, 2026 WL 891657, at *6, that reasoning is flawed.

21

particular statement by a bank regarding its integrity per se material." *Id.*; *see also Emps. Ret. Sys. v. Whole Foods Mkt., Inc.*, 905 F.3d 892, 902 (5th Cir. 2018). So too here: even though the statements concerned safety—an undeniably important subject for an aircraft manufacturer—the statements are immaterial because they were too vague and general and too untethered to anything measurable for any reasonable investor to rely on them. Indeed, by their very nature, the safety statements here are too vague and general for reasonable investors to have relied on them to make investment decisions. No matter whether investors considered the subject of aircraft safety to be important, the statements themselves remain the "kind of loosely optimistic statements that are unimportant to the total mix of information for investors." *Coll. Ret. I*, 2023 WL 6065260, at *7.

VRP cannot salvage its claims by pointing to one analyst's reference to Boeing's "commitment to airline safety" or another's assurance that "we would never doubt the company's commitment to safety." SAC ¶¶ 180, 189. VRP does not allege that either analyst commented specifically on any of the safety statements challenged here, as opposed to relying on available facts and data about Boeing more generally. Indeed, VRP cannot point to a single analyst that mentioned any of the challenged safety statements. And even if an analyst had mentioned one of them, "the fact of recapitulation by analysts did not make these statements actionable": a "report that merely recaps corporate puffery does not convert that puffery into a material misstatement." *Okla. Firefighters Pension & Ret. Sys. v. Xerox Corp.*, 300 F. Supp. 3d 551, 570 (S.D.N.Y. 2018), *aff'd sub nom. Ark. Pub. Emps. Ret. Sys. v. Xerox Corp.*, 771 F. App'x 51 (2d Cir. 2019).

*Second*, the safety statements are best understood as opinions, and VRP fails to plead facts showing that Defendants' opinions about safety are actionable as fraud. Opinions can form the basis of a securities-fraud claim *only if* a plaintiff pleads with particularity that the speaker did not actually believe the professed opinion or that the opinion did not "fairly align[]" with information

22

in the speaker's possession at the time. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185, 188–89 (2015). If the plaintiff attempts to plead the latter, the complaint "must identify particular (and material) facts going to the basis for the [speaker's] opinion … whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 194. This "is no small task." *Id.*

Courts consistently treat product-safety statements like those challenged here as nonactionable opinions—even when the products are involved in accidents or recalled. For instance, in *In re Ford Motor Co. Securities Litigation*, investors alleged that Ford misrepresented the safety of the Ford Explorer after a series of accidents by stating that the "Ford Explorer is an extremely safe and thoroughly engineered vehicle." 381 F.3d 563, 571 (6th Cir. 2004). Despite a later recall, the Sixth Circuit rejected the plaintiffs' securities-fraud claim based on that statement because it was an opinion and the plaintiffs offered "no basis" to conclude the defendants "did not believe the opinions expressed." *Id.*[8]

The safety statements challenged here are likewise opinions, and VRP does not plead with particularity facts rendering them actionable as fraud. VRP does not allege that Muilenburg or anyone else who prepared or approved the statements did not in fact hold the expressed opinions. Nor does VRP allege that the stated opinions about safety did not fairly align with the information those individuals possessed at the time of the statements. Indeed, VRP does not allege "particular (and material) facts going to the basis" for the opinions at all. *Omnicare*, 575 U.S. at 194.

---

[8]   *See also Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 556–58 (M.D.N.C. 2018) (statement touting "safety" of pharmaceutical was nonactionable opinion despite objective testing "because reasonable persons may disagree over how to analyze data and interpret results" (cleaned up)); *Gillis v. QRX Pharma*, 197 F. Supp. 3d 557, 597 (S.D.N.Y. 2016) (statement that data "showed a respiratory safety advantage" compared to other treatments was nonactionable opinion); *In re Yum! Brands Sec. Litig.*, 73 F. Supp. 3d 846, 862–64 (W.D. Ky. 2014) (statements that "restaurants … must adhere to strict food quality and safety standards," that company acts "to ensure food safety," and that suspected unsafe product is withdrawn "until safety can be assured" are nonactionable opinions).

*Third,* the safety statements are not false or misleading. VRP argues that they were false and misleading because of alleged deficiencies in MCAS's design, development, and certification. SAC ¶¶ 324, 328. But vague affirmations that the 737 MAX is "safe" and safety is a "core" Boeing "value" cannot plausibly be understood as specific representations about MCAS's design, development, and certification. Nor does Boeing's Safety Review Board determination that repeated unintended MCAS activations posed an "airplane safety issue," *id.*, contradict the challenged safety statements. To the contrary, the statements reflected Defendants'—and the FAA's—judgment that the 737 MAX remained safe to fly *notwithstanding* the possibility of repeated unintended MCAS activations, as reflected in Boeing's bulletin and the FAA's airworthiness directive reminding pilots of the existing procedures for addressing the resulting flight conditions and the FAA's decision not to ground the plane.

### 2. The SAC does not adequately allege that the existing procedures statements were false or misleading.

VRP challenges two statements related to Boeing's guidance to flight crews on how they should respond if they encountered the flight conditions experienced on the accident flights. Boeing issued a press release on March 11, 2019, after the Ethiopian Airlines accident, stating that the 737 MAX's flight manual "already outlines an existing procedure to safely handle the unlikely event of erroneous data coming from an angle of attack" sensor. SAC ¶ 322. The next day, on March 12, 2019, Boeing issued another press release stating that it "d[id] not have any basis to issue new guidance to operators." *Id.* ¶ 323. VRP fails to plead facts sufficient to show that these statements were false or misleading.

To start, these two statements were entirely accurate. In fact, the Lion Air pilots on the flight immediately preceding the first accident experienced the same conditions, followed the existing procedure to counteract erroneous MCAS activation, and flew the airplane safely to its

24

intended destination. Ex. 5 at 22. VRP nevertheless argues that "Boeing's Safety Review Board concluded that pilots would be unable to counteract MCAS using existing flight procedures" and that "Dodt informed Hamilton … that pilots would be unable to counteract repeated MCAS activation using existing flight procedures." SAC ¶ 324. These arguments are demonstrably incorrect: the Safety Review Board came to the *opposite* conclusion, determining that the best way to address erroneous MCAS activation was, in fact, to direct pilots to existing procedures. *See* Ex. 1 at 1. The FAA reached the same conclusion. Ex. 2 at 1. And VRP mischaracterizes what Dodt (an engineer, not a pilot) actually said. In reality, he never mentioned existing procedures at all. *See* SAC ¶ 162. In short, both the Safety Review Board and the FAA concluded that— notwithstanding whatever Dodt might have told Hamilton—existing procedures were sufficient to respond to erroneous MCAS activation and the 737 MAX remained safe to fly.

Insofar as these statements express a view on the sufficiency of existing procedures, they are nonactionable statements of opinion. The question whether existing procedures were sufficient to counteract an erroneous MCAS activation is a judgment based on a combination of technical and human factors. *Cf. City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 683–84 (3d Cir. 2023) (holding that insurance company's statement regarding "adequacy of its reserves" was an opinion because it was judgment "based on a variety of complex assumptions and considerations"). Once again, VRP does not plead with particularity the narrow circumstances in which opinions can be actionable as fraud under *Omnicare*. VRP does not allege that Muilenburg—or anyone else at Boeing who prepared or approved the existing procedures statements—did not in fact believe that those procedures were sufficient. Nor does VRP allege that the belief that existing procedures were sufficient did not fairly align with the information possessed by those individuals at the time of the statements. To the contrary, after the Lion Air

25

accident, both the FAA and Boeing's technical experts agreed that the runaway stabilizer procedure provided the proper response to an erroneous MCAS activation and that the plane could remain in operation. *See* SAC ¶¶ 156, 158, 165, 182. VRP's allegations thus fail to satisfy the *Omnicare* standard.

### 3. The SAC does not adequately allege that the statements about the 737 MAX design and certification were false or misleading.

VRP fails to plead facts establishing that the five challenged statements regarding the design and certification of the 737 MAX were false or misleading.

March 11, 2019: The day after the second accident, a Boeing press release included the statement that "MCAS does not control the airplane in normal flight; it improves the behavior of the airplane in a non-normal part of the operating envelope." SAC ¶ 322. According to VRP, it was "misleading for Defendants to state that MCAS does not control the airplane during normal flight when, in fact, it could operate during nearly the entire speed range for the 737 MAX." *Id.* ¶ 324. But the market could not have understood Boeing's statement after the second accident to deny that MCAS could activate *erroneously* during normal commercial flight—that much was already widely known.[9] By March 2019, the market understood that MCAS could erroneously activate during normal flight if the aircraft's angle-of-attack sensor failed, as it had in the Lion Air accident, and falsely signaled to MCAS that the aircraft was operating *outside* normal flight conditions—*i.e.*, in a "non-normal part of the operating envelope." *Id.* ¶ 322. The March 11 press release containing the challenged statement acknowledged that possibility, explaining that MCAS

---

[9] VRP pleads no facts showing that the statement "MCAS does not control the airplane in normal flight" was *material* to investors. The same press release announced that Boeing was "developing a flight control software enhancement for the 737 MAX" that would alter MCAS's design. SAC ¶ 322; *see also* Ex. 6. The same day, the FAA issued a notice detailing planned MCAS design changes and updates to pilot training requirements, which it anticipated "mandating … no later than April 2019." Ex. 7 at 1. Given the market's understanding that Boeing was overhauling the flight control software, no reasonable investor would have considered the information about MCAS's operational scope important in making an investment decision.

"was implemented on the 737 MAX to improve aircraft handling characteristics and decrease pitch-up tendency at elevated angles of attack" while noting that MCAS also could activate in the "event of erroneous data coming from an angle of attack" sensor. *Id.* Boeing's bulletin and the FAA's airworthiness directive from November 2018 likewise recognized this possibility. *See* Exs. 1, 2. And numerous news articles published after the Lion Air accident reported that MCAS could activate during normal commercial flight as a result of faulty angle-of-attack data. *See, e.g.*, Ex. 4 at 2.[10]

March 22, 2019: On March 21, 2019, *The New York Times* reported that the Lion Air and Ethiopian Airlines aircraft lacked two flight deck display indicators that provide data about the plane's angle of attack. SAC ¶ 233. *The New York Times* inaccurately described the indicators as "safety" features and reported that Boeing "charged extra" for them. *Id.* Boeing issued a response the next day stating that:

> All Boeing airplanes are certified and delivered to the highest levels of safety consistent with industry standards. Airplanes are delivered with a baseline configuration, which includes a standard set of flight deck displays and alerts, crew procedures and training materials that meet industry safety norms…. Customers may choose additional options, such as alerts and indications, to customize their airplanes to support their individual operations or requirements….

*Id.* ¶ 325. VRP argues that this statement misleadingly "tout[ed] the certification of the 737 MAX" when, in 2016, one of its technical pilots had withheld information about MCAS's authority from the FAA group responsible for determining the required level of pilot training. *Id.* ¶ 326.

VRP conflates two separate processes at the FAA—certifying the aircraft as airworthy under federal airworthiness standards and determining the minimum level of pilot training required

---

[10] The Court can take judicial notice of public documents on this motion to dismiss not for their truth, but for the fact that the information in them was public. *See Cause of Action v. Chicago Transit Auth.*, 815 F.3d 267, 277 n.13 (7th Cir. 2016) (judicial notice of matters of public record); *Schmude v. Sheahan*, 312 F. Supp. 2d 1047, 1064 (N.D. Ill. 2004) ("[I]t is routine for courts to take judicial notice of both newspaper articles and court records[.]").

to fly the aircraft.  The general assertion that "[a]ll Boeing airplanes are certified … to the highest levels of safety consistent with industry standards" cannot plausibly be understood to make any representation about the circumstances surrounding the FAA's determination of the appropriate level of pilot *training* for the 737 MAX, especially given that the statement was a direct response to *The New York Times*'s mistaken suggestion that the safety of the aircraft Boeing manufactures depended on the particular options operators selected.

April 25, 2019: During Boeing's first-quarter earnings call—after the FAA had grounded the 737 MAX—an analyst asked Muilenburg "how did this slip through the engineering organization?"  SAC ¶ 327.  Muilenburg (correctly) understood the question to be about MCAS's design from an engineering perspective, and he responded:

> [T]here is no technical slip or gap here, right?  Again, as I mentioned, we know that both accidents were a series of events, and that is very common to all accidents that we've seen in history.  And what we know is that in this case, there was erroneous angle-of-attack information that came into the airplane from multiple causes.  We know [that at] some point during the flight, that activated the MCAS control laws, and we know that ultimately there were actions or actions not taken that contributed to the final outcome….
>
> I can tell you with confidence that we understand our airplane, we understand how the design was accomplished, how the certification was accomplished, and remain fully confident in the product that we've put in the field.  But we also know there are areas that we can improve, and that is the source of the software update here.  But there was no surprise or gap or unknown here or something that somehow slipped through a certification process.  Quite the opposite.  We know exactly how the airplane was designed.  We know exactly how it was certified.  We have taken the time to understand that.  That has led to the software update that we've been implementing and testing….

*Id.*  VRP asserts that it was misleading for Muilenburg "to state that nothing out of the ordinary happened in connection with the certification of the 737 MAX when, in fact, [Boeing] had defrauded the FAA into certifying the 737 MAX based on incorrect information."  *Id.* ¶ 328.

Again, VRP conflates the two separate processes at the FAA.  As VRP recognizes, Muilenburg was not discussing the FAA's evaluation of pilot-training requirements for the 737

28

MAX. The exchange makes clear that both the analyst's question and Muilenberg's response related to MCAS's design from an engineering perspective and the FAA's certification of that design as airworthy. The analyst's question was about how the issues with MCAS "slip[ped] through the *engineering* organization." *Id.* ¶ 327 (emphasis added). And in answering that question, Muilenburg twice referred to the MCAS update—an *engineering* redesign of MCAS's software logic—and clearly discussed "how the airplane was designed." *Id*. VRP does not allege a "slip" or "gap" in the FAA's certification of MCAS's design as airworthy.

As a result, Boeing's later entry into a Deferred Prosecution Agreement ("DPA") with the Department of Justice in January 2021 related to the failure of two technical pilots to disclose certain information about MCAS to the FAA Aircraft Evaluation Group ("AEG") responsible for determining the required level of pilot training has no bearing on whether Muilenburg's statement was misleading. *See id.* ¶ 285; Ex. 27. The DPA makes clear that this misconduct "was neither pervasive across the organization, nor undertaken by a large number of employees, nor facilitated by senior management." Ex. 27 ¶ 4(h). Critically, the DPA also confirms that "others in the Company disclosed MCAS's expanded operational scope to different FAA personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." *Id.*

In sum, Boeing engineers identified the risks associated with repeated MCAS activations and concluded that pilots would recognize and correct the resulting runaway stabilizer. The issue thus did not "slip through the engineering organization"; it was the subject of a considered process. While VRP may disagree with the engineers' analysis, the fact that Boeing made a judgment on the issue confirms that there was no technical "slip" or "gap." Further, whether there was a "slip" or "gap" in the design and certification of the 737 MAX is a matter of opinion, and VRP does not plead facts sufficient to satisfy *Omnicare*, *i.e.*, that Muilenburg did not believe his statement or

29

that his belief did not fairly align with the information in his possession at the time.

April 29, 2019: Responding to a reporter's suggestion that the "design of MCAS was deeply flawed" and a request to "admit that the design was flawed," Muilenburg responded:

> We've designed the MAX to have the flying qualities that were desired in the hands of the pilots. The MCAS system is part of that design effort. We have gone back and confirmed again as we do the safety analysis, the engineering analysis, that we've followed exactly the steps in our design and certification processes that consistently produce safe airplanes. Now, in this case again, as in most accidents, there are a chain of events that occur. It's not correct to attribute that to any single item. We know there's some improvements that we can make to MCAS, and we will make those improvements.

Ex. 12 at 8; *see also* SAC ¶ 329. VRP says this statement was misleading for the same reason as the April 24 statement—because in 2016 two pilots misled the AEG about MCAS's operational scope.[11] SAC ¶ 330. Once more, VRP confuses the two separate processes at the FAA.

As with the April 24 statement, Muilenburg made clear that he was addressing MCAS's design from an *engineering* perspective and the certification of that design as airworthy under federal regulations, not the FAA's determination about the required level of pilot training. The question from the reporter asked whether "[t]he final design of MCAS was deeply flawed." Ex. 12 at 8. And in a portion of the response that VRP obscures with ellipses, Muilenburg explained that Boeing had confirmed that it followed the steps in its design and certification processes as part of the Company's "safety analysis, the engineering analysis" after the accidents. *Id.* In other words, when Muilenburg said that Boeing "followed exactly the steps in our design and certification processes," he was referring to the design and certification of MCAS from an

---

[11]     VRP incorrectly alleges that, during this same exchange, Muilenburg also said "[i]t was designed per our standards" and "[i]t was certified per our standards." SAC ¶ 329. In response to a *different* question, Muilenburg did state that "[w]e've also gone back and taken a look at the design of the MCAS system itself, the original design. We've confirmed that it was designed per our standards, certified per our standards, and we're confident in that process." Ex. 12 at 2–3. To the extent the SAC can be read to challenge this statement, it is not actionable for the same reasons discussed above.

*engineering and safety* perspective. This statement could not have created a misleading impression about the FAA's separate evaluation of the *pilot training* requirements for the 737 MAX.

> May 29, 2019: A month later at an investor conference, Muilenburg stated:
>
> I think the question there on the relationship with the FAA has centered on the delegated authority approval and how that process works. And I will tell you that I have a great deal of confidence in that process and how it works. It's a high integrity process and I think it's proven. It's demonstrated results. It's a way for the FAA to exercise its independent role, its regulatory role as it should, but also tap into the deep technical expertise in our company.

Ex. 13 at 6; *see also* SAC ¶ 331. VRP claims it was misleading for Muilenburg "to state that he had confidence in the certification process and that it was 'proven' and of 'high integrity' when Defendants had defrauded the FAA into certifying the 737 MAX based on incorrect information." SAC ¶ 332. But VRP again conflates two distinct issues.

To start, Muilenburg was not addressing the "certification process," but the "delegated authority approval" program (the Organization Designation Authorization, or ODA) under which the FAA can delegate certain tasks associated with certification and compliance to Boeing. *Id.* ¶¶ 57, 229, 371. VRP does not plead any facts suggesting that the ODA process was not "proven" and of "high integrity." Moreover, although media outlets had questioned the authority delegated to Boeing to review *MCAS's design*, *id.* ¶ 229, VRP nowhere suggests that this delegated authority played any part whatsoever in the FAA's *pilot-training* determination. VRP thus cannot rely on allegations related to the FAA's pilot-training determination to plead that Muilenburg's statement about the ODA process was misleading.

Moreover, whether the ODA process is "proven" and "high integrity" is a matter of opinion. Muilenburg's statement uses classic opinion language—he says "*I think* it's proven" and that he has "a great deal of confidence" in the process. *Id.* ¶ 331 (emphasis added). VRP nowhere alleges facts suggesting Muilenburg did not hold that opinion or that his opinion did not fairly

31

align with the information in his possession at the time, as required by *Omnicare*.

### 4. The SAC does not adequately allege that the statements about the 737 MAX's expected return to service were false or misleading.

VRP claims that Defendants' various projections about when the 737 MAX might return to service after it was grounded were false or misleading. The first such estimate was provided on June 26, 2019, when Muilenburg said he was "still … looking at" the end of summer 2019 for a return to service. *Id.* ¶ 333. The following month, Muilenburg updated that estimate, stating that Boeing's "current best estimate" was a "return to service early in the fourth quarter" of 2019, *id.* ¶ 338, but also cautioned that Boeing was "assessing" the estimate on a daily basis and that it was "dependent on the FAA and other regulators for achieving that timeline," Ex. 18 at 25. Other statements reiterated the estimate of a potential return to service early in the fourth quarter. *See id.* ¶¶ 335, 338, 340–41. On November 11, 2019, a press release stated that "Boeing continues to target FAA certification of the MAX flight control software updates during this quarter" and that "it is possible that the resumption of MAX deliveries to airline customers could begin in December." *Id.* ¶ 343. These estimates of when the 737 MAX might return to service are not actionable for two separate reasons: they are forward-looking statements protected by the PSLRA's statutory safe harbor, and they are nonactionable statements of opinion under *Omnicare*.

### a. Boeing's return-to-service projections are forward-looking statements that fall within the PSLRA's safe harbor.

The PSLRA creates a statutory safe harbor for "forward-looking statements" such as statements "of the plans and objectives of management for future operations" and statements "of future economic performance." 15 U.S.C. § 78u-5(i)(1)(B), (C). Both courts in the other securities actions involving Boeing held that the same return-to-service estimates are forward-looking statements under the PSLRA. *See Coll. Ret. I*, 2023 WL 6065260, at *20; *Seeks I*, 2022 WL 3595058, at *24. The PSLRA's safe harbor provides that a defendant "shall not be liable with

respect to any forward-looking statement" if either (1) the statement is identified as a forward-looking statement and is accompanied by meaningful cautionary language, 15 U.S.C. § 78u-5(c)(1)(A)(i); or (2) "the plaintiff fails to prove" that the person who made or approved the statement had "actual knowledge … that the statement was false or misleading," *id.* § 78u-5(c)(1)(B)(i). Both prongs of this statutory safe harbor independently protect the return-to-service statements.

The first prong applies because these forward-looking statements were accompanied by meaningful cautionary language. To be meaningful, cautionary language need only "point to the principal contingencies that could cause actual results to depart from the projection," *i.e.*, "the major risks [the defendant] objectively faced when it made its forecasts." *Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004). The cautionary language accompanying Boeing's return-to-service projections squarely addressed the very risk VRP says ultimately caused the projections to be wrong: that regulators would not recertify the 737 MAX as quickly as Boeing was forecasting. *See St. Lucie Cty. Fire Dist. Firefighters' Pension Tr. Fund v. Motorola, Inc.*, 2011 WL 814932, at *10 (N.D. Ill. Feb. 28, 2011).

Indeed, every one of the challenged statements warned investors that the actual return-to-service date could differ from Boeing's projections because the FAA and other regulators controlled the timing of recertification.[12] Boeing's other public statements further explained why

---

[12] Ex. 15 at 6 ("We're now in the process of a certification with the FAA and regulators around the world[.]"); Ex. 17 at 1 ("Boeing continues to work with civil aviation authorities to ensure the 737 MAX's safe return to service, and these authorities will determine the timing of return to service[.]"); Ex. 18 at 4 ("[A]s we have consistently emphasized, it is the FAA and other global aviation regulators that will determine when the 737 MAX returns to service[.]"); Ex. 20 at 2 ("[T]he principal schedule risk on [return to service] continues to be a regulator alignment around the world and regulator approvals[.]"; "Ultimately return-to-service timing will be determined by the regulator[.]"); Ex. 21 at 1 ("[T]he FAA and other regulatory authorities will determine the timing of certification and return to commercial service[.]").

33

the actual return-to-service date could differ from its estimates.[13]  For instance, Boeing's first quarter 10-Q, filed on April 24, 2019, cautioned that the actual return to service of the 737 MAX could vary from Boeing's estimates based on the conditions the FAA and other aviation regulators set for certifying the updates to the plane.  Ex. 11 at 30; *see id.* at 50 (recognizing possibility of "delays in one or more jurisdictions to achieve required authorizations to return to service").  After the FAA identified additional items Boeing needed to address in the planned software update, Boeing promptly disclosed this information in a Form 8-K, warning investors that it "will not offer the 737 MAX for certification by the FAA until we have satisfied all requirements for certification of the MAX and its safe return to service."  Ex. 16 at 2.  In its second quarter 10-Q filed a month later, Boeing warned that the "FAA and other civil aviation authorities will determine the timing and conditions of the 737 MAX's return to service" and noted that the return-to-service estimates were "highly uncertain."  Ex. 19 at 53.  Numerous disclosures reiterated this warning.[14]

The market appreciated the import of these warnings.  During Muilenburg's June 26, 2019, interview, for instance, the moderator commented: "So it sounds like you don't really know the bottom of the pool. … When are they going to fly, when or do we get done? … [I]t sounds like you don't really know."  Ex. 15 at 9.  Muilenburg responded: "Yeah, we're working our way through all of that. … [T]he exact timeline, the financial boundaries of this, you know, the, these are things that over time we'll, we'll figure out."  *Id.*

In the pending class action, the court agreed that the return-to-service statements were forward-looking and accompanied by cautionary language.  *Seeks I*, 2022 WL 3595058, at *24–

---

[13]  Boeing's estimates were made in the wake of these cautionary statements and must be treated as subject to them. *See, e.g.*, *Asher*, 377 F.3d at 732; *St. Lucie*, 2011 WL 814932, at *9–*10.

[14]  *See* Ex. 17 at 1 ("[C]ivil aviation authorities … will determine the timing of return to service[.]"); Ex. 20 at 2 ("[T]he principal schedule risk on [return to service] continues to be a regulator alignment around the world and regulator approvals ….  Ultimately return-to-service timing will be determined by the regulator[.]").

25. That court nevertheless concluded that certain statements fell outside the PSLRA's safe harbor because of a conversation in early June 2019 between Muilenburg and then-acting FAA Administrator Elwell. According to the SAC, Elwell asked Muilenburg to "slow down … talk of progress" on return to service. SAC ¶ 245. The *Seeks* court held that this suggestion meant the risk that regulators would disrupt the return-to-service timeline had manifested, rendering the cautionary language not meaningful. Respectfully, the court erred.

First, the PSLRA's text and structure make clear that a speaker's knowledge is irrelevant under the first prong of the safe harbor. By its terms, the first prong examines only the meaningfulness of the cautionary language accompanying the statement, not the speaker's mental state or purported knowledge. The other prong—joined to this subsection of the statute by an "or"—precludes liability for forward-looking statements where "the plaintiff fails to prove" that the individual who made or approved the statement had "actual knowledge" it was false or misleading. 15 U.S.C. § 78u-5(c)(1)(B). Because the PSLRA uses the disjunctive "or" between these provisions, it creates two *independent* safe harbors. It is therefore erroneous to evaluate the meaningfulness of the cautionary language accompanying the return-to-service estimates by considering what Muilenburg supposedly knew at the time of the statements.[15]

In *St. Lucie*, this Court rejected the notion that the speaker's state of mind should be considered when evaluating a forward-looking statement's cautionary language. In that case, Motorola argued that the PSLRA's safe harbor protected its executive's forward-looking earnings projections because the statements were accompanied by meaningful cautionary language. 2011 WL 814932, at *8. Plaintiffs responded that the cautionary language was not meaningful because

---

[15] VRP alleges that Elwell's June 2019 comment was made in a "secret" meeting with Muilenburg and "[u]nbeknownst to … investors" until later that year. *See* SAC ¶ 245; Ex. 26. Elwell's comment is thus potentially relevant only to what was known by Muilenburg, not by investors.

35

the executive was aware that the warned-of risks had "already come to pass."[16]  The Court rejected that argument, explaining that if "a forward-looking statement is accompanied by meaningful cautionary statements, then the state of mind of the individual making the statement is 'irrelevant, and the statement is not actionable regardless of [a] plaintiff's showing of scienter.'"  *Id.* at *9 (quoting *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1112–13 (9th Cir. 2010)).  Other courts in this District have likewise rejected the argument that the meaningfulness of a statement's cautionary language depends on the speaker's state of mind.  *See Plumbers & Pipefitters Loc. Union No. 630 Pension-Annuity Tr. Fund v. Allscripts-Misys Healthcare Sols., Inc.*, 778 F. Supp. 2d 858, 876 (N.D. Ill. 2011); *In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1168 (N.D. Ill. 2004).

Any contrary ruling would read the first prong of the PSLRA safe harbor out of existence.  As Judge Easterbrook explained in *Asher*, 377 F.3d at 729:

> A safe harbor matters only when the firm's disclosures (including the accompanying cautionary statements) are false or misleadingly incomplete; yet whenever that condition is satisfied, one can complain that the cautionary statement must have been inadequate.  The safe harbor loses its function.  Yet it would be unsound to read the statute so that the safe harbor never works; then one might as well treat [the safe harbor] as defunct.

Second, even if the speaker's state of mind were relevant to whether cautionary language is meaningful, the *Seeks* court failed to account for the mismatch between Elwell's alleged comment and Defendants' particular return-to-service estimates.  Even read favorably to VRP, Elwell's alleged statement cannot be read to mean that Boeing should stop making return-to-service estimates altogether, regardless of their substance and even if they included express reminders that the FAA ultimately controlled the process.  Neither Muilenburg's estimate that Boeing was still "looking at" a return to service at the end of summer—three months later—nor

---

[16]  Mem. in Opp'n to Defs.' Mot. to Dismiss at 15, *St. Lucie*, No. 1:10-cv-427 (N.D. Ill. Feb. 28, 2011), ECF No. 66. Ex. 30.

any of his later estimates were inconsistent with a request to slow down "talk of progress."

The second prong of the PSLRA's safe harbor also independently protects the return-to-service projections because VRP pleads no facts showing that Muilenburg, or anyone else who prepared or approved the estimates, had "actual knowledge" they were inaccurate. 15 U.S.C. § 78u-5(c)(1)(B)(i). VRP does not allege that Muilenburg knew in June 2019 that Boeing was not "looking at" the end of the summer as the "timeframe" for the 737 MAX's return to service, or that he knew in September 2019 that Boeing was not "targeting" early fourth quarter for return to service, or that he knew in November 2019 that it was not "possible that the resumption of MAX deliveries to airline customers could begin in December" 2019. SAC ¶¶ 333, 340, 343.

Elwell's alleged request in early June 2019 that Boeing downplay talk of progress does not establish that Muilenburg had "actual knowledge" that his end-of-summer 2019 estimate was inaccurate. And VRP has no theory at all for why Elwell's suggestion supposedly shows that Muilenburg had "actual knowledge" that the *revised* return-to-service estimates in July and September 2019 were false. The November 2019 estimate—nearly five months after Elwell's alleged request and after Boeing had *twice* revised its return-to-service estimates—is even further removed. Because none of these return-to-service estimates is contradicted by Elwell's alleged suggestion, they are protected by the second prong of the PSLRA's safe harbor.

### b. Boeing's return-to-service projections are nonactionable statements of opinion.

Boeing's return-to-service projections are also not actionable as fraud because they are statements of opinion, and VRP's allegations do not plead facts that satisfy the *Omnicare* standard for pleading fraud based on opinions. *See City of Westland Police and Fire Ret. Sys. v. MetLife Inc.¸* 129 F. Supp. 3d 48, 68 (S.D.N.Y. 2015) ("While … estimates involve some factual inputs, they necessarily require judgment and thus are statements of opinion or belief …." (quotation

37

omitted)).  As explained above, VRP does not plead that Muilenburg or anyone responsible for the estimates did not believe they were attainable at the time.  Nor does VRP plead facts showing that the estimates did not fairly align with what the speakers knew at the time of the statements.  This is an independent basis to dismiss all claims based on Defendants' return-to-service estimates.

### B.      The SAC does not adequately plead scienter.

Even if the SAC alleged a material misstatement, VRP fails to plead scienter with the requisite particularity.  Scienter is "an intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham v. Baxter Int'l Inc.*, 495 F.3d 753, 756 (7th Cir. 2007).  To plead scienter, a plaintiff must "state *with particularity* facts giving rise to a *strong inference* that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A) (emphases added).  To be strong, the inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314.  VRP must satisfy this pleading burden with respect to each Defendant and each alleged misstatement. *See Pugh v. Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).  The SAC fails to do so.

### 1.      The SAC does not plead facts giving rise to a strong inference that the speakers knew their statements were false.

The SAC does not create a strong inference that anyone who prepared or approved the statements knew they were false.  In fact, most of VRP's scienter allegations are not tied to any specific individual.  VRP instead resorts to grouping Boeing and Muilenburg together without distinction. *E.g.*, SAC ¶¶ 347–352, 361–362, 366–370.  But allegations of what a corporation "knew" are insufficient because "[i]ntent to deceive is not a corporate attribute." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008) ("*Tellabs III*").  Establishing "corporate liability for a violation of Rule 10b-5 requires look[ing] to the state of mind of the individual

38

corporate official or officials who make or issue the statement (or order or approve it or its making or issuance, or who furnish information or language for inclusion therein, or the like)." *Id.* at 708 (quotation omitted). VRP does not allege with particularity facts supporting a strong inference that Muilenburg or anyone else who prepared or approved any alleged misstatement acted with intent to deceive. As a result, the SAC simply does not plead scienter.

In an attempt to plead scienter for the "safety" and "existing procedures" statements, VRP alleges that Muilenburg and others were updated on the Safety Review Board's investigation. SAC ¶¶ 353–358. But these allegations defeat—rather than support—any inference of intent to deceive. Boeing convened a Safety Review Board immediately after the Lion Air accident to begin considering what factors might have contributed to it. *Id.* ¶¶ 155–156. One possibility identified early on was inappropriate crew response to erroneous MCAS activation. *Id.* ¶ 155. The flight data recorder supported this hypothesis. *Id.* The Safety Review Board thus concluded that Boeing should issue a bulletin reminding flight crews of how to "properly respond" to the conditions encountered on the Lion Air flight. *Id.* ¶ 158. The FAA later issued an emergency airworthiness directive endorsing the guidance in Boeing's bulletin. *Id.* ¶ 165.

The challenged statements regarding the safety of the 737 MAX and the adequacy of existing procedures were consistent with the conclusions of both the Safety Review Board and the FAA. VRP alleges no basis for Muilenburg or anyone else involved in the statements to second-guess what Boeing's technical experts and the FAA had concluded—that existing procedures provided the proper response to an erroneous MCAS activation and, after reminding pilots of those procedures, the 737 MAX remained safe to fly. VRP's allegations thus negate any possible inference of scienter—or, at the very least, render it not "as compelling as [the] opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314.

39

VRP next alleges that a Boeing engineer named Thomas Dodt told Boeing Vice President of Engineering, John Hamilton, that "MCAS could not be controlled after repeated activations and that Boeing had never even tested the hazards associated with repeated MCAS activation." SAC ¶ 357. Setting aside that VRP mischaracterizes what Dodt actually said, neither of these purported statements would have given Boeing's technical experts—much less Muilenburg—reason to believe that the airplane was unsafe to fly or that pilots could not counter an erroneous MCAS activation using the runaway stabilizer procedure. To the contrary, the Safety Review Board was well aware that, *without a proper pilot response*, repeated MCAS activations could result in a mis-trim condition that would make it difficult to control the aircraft. The November 6 bulletin advised flight crews that the stabilizer could "reach the nose down limit" if pilots did not execute the runaway stabilizer procedure. Ex. 1 at 1. The FAA's airworthiness directive likewise noted this risk and instructed pilots to follow the same procedures highlighted in Boeing's bulletin. SAC ¶ 165; *see also* Ex. 2 at 1. In short, both the Safety Review Board and the FAA concluded that—notwithstanding whatever Dodt might have told Hamilton—existing procedures were sufficient to respond to erroneous MCAS activation and the 737 MAX remained safe to fly. The fact that the Safety Review Board and the FAA were aware of these facts refutes any possible inference that Muilenburg acted with scienter when he spoke.

In any event, VRP does not even allege that Hamilton reported Dodt's message to Muilenburg. VRP at most alleges that Hamilton generally updated Muilenburg on the Safety Review Board's conclusions and the internal investigation's findings. SAC ¶¶ 157, 161. These group-pled, general allegations are not a basis to attribute *Hamilton*'s alleged knowledge to Muilenburg. *See Tellabs III*, 513 F.3d at 710.

VRP next attempts to plead scienter by alleging that Muilenburg learned in January 2019

about a 2016 instant message exchange involving a Boeing technical pilot, Mark Forkner, regarding what he believed was an MCAS malfunction in flight simulator testing. SAC ¶¶ 135, 213, 348. Although VRP suggests that Muilenburg's awareness of these messages supports an inference of scienter, the SAC never identifies which statements would be implicated, and the suggested inference is implausible.

As an initial matter, VRP alleges only that Muilenburg was informed *about* the Forkner messages, not that he examined them, and VRP does not specify what Muilenburg was told. *Id.* ¶ 213. The messages described Forkner's experience in a *simulator*—nothing in the messages indicates that Forkner expressed concerns about the safety of the airplane itself. *Id.* ¶ 135. VRP also does not explain what Forkner's comment meant, what caused the 2016 simulator issue, what actions Boeing took in response, or why Muilenburg should have viewed the messages as casting doubt on the 737 MAX's safety or certification when the message involved a simulator, especially when he learned of it *after* the FAA's intensive regulatory engagement following the first accident.

Moreover, Forkner's interactions with the FAA did *not* relate to the design of the aircraft or the FAA's certification of that design as airworthy. Rather, Forkner's "[t]eam was *separate and distinct* from" the "group within Boeing that was responsible for providing information to the FAA for certification of whether the airplane met U.S. federal airworthiness standards," and "others in the Company *disclosed* MCAS's expanded operational scope to" the FAA group responsible for certifying airworthiness. Ex. 27 at ¶ 4h, Statement of Facts ¶ 11 (emphasis added). Against this backdrop, the SAC's allegations regarding the Forkner messages cannot support any inference, much less a "compelling" inference, that Muilenburg knew his statements about the 737 MAX's design, safety, and certification were false or misleading.

With respect to the return-to-service statements, VRP alleges that then-acting FAA

41

Administrator Elwell's alleged request to Muilenburg in early June 2019 to "slow down … talk of progress" on return to service should have alerted Muilenburg that Boeing's later return-to-service projections over the next five months were too optimistic. SAC ¶ 362. These allegations cannot support a strong inference of scienter because the SAC fails to point to anything that Elwell (or anyone else) allegedly said that contradicted Boeing's return-to-service estimates at the time those estimates were made between June and November 2019. *See supra* at 36–37. The notion that Boeing was lying to the public during that five-month period while its regulator stood by silently, refusing to correct those estimated dates, defies credulity.

VRP's final scienter theory is based on the SAC's allegations that an employee at one of Boeing's production facilities, Edward Pierson, raised concerns about production quality to the head of Boeing's 737 MAX program in the summer of 2018 and sent a letter raising similar issues to Muilenburg in December 2018, two months after the Lion Air accident. SAC ¶¶ 144, 211. These allegations do not support any inference of scienter for at least two reasons. First, VRP does not allege that Pierson's concerns about *production issues* had anything to do with the supposed *design flaws* related to MCAS that are the focus of the SAC. Nor does VRP suggest that any alleged misstatements touched on those production issues. Second, the letter Pierson allegedly sent Muilenburg does not support scienter because knowledge of *accusations* does not constitute knowledge of *misconduct*. *Pugh*, 521 F.3d at 695 (holding that allegation that lawsuits filed against defendants made them aware of fraud "completely misses the boat" because litigation confers knowledge only "of *accusations* of fraud, not fraud itself"). VRP does not allege what, if anything, Muilenburg learned about the accuracy of any of Pierson's accusations, or how any such knowledge could support scienter for statements entirely unrelated to production.

### 2. The SAC's circumstantial allegations of scienter are insufficient.

VRP attempts to craft a circumstantial case for inferring scienter, but these circumstantial

42

allegations come no closer to pleading the required "strong inference." VRP first alleges that the 737 MAX was an "integral part" of Boeing's business, highlighting that the 737 MAX accounts for an outsized portion of the Company's annual revenue. SAC ¶ 365.[17] But courts in this District routinely reject such "core operations" theories of scienter. *See Société Générale Sec. Servs., GBMH v. Caterpillar, Inc.*, 2018 WL 4616356, at \*8 (N.D. Ill. Sept. 26, 2018); *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at \*9 (N.D. Ill. July 12, 2006). And for good reason: the core operations theory is antithetical to the PSLRA's requirement to plead scienter "with particularity." 15 U.S.C. § 78u-4(b)(1). Just because executives generally stay abreast of their company's key operations does not mean they know every fact about them. Especially in a case like this involving a company that makes many highly complex products consisting of thousands of different parts and systems, spanning a spectrum of specialized fields, there is no basis to infer that Boeing's CEO was familiar with every detail of a particular aircraft's software design or certification, and the SAC does not allege facts establishing Muilenburg's exposure to that information. The Court should reject this theory of scienter.

VRP's next circumstantial allegation is that Boeing employees were "concerned about emphasizing MCAS to the FAA" during the 737 MAX's development because it could have resulted in a higher level of pilot training, which "would have been prohibitively expensive and time-consuming for airlines, and, by extension, Boeing." SAC ¶ 349. This theory cannot support any inference of scienter with respect to any of the alleged misstatements because none of them concern the level of required pilot training.

---

[17]    VRP also alleges that the fact that the 737 Max was an "integral part" of Boeing's business supplied "both motive and opportunity to commit fraud." SAC ¶ 366. But VRP merely recites the alleged business considerations underlying Boeing's decision to remodel the 737 NG. *Id.* Allegations of motive that "merely reflect[] the desire common to corporate insiders for their company to be successful and profitable" are insufficient to raise an inference of scienter absent any allegation that Defendants "benefitted in some concrete and personal way from the purported fraud[.]" *In re Neurotrope, Inc. Sec. Litig.*, 315 F. Supp. 3d 721, 735 (S.D.N.Y. 2018).

Finally, VRP speculates that Muilenburg's resignation in December 2019 is evidence of scienter. *Id.* ¶ 363. But nothing about his departure, nine months after the second accident, supports an inference of scienter. The more natural inference is straightforward: two planes had tragically crashed and the 737 MAX fleet had been grounded for nine months, with dire financial consequences for Boeing, all of which, not surprisingly, led to the CEO's departure. The SAC alleges no facts suggesting that Muilenburg resigned because anyone had engaged in fraud. *See Zucco Partners v. Digimarc Corp.*, 552 F.3d 981, 1002 (9th Cir. 2009) (finding no inference of scienter where complaint merely alleged CFO's resignation was in close proximity to alleged fraud); *In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240, 249 (8th Cir. 2008) (similar).

Because the SAC is devoid of particularized factual allegations giving rise to an inference that Muilenberg or anyone else who prepared or approved the statements did so with an intent to deceive, VRP fails to satisfy the first part of the scienter analysis, and the SAC should be dismissed.

### 3. The more compelling inference from the SAC's allegations is that Defendants did not act with scienter.

VRP fails entirely to establish that the inference of scienter is "at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs II*, 551 U.S. at 314. In applying this part of the test, the Court "must weigh the strength of the plaintiffs' inferences in comparison to plausible nonculpable explanations for the defendants' conduct." *Pugh*, 521 F.3d at 693.

Here, the opposing inference of nonfraudulent intent is far more compelling. As VRP acknowledges, "in the hours following" the first accident, Boeing convened experts in an effort to understand what may have contributed to the accident and identified a possible scenario involving MCAS activation. SAC ¶ 155. Boeing officials also met with the FAA to explain the details of MCAS. *Id.* ¶ 164. Within a week, Boeing issued a bulletin to operators, reinforcing the relevant flight procedure to follow should pilots encounter the conditions experienced on the Lion Air

flight. *Id.* ¶¶ 169–170. The next day, the FAA issued an emergency airworthiness directive that gave pilots the same guidance. *Id.* ¶ 165. And in the weeks and months that followed, Boeing engaged in extensive additional dialogue with the FAA and other regulators in an effort to understand the causes of the two accidents and evaluate possible additional safety measures. *See, e.g.*, Ex. 6. These allegations show that Boeing moved swiftly after the accidents to understand potential causes and to share information with pilots, all in close coordination with regulators.

VRP's competing inference—that Boeing's most senior executives knew the 737 MAX was unsafe, knew the design and certification process was flawed, knew pilots could not counteract an erroneous MCAS activation using existing procedures, and knew that the 737 MAX would not return to service on their estimated timetable, and then lied about all of those issues—is wholly implausible. In fact, VRP's proffered inference makes little sense. For example, if Muilenburg and others knew existing procedures would not work, then why would Boeing voluntarily issue a bulletin advising pilots to follow those procedures? What gain could Boeing possibly hope to achieve from giving flight crews ineffective instructions? And why would the FAA give the same guidance to pilots? The SAC's allegations cannot answer these questions.

The far more compelling inference is that Muilenburg and others at Boeing (1) believed the Company had manufactured a safe aircraft; (2) believed the design and certification process was robust; (3) believed that pilots had the information and training to safely address an erroneous MCAS activation using existing procedures, particularly after Boeing issued the bulletin to operators and the FAA endorsed it; and (4) after the grounding, believed that Boeing was making progress toward the aircraft's safe return to service and expected to complete the process on the disclosed timetables. The Court should accordingly dismiss the SAC for failure to plead scienter.

### C. The SAC does not adequately plead loss causation.

The SAC should also be dismissed because it does not adequately plead loss causation. To

45

plead loss causation, a plaintiff must allege a causal nexus between the alleged misstatements and the losses the plaintiff seeks to recover. *Dura Pharm.*, 544 U.S. at 342. The plaintiff thus must allege facts showing "that it was the very facts about which the defendant lied which caused its injuries," rather than ordinary market forces or business reversals. *Tricontinental Indus., Ltd. v. PwC LLP*, 475 F.3d 824, 842 (7th Cir. 2007). A plaintiff must plead facts showing that when the truth concealed by an alleged misstatement emerged—referred to as a "corrective disclosure"— the value of the company's stock declined as a result. *Dura Pharm.*, 544 U.S. at 346–47.

The SAC alleges four purported corrective disclosures. But it fails to plead a connection between the stock-price declines on those dates and the *correction* of any alleged misstatement.

July 24, 2019: The SAC alleges Boeing's stock price declined when "Muilenburg hinted at the possibility that production for the 737 MAX could be halted altogether" if the grounding of the MAX continued. SAC ¶ 391. VRP asserts that this disclosure revealed that "[t]he 737 MAX was fundamentally unsafe and could not be fixed by way of a quick and easy change to MCAS." *Id.* ¶ 392. This leap in logic is unsupported. The SAC nowhere explains how a statement that "hinted at the possibility" of a production halt—which on its face said nothing about the safety of the 737 MAX or MCAS—revealed the falsity of any of Defendants' prior statements, none of which concerned whether Boeing would continue producing the 737 MAX during its grounding.

Beyond this disconnect, the possibility of a production halt was not news as of July 24, 2019. Boeing had previously delivered the same warning to investors in its first quarter 10-Q, filed on April 24, 2019, disclosing that delays in returning the 737 MAX to service "could result in additional disruption to the 737 production system, including further reductions in the production rate *and/or a temporary cease of production*." Ex. 11 at 50 (emphasis added). An alleged disclosure that contains no new information is not a *corrective* disclosure that can support

46

a plausible inference of loss causation. *See Katyle v. Penn Nat'l Gaming, Inc.*, 637 F.3d 462, 473 (4th Cir. 2011); *see also In re Omnicom Sec. Litig.*, 597 F.3d 501, 513 (2d Cir. 2010). For this reason, neither court in the other securities actions involving Boeing concluded that the alleged disclosure on July 24, 2019, supported loss causation for any of the statements challenged here. *See Coll. Ret. II*, 2026 WL 891657, at *8; *Seeks II*, 752 F. Supp. 3d at 1021–24, 1026–27; *Coll. Ret. I*, 2023 WL 6065260, at *24; *Seeks I*, 2022 WL 3595058, at *29.

October 18, 2019: On October 18, 2019, *The New York Times* published an article containing the 2016 Forkner instant messages. These messages included highly inflammatory language about Forkner's dealings with the FAA, including the statement that he "basically lied to the regulators (unknowingly)." SAC ¶ 135. As such, the publication of these messages reflected concerning conduct by Forkner and another Boeing employee, and their publication in *The New York Times* was embarrassing to Boeing and damaging to its business. This headline news also came at a time when Boeing was already under intense media and regulatory scrutiny and days before its then-CEO, Dennis Muilenburg, was set to testify before Congress. *See id.* ¶ 265. Not surprisingly, Boeing's stock price dropped after *The New York Times* published Forkner's messages. As troubling as they were, however, the messages corrected no prior misstatements. Publication of the messages would have negatively affected Boeing's business and inevitably weighed on its stock price even if Defendants had made none of the challenged statements.

Moreover, the Forkner messages did not reveal any new information about the 737 MAX's design and certification. Defendants' statements addressed the 737 MAX's design from an *engineering* perspective and its certification as airworthy under federal regulations. *Supra* at 26–30. Forkner was not an engineer, and he did not work on certifying the 737 MAX as a safe aircraft. *See* SAC ¶¶ 75–76, 124. Instead, Forkner's messages related to his communications with the FAA

47

group responsible for evaluating the pilot-training requirements for the 737 MAX. Another group at the FAA was responsible for certifying the 737 MAX's design as airworthy, and Boeing fully disclosed the expanded operation of MCAS to the FAA "personnel who were responsible for determining whether the 737 MAX met U.S. federal airworthiness standards." Ex. 27 ¶ 4(h).

Similarly, the messages did not reveal any new information about the safety of the 737 MAX. By the time *The New York Times* published the messages, the market understood that MCAS was a common factor in the Lion Air and Ethiopian Airlines accidents, and the 737 MAX had been grounded worldwide for seven months. *See* SAC ¶¶ 226, 238. Numerous articles had also examined MCAS's design and development in great detail, highlighting the very features VRP says made the aircraft unsafe. *E.g.*, Exs. 8, 14. And, as VRP acknowledges, Boeing had already announced that it was working on a software redesign for MCAS. SAC ¶ 223; Ex. 6 at 1 (Mar. 11, 2019, software announcement). In short, Forkner's messages were "not breaking news" insofar as they addressed MCAS, and "[t]he extent of public awareness is fatal to the plaintiffs' loss causation theory." *Holwill v. AbbVie Inc.*, 2025 WL 1908156, at \*21 (N.D. Ill. July 10, 2025). "It stands to reason, then, that the mere publication of" the Forkner messages "altered share prices for reasons unrelated to any correction of a defendant's prior misstatement." *Id.*

The messages also did not reveal any new information about existing procedures. The messages say nothing at all about the runaway stabilizer procedure or whether pilots could use it to counteract an erroneous MCAS activation. There also was considerable public discussion about the perceived shortcomings of those procedures in the weeks and months after the Ethiopian Airlines accident—well before the Forkner messages became public in October 2019. *E.g.*, Exs. 10, 9. Again, given all the facts in the public record, the Forkner messages disclosed no new information that "corrected" the statements about the sufficiency of existing procedures.

Finally, the Forkner messages did not correct Defendants' estimates of when the 737 MAX might return to service. Although the SAC quotes analyst reports suggesting that the publication of the messages might adversely affect Boeing's relationship with the FAA and thus delay the 737 MAX's ultimate return to service, SAC ¶¶ 398–400, that does not show that Boeing's previous estimates were false when made. Analysts instead speculated that publication of the messages could potentially delay the 737 MAX's return to service going forward by negatively affecting Boeing's relationship with the FAA after October 2019.

October 20, 2019: VRP next cites a *Wall Street Journal* article published on October 20, 2019, addressing a three-year-old Boeing survey showing that some workers "felt 'potential undue pressure' from managers regarding safety-related approvals by federal regulators across an array of commercial planes." *Id.* ¶ 396. But VRP fails to identify any corrective information in this article relevant to the alleged misstatements. The results of a general survey of employees "across an array of commercial planes" cannot plausibly be understood to say anything specific about the 737 MAX program, let alone MCAS or the 737 MAX's pilot manuals. *Id.*

December 16, 2019: On December 16, 2019, Boeing announced that it was temporarily suspending production of the 737 MAX. *Id.* ¶ 401. Again, this development negatively affected Boeing's business going forward and caused Boeing's stock price to decline—something that would have happened even if none of the challenged statements had been made. Although VRP does not identify which statements this disclosure supposedly corrected, the production-halt announcement could plausibly relate only to the return-to-service estimates. But the December 16 announcement revealed no new corrective information about the 737 MAX's return to service.

All but one of the challenged statements predicted that the 737 MAX would return to service "early in the fourth quarter" of 2019 or even earlier. *Id.* ¶¶ 333, 335, 337–338, 340–341.

49

Each of these statements was already "corrected" by the passage of time before December 16. By that date, the market already understood that return to service would not occur by the "end of summer," "in the September timeframe," or "early in the fourth quarter" of 2019. *Id.*

That leaves only the November 11, 2019, statement that "it is possible that the resumption of MAX deliveries to airline customers could begin in December." *Id.* ¶ 343. VRP's own allegations establish, however, that this statement also was corrected before December 16. VRP acknowledges that on December 12, four days earlier, the market learned that the 737 MAX "would not be returned to service until 2020." *Id.* ¶ 275. VRP quotes a December 12 *Reuters* article that reported the 737 MAX would not return to service on the predicted timeline. *Id.* ¶ 274; *see* Ex. 25. Numerous outlets released similar reports, such as one in *The Seattle Times* on December 12 that the timeline had slipped to mid-February 2020. Ex. 24; *see* Exs. 23, 22.

VRP's pleadings thus leave no doubt that the December 16 production-halt announcement was not a corrective disclosure for the challenged return-to-service statements. As the Court in the related class action recently held, "the December 11 and 12, 2019 publications had already made the market aware of the 737 MAX's 2020 return-to-service and Boeing's disconnect with the FAA, with no price drop on those dates, so the fall in Boeing's stock on December 16, on its own, does not demonstrate that the price decline was in response to *new* corrective information." *In re Boeing Co. Aircraft Sec. Litig.*, 2026 WL 734721, at \*21.[18]

<h3 style="text-align:center"><b><u>CONCLUSION</u></b></h3>

For the foregoing reasons, the Court should dismiss the SAC in its entirety with prejudice.[19]

---

[18] VRP alleges that the Funds purchased Boeing stock on several dates in early 2020. *See* SAC Exs. A, B. VRP does not plead loss causation related to these transactions because they occurred *after* the last alleged corrective disclosure on December 16, 2019, by which time alleged misstatements were all "corrected." SAC ¶¶ 388–402.

[19] Because VRP fails to allege a primary violation of Section 10(b), it also fails to state a Section 20(a) claim against Muilenburg. *See Pugh*, 521 F.3d at 693.

Dated: May 5, 2026

Respectfully submitted,

*/s/ John F. Hartmann*
John F. Hartmann, P.C.
Brenton A. Rogers, P.C.
Jules H. Cantor
KIRKLAND & ELLIS LLP
333 West Wolf Point Plaza
Chicago, Illinois 60654
(312) 862 2000
john.hartmann@kirkland.com
brenton.rogers@kirkland.com
jules.cantor@kirkland.com


*Counsel for Defendants*

51

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 5, 2026, a true and correct copy of the foregoing document

was served on all counsel of record via the Court's CM/ECF system.

*/s/ John F. Hartmann*
John F. Hartmann, P.C.